**A**

| 2120 - Served | 2121 - Served | |
|---|---|---|
| 2220 - Not Served | 2221 - Not Served | |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| **SUMMONS** | **ALIAS - SUMMONS** | **(2/28/11) CCG N001** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, _____Law_____ **DIVISION**

2016L006604
CALENDAR/ROOM H
TIME 00:00
No. ___Tort - Intentional___

Please Serve: Oxford Financial Group, Ltd.

Richard D. Doermer, et al.,
_____
(Name all parties)

c/o Laura Clark, Registered Agent

v.

980 N Michigan Ave. #1500, Chicago, IL 60611

Oxford Financial Group, Ltd.
_____

## ◉ SUMMONS ○ ALIAS SUMMONS

**To each Defendant:**

   YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

   ◉ **Richard J. Daley Center, 50 W. Washington, Room** 801_____, **Chicago, Illinois 60602**

   ○ **District 2 - Skokie**          ○ **District 3 - Rolling Meadows**      ○ **District 4 - Maywood**
   5600 Old Orchard Rd.            2121 Euclid                          1500 Maybrook Ave.
   Skokie, IL 60077               Rolling Meadows, IL 60008            Maywood, IL 60153

   ○ **District 5 - Bridgeview**      ○ **District 6 - Markham**              ○ **Child Support**
   10220 S. 76th Ave.             16501 S. Kedzie Pkwy.                28 North Clark St., Room 200
   Bridgeview, IL 60455          Markham, IL 60428                    Chicago, Illinois 60602

**You must file within 30 days after service of this Summons, not counting the day of service.**
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

**To the officer:**

   This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 12453_____          WITNESS, _____, _____

Name: Cafferty Clobes Meriwether & Sprengel LLP

Atty. for: Plaintiff

Address: 150 South Wacker Drive, Suite 3000          _____
                                                    Clerk of Court
City/State/Zip: Chicago, IL 60606

Telephone: 312-782-4880                             Date of service: 7/31/16
                                                    (To be inserted by officer on copy left with defendant
                                                    or other person)

Service by Facsimile Transmission will be accepted at: _____
                                                       (Area Code)  (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

P : DATE
07/29/2016

DOC.TYPE:   LAW
CASE NUMBER:   16L006604
**DEFENDANT**
OXFORD FINANCIAL GROUP LTD
980 N MICHIGAN AVE
CHICAGO, IL 60611
1500

SERVICE INF
RM 801 CO L

ATTACHED



**Civil Process**
**Service Lookup**

THOMAS J DART

Select Language
Powered by Google Translate

## Search Results:

| Sheriff # | Name | Address | Status |
|-----------|------|---------|--------|
| 02156724 | OXFORD FINANCIAL GROUP LTD | 980 N MICHIGAN AVE 1500, CHICAGO, IL 60611 | SERVED |

**Service Date/Time:**    7/25/2016   1:25:00 PM

Service Type:    Service on a Corporation/Company/Business /Partnership

Served on:    ANN CONWAY A\P , White female

Remarks:    RECEPTIONIST

Search Again

By using this search tool, you acknowledge that you understand that it is solely your responsibility to verify any information you may obtain herein before relying on said information for any type of legal action.

Cook County Sheriff's Office Civil Division • 50 W. Washington, Room 701
Chicago, IL 60602 • **(312) 603-3365**

Civil Action Cover Sheet - Case Initiation          (11/06/13) CCL 0520

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

Richard D. Doermer, et al.,

v.

Oxford Financial Group, Ltd.

No. 2016L006604
CALENDAR/ROOM H
TIME 00:00
Tort - Intentional

(FILE STAMP)

### CIVIL ACTION COVER SHEET - CASE INITIATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the complaint in all civil actions. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate case type which best characterizes your action. Only one (1) case type may be checked with this cover sheet.

Jury Demand ☑ Yes ☐ No

### PERSONAL INJURY/WRONGFUL DEATH
CASE TYPES:
- ☐ 027 Motor Vehicle
- ☐ 040 Medical Malpractice
- ☐ 047 Asbestos
- ☐ 048 Dram Shop
- ☐ 049 Product Liability
- ☐ 051 Construction Injuries
  (including Structural Work Act, Road Construction Injuries Act and negligence)
- ☐ 052 Railroad/FELA
- ☐ 053 Pediatric Lead Exposure
- ☐ 061 Other Personal Injury/Wrongful Death
- ☒ 063 Intentional Tort
- ☐ 064 Miscellaneous Statutory Action
  (Please Specify Below**)
- ☐ 065 Premises Liability
- ☐ 078 Fen-phen/Redux Litigation
- ☐ 199 Silicone Implant

### TAX & MISCELLANEOUS REMEDIES
CASE TYPES:
- ☐ 007 Confessions of Judgment
- ☐ 008 Replevin
- ☐ 009 Tax
- ☐ 015 Condemnation
- ☐ 017 Detinue
- ☐ 029 Unemployment Compensation
- ☐ 031 Foreign Transcript
- ☐ 036 Administrative Review Action
- ☐ 085 Petition to Register foreign Judgment
- ☐ 099 All Other Extraordinary Remedies

### COMMERCIAL LITIGATION
CASE TYPES:
- ☐ 002 Breach of Contract
- ☐ 070 Professional Malpractice
  (other than legal or medical)
- ☐ 071 Fraud (other than legal or medical)
- ☐ 072 Consumer Fraud
- ☐ 073 Breach of Warranty
- ☐ 074 Statutory Action
  (Please specify below.**)
- ☐ 075 Other Commercial Litigation
  (Please specify below.**)
- ☐ 076 Retaliatory Discharge

### OTHER ACTIONS
CASE TYPES:
- ☐ 062 Property Damage
- ☐ 066 Legal Malpractice
- ☐ 077 Libel/Slander
- ☐ 079 Petition for Qualified Orders
- ☐ 084 Petition to Issue Subpoena
- ☐ 100 Petition for Discovery

** Fiduciary duty and negligence

Service via email from opposing party/counsel will be accepted at:

By: Cafferty Clobes Meriwether & Sprengel LLP  12453
(Attorney)

by consent pursuant to Ill. Sup. Court Rules 11 and 131.

<u>Pro Se Only:</u> ☐ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice from the Clerk's office for this case at this email address: _____

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

## CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| RICHARD D. DOERMER, as a Beneficiary of the RICHARD DAVID DOERMER—KATHRYN DOERMER CALLEN ISSUE TRUST dtd July 28, 2004, and RICHARD D. DOERMER, as Co-Trustee on behalf of the RICHARD DAVID DOERMER—KATHRYN DOERMER CALLEN ISSUE TRUST dtd July 28, 2004,<br><br>Plaintiffs,<br><br>and<br><br>KATHRYN DOERMER CALLEN as a Beneficiary and Co-Trustee of the RICHARD D. DOERMER—KATHRYN DOERMER CALLEN ISSUE TRUST dtd July 28, 2004,<br><br>Involuntary Plaintiff,<br><br>vs.<br><br>OXFORD FINANCIAL GROUP, LTD<br><br>Defendant. | No. 2016L006604<br>CALENDAR/ROOM H<br>TIME 00:00<br>Tort — Intentional<br><br>Judge<br><br>JURY DEMANDED |

## <u>COMPLAINT</u>

Plaintiff Richard D. Doermer, as a beneficiary of the Richard David Doermer—Kathryn Doermer Callen Issue Trust dtd July 28, 2004 (hereafter the "Issue Trust"), and plaintiff Richard D. Doermer, as co-trustee on behalf of the Issue Trust, by and through their attorneys, Cafferty Clobes Meriwether & Sprengel LLP, demand a jury and make the following allegations against defendant Oxford Financial Group, Ltd. Hereafter, where appropriate plaintiff Richard D. Doermer, as a beneficiary of the Issue Trust and plaintiff Richard D. Doermer as co-trustee on behalf of the Issue Trust will be referred to jointly as "Richard Doermer."

THE PARTIES

1.      Richard Doermer, of Chicago Illinois, is a named beneficiary and a co-trustee of the Richard David Doermer—Kathryn Doermer Callen Issue Trust dtd July 28, 2004 (hereafter, "Issue Trust). He brings this action and files this complaint as plaintiff Richard D. Doermer, as a beneficiary of the Issue Trust, and as plaintiff Richard D. Doermer as co-trustee on behalf of the Issue Trust. He brings this action and files this complaint in no other capacity.

2.      Defendant Oxford Financial Group, Ltd. is one of the largest Registered Investment Adviser ("RIA") firms in the country. It provides investment advice and financial planning services, and it provides families generational estate planning advice and investment strategies. Its home office is in Carmel, Indiana, and it has offices in Chicago, Illinois, Cincinnati, Ohio; Minneapolis, Minnesota; Indianapolis, Indiana; and Grand Rapids, Michigan. Its Chicago business office is located at:980 North Michigan Ave. # 1080, Chicago, IL 60611. Hereafter Oxford Financial Group, Ltd. shall be referred to as "Oxford Financial."

3.      As an RIA firm, Oxford Financial is subject to oversight by the Securities Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA") and owe their clients a fiduciary duty.

4.      Oxford Financial has oversight of more than $20 Billion in assets (which includes assets under management) for over 700 families and institutions in 37 states. The firm specializes in serving clients with net worth above $5 Million.

5.      Involuntary plaintiff Kathryn Doermer Callen (hereafter referred to as Kathryn Callen) is a beneficiary and co-trustee of the Issue Trust. Like plaintiff Richard Doermer, as a beneficiary of the Issue Trust she will benefit if the trust is enhanced and she will be damaged and suffer losses if the trust is dissipated or suffers losses. Like Richard D. Doermer, as a co-

2

trustee of the Issue Trust she owes a fiduciary duty to protect the interests of the Issue Trust. Kathryn Callen's conduct as a co-trustee of the Issue Trust is a material and relevant factor in the case. As a beneficiary and co-trustee of the Issue Trust, in Kathryn Callen's absence the Court will not be able to accord proper and complete relief among the existing parties and the subject matter of the controversy would be materially affected by her absence because her conduct as a co-trustee is a material factor in the case.

6.    Plaintiff Richard Doermer does not ask for or seek any relief or recovery against involuntary plaintiff Kathryn Callen personally, or as a beneficiary or as co-trustee of the Issue Trust.

7.    Plaintiff Richard Doermer has given notification and has made a written request to involuntary plaintiff Kathryn Callen to voluntarily join in this lawsuit as a plaintiff but she has refused. A copy of the letter is attached, Exhibit A.

<u>THE ISSUE TRUST</u>

8.    The settlor of the Issue Trust is Richard T. Doermer (deceased), father of Richard Doermer and Kathryn Callen, his only children; hence, the trust being named the "Issue Trust." Richard Doermer was born March 1, 1951; Kathryn Callen was born April 8, 1955. A copy of the Issue Trust is filed herewith as Exhibit B. The preamble to the Issue Trust (Ex. B at ( i ) reads as follows:

> Agreement of July 28, 2004 establishing "The Richard David Doermer—Kathryn Doermer Callen Issue Trust"
>
> This Issue Trust is particularly designed (i) to provide for the health, support, maintenance, education, well-being and best interests of the two Doermer children, (ii) to provide or aid to, through six charities identified in Article 1, funds designed to serve the needs of a number of charitable and civic causes of particular interest to the Doermer family, and (iii) to provide an additional source of direct payment to education, medical and health care providers for the benefit of all Doermer children, grandchildren, their spouses and their descendants.

3

9.     The primary beneficiaries of the Issue Trust are: Richard Doermer and Kathryn Callen; the settlor's grandchildren, Caitlin McNabb Doermer (child of Richard Doermer) and John Michael Callen (child of Kathryn Callen), Thomas Bradford Callen (child of Kathryn Callen), Mary McNabb Callen (child of Kathryn Callen), and Abigail Marie Bergeron (child of Kathryn Callen); and six charities including, The Roman Catholic Diocese of Fort Wayne-South Bend, Inc., of Fort Wayne, Indiana; University of Notre Dame, of South Bend, Indiana; The Community Foundation of Greater Fort Wayne, of Fort Wayne, Indiana; and Indiana-Purdue Foundation at Fort Wayne, of Fort Wayne, Indiana. See Ex. B, Article 1 at 1-2.

10.     The Issue Trust was originally governed and administered by Richard Doermer and Kathryn Callen as individual co-trustees and by the Bank One Trust Company, as corporate co-trustee. Ex. B at ( i ). Pursuant to the merger of Bank One Trust Company and JP Morgan Chase Bank, JP Morgan Chase Bank became the corporate co-trustee. Hereafter, JP Morgan Chase Bank shall be referred to as "JP Morgan."

11.     The situs of the Issue Trust was originally in the State of Indiana. Ex. B, Article X11, ¶ 12-D at 66.

12.     On October 11, 2010, the settlor of the Issue Trust, Richard T. Doermer, died.

## COUNT I

## BREACH OF FIDUCIARY DUTY AND NEGLIGENCE

13.     After the settlor of the Issue Trust died, Richard Doermer and Kathryn Callen could not agree with respect to the investment management of the Issue Trust's securities and assets. Generally, Richard Doermer favored diversifying and having suitability and suitable investment allocation for investments of the Issue Trust and its securities and assets. Kathryn Callen favored limitations and restrictions for investments of the Issue Trust and its securities

4

and assets. As a result of their irreconcilable differences as co-trustees, the corpus of the Issue

Trust and its securities and assets remained inactive and un-invested and without diversification

and without investment suitability and suitable investment allocation. The wealth management

of the Issue Trust was virtually non-existent and frustrated.

14. As a result, in or about January 2012, Kathryn Callen as co-trustee and on behalf

of the Issue Trust retained defendant Oxford Financial to advise and give her advice and

guidance in the trust administration and management of the trust including her dispute with

Richard Doermer involving the non-investment and wealth management of the trust and its

securities and assets. Oxford Financial was paid from and directly by the Issue Trust for their

services.

15. Two employees and agents of Oxford Financial, and other employees and agents

of Oxford Financial, began to advise and give guidance to Kathryn Callen in the administration

and management of the Issue Trust including her dispute with Richard Doermer involving

securities and asset investments and the wealth management of the trust and its securities and

assets. The two employees and agents of Oxford Financial are:

> (1) Debora A. Bennett, of Carmel, Indiana, an employee, agent and a Managing
> Director at Oxford Financial Group. She is involved in its financial planning,
> banking, trust and investment strategies. She is a Certified Financial Planner
> ("CFP"), which consists of postgraduate study in the fields of investments,
> insurance, taxation, retirement and estate planning. She also holds a financial
> industry securities registration subject to FINRA (Financial Industry Regulatory
> Authority) oversight having passed securities examinations which include
> FINRA's Series 65 (Uniform Investment Adviser Law Examination);

> (2) Lorelei M. Tolson, of Carmel, Indiana, an employee, agent and a Managing
> Director at Oxford Financial Group. She is an Investment Advisor Representative
> ("IAR") working for Oxford Financial Group. She is, like Debora A. Bennett, a
> Certified Financial Planner ("CFP"). She is also a CPA (Certified Public
> Accountant); a Personal Financial Specialist ("PFS"), which is a specialty
> credential awarded by the American Institute of Certified Public Accountants to
> CPAs who specialize in helping individuals plan all aspects of their wealth; a

Certified Investment Management Analyst ("CIMA"), which is a certification program designated specifically for financial professionals who want to attain a level of competency as an advanced investment consultant; a Certified Exit Planning Advisor ("CEPA"), which is an advanced certification for business transition planning or exit planning professionals; and a Certified Exit Planner ("CExP"), which is an advanced certification for business transition planning or exit planning professionals.

16. During all relevant and material times relating to the allegations and issues involved and alleged in this complaint and the case, Oxford Financial, Debora A. Bennett, and Lorelei M. Tolson had a fiduciary duty to the Issue Trust to act in the best interest of the Issue Trust and protect the interests of the Issue Trust and not be negligent by giving negligent, wrongful, improper and unsuitable advice, planning, strategies and directions to Kathryn Callen, a co-trustee of the Issue Trust.

17. Oxford Financial, Debora A. Bennett, and Lorelei M. Tolson breached their fiduciary duty to the Issue Trust to act in the best interest of the Issue Trust and protect the interests of the Issue Trust and were negligent by causing the Issue Trust not to be converted to a direct trust and divided into two separate individual trusts, and causing the Issue Trust to be dissipated and suffer losses and lose reasonable potential gains by causing the corpus of the Issue Trust and its securities and assets to remain inactive and un-invested and without diversification and without investment suitability and suitable investment allocation, when it was suitable and reasonable for the Issue Trust and its securities and assets to have been greatly enhanced and to make great gains by becoming active and invested and diversified with suitable investment allocation during all relevant and material times relating to the allegations and issues involved and alleged in this complaint and the case.

18. In or about March 2012 Oxford Financial, Debora A. Bennett, and Lorelei M. Tolson advised Kathryn Callen to have the Issue Trust divided into two separate individual

trusts, one trust being for Kathryn Callen and her family lineage and the other trust being for Richard Doermer and his family lineage. The administration and investment management of each separate trust would be done separately and respectively by Kathryn Callen for her separate individual trust, and Richard Doermer for his separate individual trust.

19.    The proposal to divide the Issue Trust into two separate individual trusts was made to Richard Doermer, and he accepted and agreed to the proposal.

20.    Pursuant to their agreement to divide the Issue Trust, Kathryn Callen and Richard Doermer agreed to replace JP Morgan with Bankers Trust Company of South Dakota, and to move the situs of the Issue Trust from Indiana to South Dakota to take advantage of its favorable trust laws. Hereafter, Bankers Trust Company of South Dakota shall be referred to as "Bankers Trust." Bankers Trust is located in Sioux Falls, South Dakota.

21.    Pursuant to their agreement to divide the Issue Trust into two separate individual trusts, Kathryn Callen and Richard Doermer agreed to convert the Issue Trust to a directed trust under South Dakota laws. Basically, a directed trust is a trust created by the free and deliberate acts of the parties involved.

22.    In June 2012, Kathryn Callen and Richard Doermer, as co-trustees of the Issue Trust, retained South Dakota trust and estates attorney Mary Anne Akkerman (Lindquist & Vennum, LLP) to assist them with replacing the corporate trustee JP Morgan with Bankers Trust; moving the situs of the Issue Trust from Indiana to South Dakota; modifying the Issue Trust to create a directed trust; and to divide the Issue Trust into two separate individual trusts for Kathryn Callen and Richard Doermer and their respective family lines. Hereafter, attorney Mary Anne Akkerman shall be referred to as "Akkerman."

7

23. In June 2012 Kathryn Callen and Richard Doermer, as co-trustees of the Issue Trust, removed JP Morgan as corporate trustee of the Issue Trust and replaced it with Bankers Trust as successor corporate trustee. The situs of the Issue Trust was moved from Indiana to South Dakota. Because it was understood that the Issue Trust would be converted to a directed trust shortly after the situs was moved to South Dakota, Bankers Trust accepted the limited role of an administrative trustee. An administrative trustee's duties generally include taking title and ownership of the trust assets, establishing and maintaining a trust bank account, preparing or signing the trust tax returns, preparing and sending trust statements, making trust payments, and making trust distributions and receiving contributions.

24. Pursuant to the agreed upon decision to divide the Issue Trust, Oxford Financial advised Kathryn Callen, and Richard Doermer agreed, to engage the CPA firm of Baden, Gage & Schroeder ("Baden Gage") of Fort Wayne, Indiana to determine a fair accounting procedure for dividing the Issue Trust into two separate individual trusts for Kathryn Callen and Richard Doermer and their respective family lines. Baden Gage has been the Doermer family's long time accounting firm.

25. Baden Gage determined that an adjustment of approximately $328,000 should be made for the benefit of Kathryn Callen to account for a potential contingency related to certain charitable remainder unitrusts that had been established for the benefit of Kathryn Callen and Richard Doermer, and that the remainder of the Issue Trust assets should be divided equally between the separate individual trust for Kathryn Callen and her family and the separate individual trust for Richard Doermer and his family.

26. Assuming the Issue Trust had a total of $14,585,790 in marketable securities and other liquid investments, the Baden Gage firm determined that $7,456,735.50 should be

8

transferred to the Kathryn Callen separate divided trust and that $7,129,054.50 should be transferred to the Richard Doermer separate divided trust.

27.     On or about September 7, 2012 as a prerequisite to dividing the Issue Trust into two individual separate trusts, Oxford Financial directed attorney Akkerman to promptly prepare a legal petition to convert the Issue Trust to a directed trust; and identified who was to serve as the investment advisors, the distribution advisors, and trust protectors; and stated that the parties had agreed that Akkerman should use standard provisions for the directed trust.

28.     Pursuant to Oxford Financial's directions attorney Akkerman drafted a legal petition to convert the Issue Trust into a directed trust and to have the Issue Trust divided into two separate individual trusts; and attorney Akkerman provided the draft petition to the parties on September 9, 2012. Kathryn Callen and Richard Doermer agreed to the terms of the draft petition. Attorney Akkerman understood that the co-trustees of the Issue Trust agreed to the terms of the legal petition and that the legal petition had been finalized.

29.     Pursuant to Oxford Financial, Debora A. Bennett, and Lorelei M. Tolson's breach of fiduciary duty to the Issue Trust to act in the best interest of the Issue Trust and protect the interests of the Issue Trust, and pursuant to their negligence in giving co-trustee Kathryn Callen wrongful, improper, unsuitable, advice and planning strategies and directions, co-trustee Kathryn Callen refused to sign the agreed upon legal petition or any of the many other subsequent versions of the legal petition.

30.     Over a protracted period of time and a continuum of unwarranted changes and demands by Oxford Financial, Debora A. Bennett, and Lorelei M. Tolson, a total of eight versions of the legal petition were prepared by attorney Akkerman in attempts to accommodate unwarranted, ill advised, and improper delaying changes that were advised and demanded by

9

Oxford Financial, Debora A. Bennett, and Lorelei M. Tolson. The continuum of wrongful actions of Oxford Financial, Debora A. Bennett, and Lorelei M. Tolson significantly delayed and protracted the process and prevented the Issue Trust from being converted to a directed trust and divided into two separate individual trusts, and to have the securities and assets of the Issue Trust actively invested and diversified with suitable investment allocation.

31.     As a result of and during the continuum of unwarranted changes and demands made by Oxford Financial, Debora A. Bennett, and Lorelei M. Tolson, while they were acting as Kathryn Callen's agent, Kathryn Callen and Oxford Financial, Debora A. Bennett, and Lorelei M. Tolson were transacting business in Illinois by participating in and initiating, responding to and transmitting hundreds of emails, correspondence and telephone conference calls in Chicago, Illinois to and from and with Richard Doermer and his agent and representative William Richards, a partner at BNR partners, located in Chicago, Illinois. The continuum of wrongful transactions of business in Illinois by Oxford Financial, Debora A. Bennett, and Lorelei M. Tolson gave rise to the cause of action alleged herein. William Richards is a significant and material witness to the cause of action alleged herein.

32.     The delays and protraction resulting from the actions of Oxford Financial, Debora A. Bennett, and Lorelei M. Tolson caused the Issue Trust to miss reasonable investment opportunities during a Bull Market, causing a loss and dissipation in excess of $2,000,000 for the Issue Trust.

33.     By reason of Oxford Financial, Debora A. Bennett, and Lorelei M. Tolson's on-going unabated and continuing breach of fiduciary duty and negligence, Richard Doermer filed a legal Petition to divide the Issue Trust into two separate individual trusts, one trust for Kathryn Callen and her lineage, and one trust for Richard Doermer and his lineage. The Petition was

10

filed in Sioux Falls, South Dakota, Circuit Court, County of Lincoln, Second Judicial Circuit, No. TR- 13-9, "In The Matter Of The Richard David Doermer—Kathryn Doermer Callen Issue Trust." The presiding judge was Judge Stuart L. Tiede.

34.     On March 27, 2014, Judge Stuart L. Tiede granted leave to file an Amended Petition. The Amended Petition states that the Issue Trust holds securities in an amount of approximately $14,800,000.00, and "asks the Court to divide the Issue Trust into two separate equal trusts: The Richard David Doermer Issue Trust and the Kathryn Doermer Callen Issue Trust."

35.     On November 25, 2014, Judge Stuart L. Tiede entered an Order that provides, in part:

> At 1:30 pm on October 28, 2014, at the Lincoln County Courthouse, the Court held a hearing on the Petition For Approval of Accounting, Ratification and Approval of Trustees' Resolutions, Partial dismissal of June 2013 Petition, Termination of Court Supervision, and Other Relief ("Petition") filed by Bankers Trust Company of South Dakota ("Bankers Trust").

> (g) Ordered, Adjudged, and Decreed that Bankers Trust's request in the Petition for the Court to ratify and approve the Trustees' delegation of Investment authority to Morgan Stanley pursuant to the Resolutions, attached to the Petition as Exhibit B, is granted;

> (h) Ordered, Adjudged, and Decreed that the Court ratifies and approves paragraph (a) of the Resolutions stating: "the Trust will be managed in a manner very similar to the parties' stipulation. RD and KC will direct Banker's Trust to engage Morgan Stanley Wealth Management ("Morgan Stanley") and its representatives, Brian Hickey, to provide investment management and securities custodial services for the investment assets of the Trust up to a maximum amount of Twenty-Five Million dollars ($25,000,000.00), which does not include the Trust's interests in Doermer Family Interests, LP. Morgan Stanley and Mr. Hickey will provide investment management services consistent with the Trust Instrument."

> (i) Ordered, Adjudged, and Decreed that the Court ratifies and approves paragraph (b) of the Resolutions stating that "while the Trustees may make suggestions and recommendations to Morgan Stanley and Mr. Hickey, neither is under any obligation to accept those suggestions or recommendations. Morgan

11

Stanley and Mr. Hickey will retain complete discretion over investment management subject to the Trust Instrument and the Trustees' power to remove Morgan Stanley and Hickey by majority vote."

36.     After the Court Order was entered on November 25, 2014, Morgan Stanley and Brian Hickey began and are now providing, for the first time, active investment of securities and assets, diversification, suitability, prudent investment allocation, and active and proper wealth management of the Issue Trust, pursuant to the Court Order and their fiduciary duty to the Issue Trust. Brian Hickey's office is in Chicago, Illinois and he is a resident of Winnetka, Illinois; he is a material witness in the case.

37.     By reason of the premises, from the time that co-trustees Kathryn Callen and Richard Doermer entered into their agreement on or about September 9, 2012 to November 25, 2014 when the South Dakota Court entered its Order providing that Morgan Stanley and its wealth management investment representative, Brian Hickey, shall provide investment management of the Issue Trust:

> Oxford Financial, Debora A. Bennett, and Lorelei M. Tolson breached their fiduciary duty to the Issue Trust and were negligent in matters of the Issue Trust by giving negligent, wrongful, improper and unsuitable advice and planning strategies and directions to co-trustee Kathryn Callen, causing the agreement between Kathryn Callen and Richard Doermer on or about September 9, 2012 not to be fulfilled, and causing the Issue Trust not to be converted to a directed trust and divided into two separate individual trusts, and causing the Issue Trust to be dissipated and suffer losses and reasonable potential gains by causing the Issue Trust and its securities and assets to remain inactive and un-invested and without diversification and without investment suitability and suitable investment allocation, when it was suitable and reasonable for the Issue Trust and its securities and assets to have been greatly enhanced and to make great gains by becoming active and invested and diversified with suitable investment allocation during the period between September 9, 2012 and November 25, 2014.

38.     By reason of the premises, during all relevant and material times relating to the allegations and issues involved and alleged in this complaint and the case, Oxford Financial, Debora A. Bennett, and Lorelei M. Tolson had and breached their fiduciary duty to the Issue

12

Trust and were negligent, and as a direct and proximate cause of their breach of fiduciary duty and negligence the Issue Trust was damaged and suffered dissipation and great losses and was wrongfully deprived of great gains and profits it reasonably would have made and received.

39.     Also, by reason of the premises and as a direct and proximate cause of the breach of fiduciary duty and negligence by Oxford Financial, Debora A. Bennett, and Lorelei M. Tolson, and as a direct and proximate cause of dissipation and losses of the Issue Trust, plaintiff Richard Doermer, as a beneficiary of the Issue Trust was damaged and suffered great losses from disbursements and benefits that he and his family lineage would have been entitled to receive from the Issue Trust.

## COUNT II

### GROSS NEGLIGENCE AND WILFUL AND WANTON MISCONDUCT
### CLAIM FOR PUNITIVE DAMAGES

40.     Plaintiff Richard Doermer, as a beneficiary of the Issue Trust and plaintiff Richard D. Doermer, as co-trustee on behalf of the Issue Trust, adopt and re-allege and incorporate by reference all of the preceding paragraphs, including paragraphs 1 through 39 as paragraphs 1 through 39 for Count II.

41.     All of the allegations and charges in the preceding paragraphs 1 through 36 were done by Oxford Financial, Debora A. Bennett, and Lorelei M. Tolson with gross negligence and wrongful misconduct that was reckless willful and wanton with utter indifference to or conscious disregard for the rights and interests of others, including the plaintiffs.

42.     With respect to plaintiffs' causes of action and claims, in addition to compensatory damages, punitive damages should therefore be assessed against defendant Oxford Financial in the nature of punishment and as a warning and example to deter the defendant Oxford Financial and others from committing like wrongful acts and misconduct in the future.

13

43. By reason of the premises, plaintiff Richard Doermer as co-trustee of the Issue Trust has a fiduciary duty to the Issue Trust and standing to bring this lawsuit on behalf of the Issue Trust to protect and act in the best interest of the Issue Trust.

Wherefore, plaintiff Richard Doermer, as a beneficiary of the Issue Trust and plaintiff Richard Doermer, as co-trustee on behalf of the Issue Trust respectfully pray that the Court enter orders and judgment in their favor and against defendant Oxford Financial on all issues and liability, including:

A. Finding and entering judgment in favor of plaintiff Richard Doermer, as a beneficiary of the Issue Trust and plaintiff Richard Doermer, as co-trustee on behalf of the Issue Trust and against Oxford Financial on all issues of liability, as determined by the Trier of Fact.

B. For compensatory damages as determined by the Trier of Fact and in excess of the jurisdictional amount of the Court;

C. For punitive damages against Oxford Financial in the nature of punishment and as a warning and example to deter the defendants and other from committing like wrongful acts and misconduct in the future.

D. Awarding attorney's fees and costs in favor of the plaintiffs to be paid by Oxford Financial.

E. Allowing and granting such additional relief and damages to which the plaintiffs may be entitled and the Court deems appropriate.

Plaintiff Richard Doermer, as a beneficiary of the Issue Trust and plaintiff Richard Doermer, as co-trustee on behalf of the Issue Trust hereby submit their Complaint to the Court.

Respectfully submitted,

Dated: July 5, 2016
Firm No. 12453

Dom J. Rizzi
Dom J. Rizzi
John Scheflow
CAFFERTY CLOBES MERIWETHER & SPRENGEL
150 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
312-782-4880

14

## CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| RICHARD D. DOERMER, as a Beneficiary of the RICHARD DAVID DOERMER—KATHRYN DOERMER CALLEN ISSUE TRUST dtd July 28, 2004, and RICHARD D. DOERMER, as Co-Trustee on behalf of the RICHARD DAVID DOERMER—KATHRYN DOERMER CALLEN ISSUE TRUST dtd July 28, 2004, | ) ) ) ) ) ) ) ) | No. |
| Plaintiffs, | ) ) | |
| and | ) ) | Judge |
| KATHRYN DOERMER CALLEN as a Beneficiary and Co-Trustee of the RICHARD D. DOERMER—KATHRYN DOERMER CALLEN ISSUE TRUST dtd July 28, 2004, | ) ) ) ) ) | |
| Involuntary Plaintiff, | ) ) | JURY DEMANDED |
| vs. | ) ) | |
| OXFORD FINANCIAL GROUP, LTD | ) ) | |
| Defendant. | ) ) | |

## <u>EXHIBITS TO COMPLAINT</u>

EXHIBITS A and B

Dom J.Rizzi
John Scheflow
Cafferty Clobes Meriwether & Sprengel
150 South Wacker Drive, Suite 3000
Chicago, IL 60606
312-782-4880
drizzi@caffertyclobes.com

# EXHIBIT A



Cafferty Clobes
Meriwether&Sprengel LLP

Dom J. Rizzi
drizzi@caffertyclobes.com

June 27, 2016

Kathryn D. Callen
1306 Westover Road
Fort Wayne, Indiana 46807
Kadoe1@aol.com

Dear Mrs. Callen:

Please accept this as a notification that my law firm will be filing a lawsuit in the Circuit Court of Cook County, Illinois, involving Oxford Financial Group, LTD. and the "Richard David Doermer—Kathryn Doermer Callen Issue Trust dtd July 28, 2004."

Basically, the lawsuit alleges that Oxford Financial Group, LTD. breached its fiduciary duty to the Issue Trust and was negligent in giving unsuitable advice and directions to you as co-trustee of the Issue Trust, and that its conduct and actions were grossly negligent and willful and wanton warranting punitive damages. Since you dealt directly with Oxford Financial Group, LTD. in regard to its alleged breach of fiduciary duty and negligence and wrongful misconduct, it would serve no useful purpose to provide further detail in this letter and notification.

In the lawsuit to which this notification is made, plaintiff Richard D. Doermer, as a beneficiary of the Issue Trust and plaintiff Richard D. Doermer as co-trustee on behalf of the Issue Trust, does not seek any relief or recovery against you personally, or as a beneficiary or as co-trustee of the Issue Trust.

Along with this notification, I am making a request on behalf of Richard D. Doermer that you voluntarily join him as a plaintiff in the lawsuit against Oxford Financial Group, LTD. to protect your interests as a beneficiary of the Issue Trust and as a co-trustee to protect the interests of the Issue Trust. If you refuse to voluntarily join in the lawsuit as a plaintiff or I do not hear from you by July 4, 2016, I will file the lawsuit and name you as an Involuntary Plaintiff. A copy of the complaint that will be filed on July 5, 2016 is enclosed herewith.

Cafferty Clobes Meriwether&Sprengel LLP

Kathryn D. Callen
June 27, 2016
Page Two


       Of course, if you wish to voluntarily join the lawsuit to which this notification is made, you
may choose your own personal attorney or law firm to represent you as a plaintiff. As I have
already said, in the lawsuit to which this notification is made, plaintiff Richard D. Doermer, as a
beneficiary of the Issue Trust and plaintiff Richard D. Doermer as co-trustee on behalf of the Issue
Trust does not seek any relief or recovery against you personally, or as a beneficiary or as co-
trustee of the Issue Trust.

                        Sincerely,

                        Dom J. Rizzi

DJR/smn
Enclosure

# EXHIBIT B

---

## Tab No. 5 - Agreement of July 28, 2004 Establishing "The Richard David Doermer – Kathryn Doermer Callen Issue Trust"

---

This Issue Trust is particularly designed (i) to provide for the health, support, maintenance, education, well being and best interests of the two Doermer children, (ii) to provide or add to, through six charities identified in Article I, funds designed to serve the needs of a number of charitable and civic causes of particular interest to the Doermer family, and (iii) to provide an additional source of direct payment to education, medical and health care providers for the benefit of all Doermer children, grandchildren, their spouses and their descendants.

The Trust is governed by three Co-Trustees, RDD, KDC and Bank One. Grantor RTD, in Articles III and IV, expresses his views on distribution priorities, recognizing that the three trustees are given sole discretion to make all distribution decisions (except for distributions to or for his two children, which are to be determined solely by the corporate trustee and except also for various directed annual distributions to the six charities mentioned). Article IV of the Issue Trust Agreement also contains provisions (i) directing further distributions to KDC if she survives her brother RDD, (ii) authorizing reimbursement of certain income taxes payable by RTD's two children, (iii) allowing RTD's children and grandchildren to cause modifications in distributions to their respective spouses and descendants, and (iv) governing many other important aspects of Issue Trust administration.

A more detailed list of contents of the Issue Trust Agreement is set out on the pages immediately preceding the full Agreement under Tab 4.

AGREEMENT ESTABLISHING THE
RICHARD DAVID DOERMER -- KATHRYN DOERMER CALLEN
ISSUE TRUST

July 28, 2004

List Of Contents

| Paragraph No. | | Page No. |
|---|---|---|
| 1. | Preliminary Observations Of RTD Concerning His Overall Plan For The Disposition Of His Estate And Concerning The Service Of The Trustees Hereunder. | 1 |
| 2-A. | Establishment Of The "Issue Trust", For The Benefit Of RTD's Children, Specified Charitable Organizations, RTD's Grandchildren, And Others. | 6 |
| 3-A. | Purposes Of The Issue Trust And The GST Trusts. | 6 |
| 4-A. | General Statement Concerning Distributions From The Issue Trust. | 9 |
| 4-B. | Specific Distributions To Issue Trust Beneficiaries | 9 |
| 4-B(1). | Directed Annual Distributions To The Five Public Charities And To The Doermer Family Foundation, Inc. | 9 |
| | (a) Distributions To Be Made To The Five Public Charities And To The Doermer Family Foundation, Inc. | 9 |
| | (b) Payment Of Each Annual Base Amount In Two Installments To The Five Public Charities And The Doermer Family Foundation, Inc. | 11 |
| 4-B(2). | Recommended Annual Base Amount Distributions To Each Of RTD's Two Children (How And When Made). | 11 |
| 4-B(2)(a). | Annual Value Appreciation Supplemental Distributions To The Two Children. | 12 |
| 4-B(2)(b). | Authorized Further Discretionary Distributions To RTD's Two Children. | 14 |

| Paragraph No. | | Page No. |
|---|---|---|
| 4-B(3). | Recommended Distributions To Surviving Spouses Of Deceased Children Of RTD. | 14 |
| 4-B(4). | Discretionary Payments For Education, Medical And Health Care Services To The Spouses Of The Two Children Of RTD, Each Grandchild Of RTD, The Spouse Of Each Grandchild, And To The Descendants Of Each Grandchild. | 14 |
| 4-B(5). | Concerning Distributions To Providers Of Education, Medical And Health Care Services. | 14 |
| 4-B(6). | Contingent Further Distributions To Kathryn D. Callen (KDC) If She Survives Her Brother Richard D. Doermer. | 15 |
| 4-B(7). | Prorating Annual Base Amount Payments, VAS Distributions And Substitute CRT Payments To KDC For Any Short Year. | 18 |
| 4-B(8). | Reimbursement Of Certain Income Taxes Paid Or Payable By RTD's Two Children. | 19 |
| 4-C. | Limited Power Given To Children And Grandchildren Of RTD Allowing Children And Grandchildren To Modify Payments To Their Respective Spouses And Descendants. | 20 |
| 4-D. | Recommended Annual Distributions To GST Tax-exempt Trusts. | 21 |
| 4-E. | If Any Of The Five Public Charities Or The Family Foundation Is Not In Existence Or Becomes Not Qualified As A Charitable Beneficiary. | 22 |
| 4-F. | Internal Revenue Code. | 22 |
| 4-G. | Consideration Of Other Income And Resources Of Trust Beneficiaries. | 22 |
| 4-H. | Limitations On Annual Distributions To RDD And KDC. | 22 |

2

Exhibit B Page 3

| Paragraph No. | | Page No. |
|---|---|---|
| 4-I. | Changes In The Pattern Of Distributions For Education And Medical Or Health Care. | 23 |
| 4-J. | Issue Trust Is Chargeable With Those Estate Taxes Assessed In Or Payable By A Beneficiary's Estate Attributable To Such Properties If Includible In The Beneficiary's Estate. | 23 |
| 4-K. | In Making Annual Base Amount Distributions, VAS Distributions And Distributions For The Medical And Health Care And Further Education Of RTD's Two Children, And All Other Distributions To RTD's Two Children, The Corporate Trustee Need Not, Except To Anticipate Contingent Payments To KDC As Provided In Paragraph 4-B(6), Consider The Effects Upon Remaindermen Or Other Subsequent Interests. | 23 |
| 5-A. | Protection Against A Beneficiary's Creditors And Restrictions On Transfers Of Beneficiary Interests. | 24 |
| 6-A. | Expiration Of The Issue Trust Agreement And Termination Of The Issue Trust. Rule Against Perpetuities And Restraints On Alienation. Ultimate Passage Of Residual Assets To Doermer Family Foundation, Inc. | 25 |
| 6-B. | Trustees' Authority To Terminate The Issue Trust In Event GST Taxes Deemed By The Trustees To Be Excessive Are Imposed Upon Qualified Distributions For Education And Medical Care Services. | 26 |
| 6-C. | Distributions To Other Charities If Doermer Family Foundation, Inc. Not In Existence. | 27 |
| 7-A. | Trustees' Power To Retain Property In Trust If Beneficiary Is Deemed Incompetent Or To Distribute Such Property To Others For The Benefit Of Such Beneficiary. | 28 |
| 7-B. | Subchapter "S" Corporation Provisions. | 28 |
| 7-C. | Allocating Burden Of Any Generation Skipping Transfer Tax. | 28 |

3

| Paragraph No. | | Page No. |
|---|---|---|
| 7-D. | Generation Skipping Tax Election; Allocation Of Tax Exemption. | 29 |
| 7-E. | Trustees Are Authorized To Divide Any Trust Into Two Separate Trusts To Achieve Inclusion Ratios Of Either Zero Or One. | 29 |
| 8-A. | General Powers of Trustees. | 30 |
| 8-B. | Special Provisions Concerning The Voting Of Avis, Pacific Service Company, Doerner Family Interests, L.P., And Other Family Closely-held Interests. | 34 |
| 8-B(1). | Trustees Shall Have Power To Vote Stock And Partnership Interests, But RTD's Two Children Can, In Their Individual Capacities, Upon Request, Obtain Trustees' Proxy To Vote All Or Any Of Closely-held And Other Specified Family Interests. | 35 |
| 8-B(2). | Those Holding Power To Vote Closely-held Interests Are Not To Be Subject To The Prudent Man Rule Or Any Prudent Investor Rule In Exercising Such Voting Power. | 36 |
| 8-C. | Special Consent Provisions Concerning The Sale, Distribution Or Other Disposition Of Family Closely-held Assets. Many Other Specific Powers Are Given To The Trustees. | 36 |
| 8-C(1). | Prior Written Consents Of RTD's Two Children Or Their Survivor Are Required Before A Sale, Distribution, Pledge, Or Other Disposition Can Be Made Of Family Closely-held Assets. RTD's Children Can Direct Trustee To Seek Out Prospective Buyers Of Such Assets. | 37 |
| 8-C(2). | Separate Sales Of Avis Or Pacific Service Co. Divisions, Subsidiaries Or Assets Are Not Subject To The Consent Restrictions Of Paragraph 8-C(1). | 39 |
| 8-C(3). | Trustees And RTD's Children Shall Not Be Responsible For The Acquisition, Retention Or Enlargement Of Any Family Closely-held Asset. | 39 |

4

| Paragraph No. | | Page No. |
|---|---|---|
| 8-C(4). | Competent Appraisals Should Be Obtained Of Any Interest Described In Paragraph 8-B Above Considered Or Proposed To Be Sold Or Disposed Of By RTD's Two Children Or By The Corporate Trustee; Borens Should Be Given First Reasonable Opportunity To Buy Any Of The Avis And Pacific Service Company Interests Or Any Other Closely-held Interests Held By The Trustees In Which The Borens Also Have An Interest. | 40 |
| 8-C(5). | Trustees' Power To Treat Each Closely-held Interest As An Entity Separate From Any Trust And To Consent To The Reinvestment Of Income Of Such Entity For Reasonable Business Purposes. | 41 |
| 8-C(6). | Powers Of Corporate Trustee Relating To Collection Or Enforcement Of Promissory Notes, Guaranties, Etc. Directly Or Indirectly Involving Doermer Family Members. | 41 |
| 8-C(7). | Sales Of Trust Property Are Authorized Subject To The Consents Of The Two Doermer Children As Provided In Paragraph 8-C(1). | 41 |
| 8-C(8). | Repairs Of Trust Property And Payment Of Expenses And Taxes. | 42 |
| 8-C(9). | Trustees May Consent To Corporate Reorganizations. | 42 |
| 8-C(10). | Claims And Settlements. | 42 |
| 8-C(11). | Payment Of Administrative Expenses. | 42 |
| 8-C(12). | Trustees Are Authorized To Use Agents Or Attorneys-In-Fact. | 42 |
| 8-C(13). | Authority Given To Corporate Trustee To Borrow Money. | 43 |
| 8-C(14). | Corporate Trustee's Powers Relating To Loans, Pledges, Sales And Other Transactions Between Or Among Doermer Family Trusts And/Or Doermer Family Partnerships. | 43 |
| 8-C(15). | Authorized Loans To RTD's Children And Grandchildren, Subject To An Aggregate Limit, As Respects Each Such Borrower, Of $300,000. | 44 |

Exhibit B Page 6

| Paragraph No. | | Page No. |
|---|---|---|
| 8-C(15)(a). | Additional Loan In Form Of Mortgage On Principal Residence. | 44 |
| 8-C(16). | Trustees Have Authority To Make Allocations To Principal And Income. | 45 |
| 8-C(17). | Distributions In Kind To Beneficiaries Are Authorized. | 46 |
| 8-C(18). | No Consents Of Courts Or Other Persons Are Required For Trustees' Actions Unless Otherwise Directed. | 46 |
| 8-C(19). | Separate Shares Within Any Trust May Be Created For Income Tax Purposes. | 46 |
| 8-C(20). | Authorized Distributions In Event Of Disability Or Incapacity Of A Beneficiary. | 46 |
| 8-C(21). | Corporate Trustee Has Authority To Terminate Trusts Of $100,000 Or Less. | 47 |
| 8-C(22). | Corporate Trustee Shall Periodically Send Detailed Reports To Trust Beneficiaries Concerning Issue Trust Assets, DFI Partnership Interests Held By The Trust And Concerning DFI Assets Which Underlie The Value Of Such Partnership Interests. | 47 |
| 8-C(23). | No Court Qualifications Nor The Posting Of Bonds Shall Be Required Of Trustees. | 50 |
| 8-C(24). | Annual Meeting And Discussion With Trust Beneficiaries. | 50 |
| 8-C(25). | If Two Or More Trustees Are Given Authority To Administer The Trust. | 50 |
| 8-D. | Consolidation Of Trusts; Trustees' Fees; General Power To Vote Securities. | 51 |
| 8-D(1). | Trustees' Power To Consolidate And Manage Certain Trusts As A Single Estate Until Division Becomes Necessary. | 51 |
| 8-D(2). | Copies Of Trust Agreement To Beneficiaries Upon Request. | 51 |

6

| Paragraph No. | | Page No. |
|---|---|---|
| 8-D(3). | Trustees' Fees | 52 |
| 8-D(4). | Trustees' General Power To Vote Securities. | 52 |
| 8-E. | Power To Remove Trustees And To Appoint Successor Trustees. | 52 |
| 8-E(1). | Power To Release A Discharged Trustee. | 55 |
| 8-F. | Disclaimers And Releases By Beneficiaries Are Permitted. | 55 |
| 8-F(1). | Each Beneficiary May Disclaim Or Release Any Interest In Any Trust. | 56 |
| 8-F(2). | Release Of Rights And Powers By A Donee Or A Holder. | 56 |
| 8-F(3). | Power Of Conservator, Guardian Or Attorney-In-Fact To Disclaim Or Release. | 56 |
| 8-G. | If The Corporate Trustee Merges Into Or Consolidates With Another Institution, Successor May Serve Without Court Order. | 56 |
| 8-H. | Further Powers And Provisions Concerning Trust Administration. | 56 |
| 8-I. | Life Insurance Interests. | 58 |
| 8-J. | Support Of Dependents. | 58 |
| 8-K. | Cost Of Living Adjustment Provisions. | 59 |
| 9-A. | Particular Limitations On Powers Of Trustee And Others. | 60 |
| 10-A. | Life Insurance; Ownership And Administration. | 60 |
| 11-A. | Investment Advisors Are Authorized. | 61 |
| 12-A. | Additional Properties May Be Added To Any Trust. | 62 |
| 12-B. | Definitions Of Terms Used. | 62 |

7

Exhibit B Page 8

| Paragraph No. | | Page No. |
|---|---|---|
| 12-B(1). | RTD's Children. | 62 |
| 12-B(2). | Grandchild, Great-Grandchildren, Child, Children, Descendants, And Issue. | 62 |
| 12-B(3). | Spouse. | 63 |
| 12-B(4). | Emergency. | 63 |
| 12-B(5). | Transfer Taxes. | 64 |
| 12-B(6). | Trust Estate. | 64 |
| 12-B(7). | Per Stirpes. | 64 |
| 12-B(8). | Various Tax Terms. | 64 |
| 12-B(9). | Family Closely-held Asset Defined. | 64 |
| 12-B(10). | Successor Corporation. | 65 |
| 12-B(11). | Avis Stock. | 65 |
| 12-B(12). | Doermer Family. | 65 |
| 12-C. | Simultaneous Death; Presumption Of Certain Survivals. | 65 |
| 12-D. | Trust Situs. | 66 |
| 12-E. | Notices. | 66 |
| 12-F. | Form And Mailing Of Payments. | 67 |
| 12-G. | Heirs, Successors And Assigns Are Bound By Trust Terms. | 67 |
| 12-H. | Incompetency, How Determined. | 67 |
| 12-I. | Restriction On Powers Granted To Trustees And Others To Preclude An Inclusion Of The Value Of Any Trust Property In The Taxable Estate Of RTD. | 67 |

8

Exhibit B Page 9

| Paragraph No. | | Page No. |
|---|---|---|
| 12-J. | Gender And Singular And Plural Usage. | 67 |
| 12-K. | Birthdates Of RTD, His Two Children And His Grandchildren. | 68 |
| 12-L. | Distributions Of Income Or Principal To Or For The Benefit Of RTD Are Prohibited. Trustees Purchases Of Assets From Or Loans To RTD's Estate, However, Are Permitted. | 68 |
| 13-A. | Desired General Equality Of Recommended Distributions To Two Children, As Feasible, From The Issue Trust; Communication Of Income Tax Character Of Distributed Amounts To Distributees | 68 |
| 13-B. | Comments To RTD's Children Concerning Sharing Of Benefits Of Trust Ownership Of Closely-held Interests. | 69 |
| 13-C. | RTD's Observations To Trustees Concerning Mix And The Quality Of Investments And The Balancing Of Beneficiary Interests. | 69 |
| 13-D. | Further Comments On Trustees' Power To Employ Investment Advisors And To Invest In Mutual Funds. | 71 |
| 13-E. | RTD's Right To Reacquire Trust Principal And Substitute Other Property Of Equivalent Value. | 71 |
| 13-F. | Provisions Of This Trust Agreement Reflect Much Deliberation And Concentrated Effort By RTD And His Wife Prior To Her Death, But Inadvertent Inconsistencies May Appear; The Corporate Trustee Is, Therefore, Authorized To Resolve All Such Inconsistencies, Ambiguities Or Conflicts, If Any, Doing So In The Context And Spirit Of The Agreement Itself As Interpreted Solely By Such Trustee. | 72 |
| 13-G. | Allocation Of Expense, Taxes, And Charges Customarily Allocated To GST Tax-exempt Trusts May Be Charged To The Issue Trust. | 72 |

9

| Paragraph No. | | Page No. |
|---|---|---|
| 13-H. | Services Of Phyllis J. Alberts. | 73 |
| 14-A. | Dealings (Loans, Asset Purchases And Sales, Etc.) Between Trusts Or Between Any Trust And The Estate Of Richard T. Doermer. | 74 |
| 15-A. | Irrevocability Of Agreement And Of Each Trust Established Hereunder. | 74 |

10

Exhibit B Page 11

AGREEMENT ESTABLISHING THE
RICHARD DAVID DOERMER – KATHRYN DOERMER CALLEN
ISSUE TRUST

THIS AGREEMENT is made in Allen County, Indiana, between RICHARD T. DOERMER (hereinafter sometimes referred to as "RTD", "Settlor" or "Grantor"), and BANK ONE TRUST COMPANY, N.A., RICHARD DAVID DOERMER, and KATHRYN D. CALLEN as Trustees ("Trustees" or "Co-Trustees"). The Agreement itself is effective as of the ___28th___ day of _____July_____, 2004. It is sometimes herein referred to as "this Agreement" or the "Issue Trust Agreement". Bank One Trust Company, N.A. is also sometimes referred to herein as "Bank One" or as "Corporate Trustee", which term applies as well to any corporate successor to Bank One.

W I T N E S E T H :

RTD has transferred and delivered to the Trustees the property specifically described on Schedule A, which is hereto attached and made a part hereof. Such property shall constitute the initial trust estate hereunder. RTD and the Trustees hereby agree that such property shall be held and administered by the Trustees in accordance with the provisions which follow.

### ARTICLE I

1. Preliminary Observations Of RTD Concerning His Overall Plan For The Disposition Of His Estate And Concerning The Service Of The Trustees Hereunder.

RTD's observations in this Article I are intended to provide the reader with a broad perspective concerning RTD's plans for the disposition, in various steps, of the assets he and his deceased wife were fortunate enough to accumulate over many years. In very similar form they also appear in an agreement directing the establishment of five generation skipping transfer tax-exempt trusts ("the GST Trusts Agreement") executed by RTD simultaneously with the execution of this Agreement. The GST Trusts are designed primarily to serve RTD's grandchildren, their families, and their descendants.

RTD's son, Richard David Doermer, in his individual capacity, is frequently referred to herein as "Richard" or "RDD"; and RTD's daughter, Kathryn Doermer Callen, in her individual capacity, is frequently herein referred to as "Kathy" or "KDC".

As can quickly be observed, this Agreement has many pages and many provisions. Not all of its terms may in fact be called into use by the Trustees, but they are deemed necessary in order to permit the Trustees to respond to various considered, even though unexpected and unlikely, future events. The trust being created hereunder is part of a broad plan relating to a large portion of Doermer family resources. The overall plan has a number of objectives, including but not limited to (i) provision for the financial security of RTD's two children and all of his grandchildren; (ii) reasonably assured medical and health care

1

and education for such children, the spouse of each child, of each grandchild, the spouse of each grandchild, and further descendants; and (iii) annual contributions, periodically increasing in amount, to five public charitable organizations plus the Doermer Family Foundation, Inc. ("Family Foundation"). The plan's objectives include also the utilization of experienced management for the assets employed; the protection of resources against possible spousal or other third party claims against children, grandchildren and other beneficiaries; and the eventual passage of a substantial portion of the assets involved to selected charities. The plan utilizes a number of commonly used planning and investment management techniques, including but not limited to gifts, sales, bequests (both direct and in trust), limited partnership interests and charitable lead, charitable remainder and other trusts.

The five public charitable organizations mentioned in the immediately preceding paragraph are:

  a) The Roman Catholic Diocese of Fort Wayne-South Bend, Inc., Fort Wayne, IN;
  b) University of St. Francis, Fort Wayne, IN;
  c) University of Notre Dame, Notre Dame, IN;
  d) Fort Wayne Community Foundation, Inc., Fort Wayne, IN, and
  e) Indiana-Purdue Foundation at Fort Wayne, Fort Wayne, IN

Such five charities shall share in equal amounts all distributions payable to or declared by the Trustees in favor of such charities unless the related distribution documents specify otherwise. These five charities are sometimes hereinafter referred to as "the five public charities".

This Issue Trust Agreement has as its particularly significant objectives (i) the flow of income or resources to each of RTD's two children,...as needed to provide each child with a relatively high standard of living and relative freedom from concern over family education and medical or health care costs, and to serve in a generous way the best interests of each child (it is RTD's wish that the term "best interests" of a child be liberally construed); (ii) a stream of income, growing in amounts upon the deaths of RTD and his children, to the five public charities and the Family Foundation; and (iii) a flow of income to each of five generation skipping transfer ("GST") tax-exempt trusts upon the deaths of RTD's two children, the amount to increase upon the death of the survivor of the two children, such amounts to be payable notwithstanding the possible imposition of a GST tax on each such distribution.

RTD views it as important, and he therefore hereby directs, that, notwithstanding any other provision of this Agreement, neither Richard nor Kathy, nor any person appointed by either of them to serve as a successor Trustee pursuant to Paragraph 8-D(1) hereof, shall have any power to participate in, or to act as a Trustee hereunder in, any deliberation or decision involving a possible distribution of any kind to either of them or involving any decision or action which if made or taken would serve to the benefit of either of them or of any creditor of either of them; and in no event shall any individual Trustee make or influence any distributions hereunder to or for the benefit of such individual Trustee or any

2

Trustee under this Agreement if such distributions would relieve such distributee or any individual Trustee hereunder of an obligation to support another person.

To assist and guide the Corporate Trustee in the exercise of its exclusive authority to determine distributions to or for RTD's two children, RTD has herein made various recommendations, which he requests the Corporate Trustee to respect and observe. Specifically, as is set out in Article IV, RTD has recommended that the Corporate Trustee make annual distributions in recommended amounts, payable in quarterly installments, to each child, which payments RTD views to be in and for the best interests of each child. He also in this Agreement has recommended that the Corporate Trustee pay the education and medical and health care expenses of each child.

Concerning provisions herein directing the Corporate Trustee to pay the education, medical and health care costs of RTD's grandchildren and their immediate families, it is the intention of RTD that such Trustee exercise the discretionary powers, herein conferred, to pay such costs in such manner that the payments or distributions involved will be considered nontaxable gifts for generation-skipping purposes as provided in Section 2642(c)(3)(B) of the Code.

It is contemplated by RTD that he will utilize or apply some if not all of his presently unused lifetime exemption from generation skipping transfer (GST) taxes (typically applicable to gifts or other dispositions of property to or for the support and maintenance of grandchildren and subsequent descendants) to the gifts made by him to the trusts being established under the GST Trusts Agreement. Such unused lifetime exemption is presently in the amount of approximately $1,402,200.

The GST Trusts Agreement authorizes the payment from the GST trusts of beneficiary education and medical and health care costs (if distributions from the Issue Trust, and other trusts, to pay for such costs cannot advisedly, in the sole judgment of the GST Corporate Trustee, be made). RTD, however, may, during his lifetime elect to pay some or all of such costs personally if to him that appears advisable and feasible. If RTD does not pay them during his lifetime, and in all events following his death, RTD requests that to the extent feasible such costs be paid out of the Issue Trust or other GST Tax non-exempt source in order to preserve the distribution power of the GST Trusts to make support and maintenance distributions to his grandchildren and their families.

Family members will observe that the provisions of the two trust agreements are in many respects similar, though each agreement is intended to achieve or accommodate particular of RTD's objectives. Present law, for example, as noted above, permits qualified distributions for the education and medical care of grandchildren and great-grandchildren (and other descendants) to be made free of gift and GST taxes; and this circumstance has moved RTD, in this Agreement, to encourage the Corporate Trustee to make such distributions out of the Issue Trust. Because of the heavy burden of GST taxes, RTD has suggested that the Corporate Trustee not make distributions from the Issue Trust (except where otherwise authorized, as in Paragraph 4-D) which, for whatever reason, are not qualified for exemption or exclusion from GST taxes.

3

Ownership of large interests in Avis Industrial Corporation ("Avis") and Doermer Family Interests, L.P. (sometimes referred to as "DFI" or "DFI Partnership") by the Doermer family also suggest some distinct provisions, which have been incorporated in each trust agreement, designed to protect those interests and, for a reasonable time, to encourage their full retention (unless sold as a full block) for the benefit of all members of the Doermer family.

The administrative provisions are essentially identical in both trust agreements and consume most of the pages of each agreement. RTD, in the interest of simplifying the reading of these complex documents, has endeavored to place most of the dispositive provisions, of presumably primary interests to family members, toward the front of each agreement, principally in Article IV.

Inasmuch as the principal assets expected to be initially held by the Issue Trust and the five GST Trusts are Class B limited partnership interests in Doermer Family Interests, L.P. (DFI), which in turn holds approximately $70 million in a variety of assets, including publicly-held securities, other partnership interests, closely-held stocks, and other assets, RTD has felt it advisable to plan carefully for the long-term management and control of the principal voting interests of DFI. Accordingly, 83.3334% of the DFI General Partner voting interests, representing all of such interests heretofore owned by RTD, have on this date been placed, in equal shares, in two DFI Partnership Management Trusts ("Management Trusts"). The remaining 16.6666% of such General Partner interests remain in the ownership of the two Doermer children, 8.3333% held by each child.

DFI was formed and funded on December 20, 2000; and the General Partner voting interests, representing 1.2% of all beneficial interests in the partnership, were then (proportionate to contributions made to partnership capital) distributed 83.3334% to RTD and 16.6666% to his two children. Incident to establishment of the Issue and the GST Trusts, RTD, as noted above, has on this date sold all of his General Partner interests in DFI to the two Management Trusts. The net income from Management Trust No. 1 passes annually to son Richard, and the net income from Management Trust No. 2 passes annually to RTD's daughter, Kathy. RTD, further, has on this date transferred approximately 19.068% of DFI partnership ownership, in the form of Class B limited interests, to the five GST trusts (approximately 3.8136% to each trust). Kathy and Bank One are the Trustees of those four GST Trusts which bear the names of her four children, and Richard and Bank One are Trustees of the GST Trust bearing the name of Caitlin Doermer. The two children and Bank One are the Trustees of each of the two Management Trusts.

Class B limited interests in DFI, which have limited voting power but have a large interest in the capital accounts, and the profits (or the losses) of DFI, represent 98.8% of the beneficial ownership of DFI. Following RTD's transfer on this date of all of his General Partner interests and 66.045% of his Class B interests held (representing 66.042% of total Class B interests outstanding) to various recipients, the DFI ownership is now held as follows:

4

A. <u>General Partner Interests:</u>

| | |
|---|---|
| Management Trust No. 1 | 41.6667% |
| Management Trust No. 2 | 41.6667% |
| Son Richard | 8.3333% |
| Daughter Kathy | 8.3333% |
| Total | 100.0000% |

B. <u>General Partner Interests And Class B Limited Partner Interests Combined.</u>

| | Ownership Prior To Gifts & Sales | Gifts/Sales From RTD | Ownership After Gifts & Sales |
|---|---|---|---|
| Issue Trust | 0 | 34.384% | 34.384% |
| Five GST Trusts in the aggregate | 0 | 19.068% | 19.068% |
| RTD retained | 98.5612% | ----- | 37.548% |
| Son RDD | 0.7194% | 3.2806% | 4.000% |
| Daughter KDC | 0.7194% | 3.2806% | 4.000% |
| Management Trust No. 1 | 0 | 0.5000% | 0.500% |
| Management Trust No. 2 | 0 | 0.5000% | 0.500% |
| Total | 100.0000% | 61.0132% | 100.000% |

Each of the five public charitable organizations and the Doermer Family Foundation, Inc. is a preferred recipient of annual distributions from the Issue Trust, which distributions are periodically and significantly enlarged upon the death of RTD and the death of each of his two children.

There is a third class of DFI interests, entitled "Class A Cumulative Preference Income" interests, which have essentially no voting power, but which call for the payment each year of a preferential distribution in an amount equal to 11% of the average daily balance of such interests, as shown in the books and records of DFI, held by any Class A partner during any calendar year. This class of interests was funded on 12/20/00 with $200,000 provided entirely by RTD, and he thereby acquired all of such interests. He has on this date, however, gifted half of his Class A holdings to the Fort Wayne Community Foundation, Inc., a public charity.

RTD hopes that each reader will endure with patience and good spirit the burden of digesting both this rather voluminous Agreement and the GST Trusts Agreement. He would add that the burden, shared with his wife prior to her death on June 15, 2000, of resolving what to do with the family's blessings and then of reducing decisions made to comprehensible legal form has far exceeded whatever discomfort the readers may feel in struggling through all which follows.

5

## ARTICLE II

### Establishment of the RDD-KDC Issue Trust

2-A. Establishment Of The "Issue Trust" For The Benefit Of RTD's Children, Specified Charitable Organizations, RTD's Grandchildren, And Others. There shall be established under this Agreement a trust known as "the RDD-KDC Issue Trust" or "the Issue Trust," to be administered for the benefit of six charitable organizations (identified in Paragraph 1 above), RTD's children, their spouses, RTD's grandchildren, and the spouses and descendants of such grandchildren. The Issue Trust shall be held and administered pursuant to the remaining terms of this Agreement.

## ARTICLE III

### Trust Purposes

3-A. Purposes Of The Issue Trust And The GST Trusts. The Issue Trust, established under this Agreement, is principally designed (i) to provide for the medical, health, support, maintenance, education, well being and best interests of the two Doermer children, (ii) to provide or add to, through the six charities mentioned above, funds designed to serve the needs of a number of charitable and civic organizations and causes of particular interest to the Doermer family; (iii) to provide a source of direct payment to education, medical and health care providers for the benefit of any and all (now five) Doermer grandchildren, their spouses, and their descendants, and (iv) to provide for the payment of medical and health care costs and for the health, support and maintenance of the spouse of each deceased child.

The trusts established under the GST Tax-exempt Trusts Agreement, on the other hand, are, as noted above, primarily intended to provide distributions for the medical, health, support, maintenance and education of each of RTD's grandchildren, doing so in increasing amounts as each grandchild grows in maturity and moves into specified age brackets. All of such distributions are viewed by RTD to be in the best interests of such grandchildren; and all such distributions are intended to be free of GST taxes.

It is the intention of RTD that the Corporate Trustee (which has sole discretionary authority over trust distributions to RTD's two children) exercise the powers granted to it under this Issue Trust Agreement primarily to benefit the five public charities, the Doermer Family Foundation, Inc. the two Doermer children, and the grandchildren of RTD to the extent of distributions to third party providers of education, medical and health care services, even if the exercise of its discretionary powers eliminates the contingent interest of any remaindermen. In that regard, it is RTD's wish that the term "best interests" of a child, as used herein, be liberally construed and include not only the possibility of distributions for the health, medical care, maintenance, support and education (including, but not limited to, college, post-graduate, professional, vocational, language and artistic studies) of such child, but also the possibility of distributions for his or her comfort, convenience and happiness even to the extent of terminating the Trust by distributing the entire trust estate for the

6

benefit of such children at any point in time following the creation of such trust and thereby eliminating the contingent interest of any remainderman. As illustrations, and not in limitation of the purposes for which distributions may be made pursuant to such standard, the Corporate Trustee may make distributions to enable a child of RTD to travel for business, education, pleasure or any other purpose, and/or simply to augment the child's personal net worth, even if the child already has a substantial net worth. However, in making any distribution of income and/or principal, RTD desires that the Corporate Trustee consider not merely the general economic requirements of the child, but also the ability and experience of the child to deal with and manage the monies or property involved.

It is also the intention of RTD that the Trustees exercise the discretionary powers herein conferred for the education, health, and medical needs of the grandchildren of RTD, the spouses of such grandchildren and the descendants of the grandchildren in a manner such that such distributions will be considered to be excluded from the term "generation skipping transfer" as provided under the terms of Code Section 2611(b) if the beneficiary is a skip person for the purposes of the generation-skipping tax. It is the intention of RTD that the Trustees exercise the discretionary powers as set forth in the preceding sentence primarily to benefit the individuals mentioned in that sentence, rather than subsequent beneficiaries or remaindermen of the trust, even if the exercise of such discretionary powers eliminates the contingent interest of any such remainderman.

It is further the intention of RTD that the Trustees exercise their discretionary powers to make payments for the education and medical needs of the spouses of Richard and Kathy in order to benefit such individuals, rather than the Doerner Family Foundation as the final residual remainderman of the Trust, even if the exercise of such discretionary powers eliminates the contingent interest of such remainderman. The term "education", as used herein is to be liberally construed and should include, but not be limited to, pre-school through elementary school, high school, preparatory school, college, post-graduate, professional, vocational, language and artistic studies.

RTD recognizes the possibility that the distributions to the five public charities and the Family Foundation and to or for the benefit of his children, their spouses, his grandchildren, their spouses, and the descendants of his grandchildren may exhaust the principal of the Issue Trust so that the Trust will terminate and no property will be available for distribution to the final charitable remainder beneficiary.

RTD desires that to the extent practicable, except as is otherwise provided in this Agreement, his two children as a class, insofar as the Corporate Trustee's discretionary distributions to them are concerned, be treated approximately equally.

By way of amplification of his general provisions above concerning distributions which could eliminate the contingent interests of subsequent or subordinate beneficiaries, RTD wishes to observe that he tends to view the various recommended distributions generally described below to have the priorities there indicated ((i) through (viii)), though he quickly and unequivocally acknowledges (a) that the Trustees have complete and exclusive authority and discretion from time to time to make all distribution decisions (except that

7

distributions to or for his two children are to be made only by the Corporate Trustee as provided above in Article 1), (b) that he expects that distributions may well be made in or from all priority categories set out below in most if not all future years and (c) that he recognizes that distributions to or for some of the specified persons or purposes may serve to reduce or exhaust the principal of the Issue Trust and thereby impair or eliminate the contingent interests of subsequent beneficiaries or remaindermen.

Against the background described above, RTD, in the hope of being somewhat useful to the Trustees in the exercise of their distribution authorities, presents the following, in the following order, as an expression of his views on distribution priorities:

(i) directed "base amount" annual distributions to the six charities during the various time periods described below in Paragraph 4-B(1);

(ii) the recommended base minimum amount annual distributions to his two children described in Paragraph 4-B(2) below;

(iii) distributions to pay for costs of education, medical and health care services to RTD's two children and others, described in Paragraph 4-B(4) below;

(iv) annual Value Appreciation Supplemental distributions to RTD's two children recommended in Paragraph 4-B(2)(a);

(v) contingent further distributions to Kathryn D. Callen if she survives her brother, as specified in Paragraph 4-B(6);

(vi) distributions to surviving spouses of deceased children of RTD recommended in Paragraph 4-B(3);

(vii) further discretionary but recommended distributions to RTD's two children under the provisions of Paragraph 4-B(2)(b);

(viii) distributions to the Doermer Family Foundation as the final residual beneficiary, as provided in Article VI below.

RTD, it should be said, fully appreciates that circumstances in the life of one or the other of his two children (ill health, significantly greater financial burdens, etc.) might well suggest greater discretionary support distributions, with a higher priority, to that child from the Issue Trust than to the other child from such Trust. RTD, accordingly, has extended full and exclusive power of discretion to the Corporate Trustee to determine the amount of actual such discretionary distributions, and the relative priority each should have, in the light of circumstances prevailing from time to time, as such Corporate Trustee alone deems advisable. Because he views a relative equality of discretionary distributions to his two children to be important to him, RTD feels that any distribution by the Corporate Trustee to equalize discretionary distributions between the children should be considered to be in and for the best interests of each child.

8

## ARTICLE IV.

### Distributions From The Issue Trust

4-A.  General Statement Concerning Distributions From The Issue Trust. Recommended or directed distributions during various time periods and family circumstances from the Issue Trust to or for the benefit of family members, the five specified public charities, and the Doermer Family Foundation, are set out below.

Distributions to the five public charities, the Family Foundation, and to or for the benefit of each of the two Doermer children, their spouses, RTD's grandchildren and their spouses and descendants are to be in addition to distributions they may receive as direct holders of DFI Partnership interests or as beneficiaries of other trusts outside of the Issue Trust and outside of the GST Tax-exempt and the two Management Trusts.

Wherever in this Article IV or elsewhere in this Agreement there are directed or recommended distributions payable in specified dollar amounts, including base amounts, to any beneficiary, RTD recommends, in order to preserve a sizeable measure of each distribution's intended purchasing power, that such amounts be adjusted upward each calendar year, commencing January 1, 2005 to first affect distributions in the year 2006, in the manner described in Paragraph 8-K hereof. Thus the annual base amounts payable to the five public charities, the Doermer Family Foundation, each of RTD's two children, and to the surviving spouse of each deceased child, shall, among other distributions and amounts where specified, be adjusted annually as provided in Paragraph 8-K.

In order to provide the two Doermer children each year with some participation in the annual value growth of the national economy, as reflected in the movement of three common stock indices identified below, RTD is recommending, as set out in Paragraph 4-B(2)(a), that the Corporate Trustee distribute each year to each of RTD's two children not only a minimum stated amount ("base amount"), adjusted upward for inflation each year, but also an additional amount during each calendar year following a year in which common stock prices increased above their level at the beginning of such year. Such additional amount is described below as a value appreciation supplemental ("VAS") distribution.

4-B.  Specific Distributions To Issue Trust Beneficiaries.

4-B(1).  Directed Annual Distributions To The Five Public Charities And To The Doermer Family Foundation, Inc.

(a)  Distributions To Be Made To The Five Public Charities And To The Doermer Family Foundation, Inc. It is directed that, commencing during the year 2005, and continuing thereafter until the termination of the Issue Trust under the provisions of Paragraph 6-A below, there be distributed to the five public charities in the aggregate and to the Doermer Family Foundation the annual base amounts prescribed below. The interest of each of such six charities in the distribution to be made to it each year is to be a present non-discretionary right to receive such amount. The annual base amount shall be paid from

9

income and, to the extent income is insufficient, from Trust principal; and each base amount shall be subject to the cost-of-living adjustment provisions of Paragraph 8-K below. The Corporate Trustee, subject to the written consent of RTD's two children while they are living, and to the written consent of their survivor, is hereby also given the authority (which authority shall continue after the death of the survivor of the two children) to make additional distributions to the five public charities, to other public charities, and to the Doermer Family Foundation whenever it believes that the interests of Trust beneficiaries would not be adversely affected in a material way by any such distribution provided, however, that the total of such additional distributions in any calendar year shall not exceed a sum equal to fifty percent of the aggregate of the base amount distributions directed to be made to the six charities in such year set out below.

The annual base amount distributions in the aggregate to the five public charities, each to receive a 20% share, during the overall period above defined, and the annual base amount distributions to the Doermer Family Foundation, Inc. during such overall period, shall be as follows:

(1) during the period prior to RTD's death and while each of the two Doermer children is living, the annual base amount for the five public charities in the aggregate shall be the sum of $35,000; in addition the sum of $15,000 shall be paid to the Doermer Family Foundation, Inc.;

(2) during the period prior to RTD's death and following the death of the first of the two children to die and while both RTD and the other child are still living, the annual base amount for the five public charities in the aggregate shall be the sum of $70,000; in addition the sum of $30,000 shall be paid to the Doermer Family Foundation;

(3) during the period prior to RTD's death but following the death of the last of the two children to die, assuming RTD survives them, the annual base amount for the five public charities in the aggregate, while RTD is living, shall be the sum of $100,000; and the sum of $50,000 shall also be paid to the Doermer Family Foundation;

(4) during the period after the death of RTD and while each of the two children of RTD is living, the annual base amount for the five public charities shall be the sum in the aggregate of $125,000. Also, and in addition to such sum, there shall be paid to the Doermer Family Foundation, Inc. the sum of $110,000 per year;

(5) during the period after the death of RTD and following the death of the first of RTD's two children to die and while the other child is still living, the annual base amount payable to the five charities in the aggregate shall be the sum of $150,000. In addition to such sum payable to the five public charities, there shall be paid the sum of $140,000 per year to the Doermer Family Foundation, Inc.;

(6) during the period after RTD's death and after the deaths of both of his children, the annual base amount payable to the five public charities in the aggregate shall

10

be the sum of $300,000. In addition to such sum payable to the five public charities, there shall be paid to the Doermer Family Foundation, Inc. each year the sum of $200,000. Such annual sums to the public charities and to the Doermer Family Foundation shall then continue, subject to cost-of-living adjustments described above, until the termination of the Issue Trust under Paragraph 6-A below.

The distributions to the Doermer Family Foundation, Inc. shall have the same rights and be of the same character as are accorded to the five public charities under Paragraph 4-B(1)(a) above.

(b) Payment Of Each Annual Base Amount In Two Installments To The Five Public Charities And The Doermer Family Foundation, Inc.

(1) Each annual amount payable to each of the five public charities and the Doermer Family Foundation, Inc. shall be paid in two equal semi-annual installments, each installment to be in a sum equal to 50% of the applicable annual base amount. Such installments are to be paid on or about May 30 and November 30 of each year. The first such semi-annual installment payment to each of such beneficiaries is to be made on May 30, 2005.

(2) When the annual base amount for each of the charities specified in this Paragraph 4-B(1) is increased as a result of the death of RTD or one of his children, the enlarged annual base amount shall be payable from and after the day following such death; and the first installment subsequent to such death (payable on May 30 or November 30, as the case may be) shall then include (i) the enlarged base amount prorated from the day after date of the death until the end of the calendar year in which such death occurred and (ii) the prior base amount prorated from January 1 of the year of death until and through the date of death.

4-B(2). Recommended Annual Base Amount Distributions To Each Of RTD's Two Children (How And When Made). The annual "base amount" distributions from the Issue Trust recommended to be determined and paid by the Corporate Trustee to each of the two Doermer children, as set out immediately below, are as follows:

(i) Prior to RTD's death, and during calendar years 2004 through and including year 2010, to each child then living the sum of $140,000 per year, and then to increase to $300,000 per year commencing in calendar year 2011 if RTD is then still living. The enlarged payment would then continue thereafter up to and including the full calendar year of RTD's death.

(ii) After the death of RTD, to each child then living, the sum of $400,000 per year, such distribution to commence during the calendar year immediately following RTD's death, to continue through and including the full year of such child's death.

11

Exhibit B Page 22

The recommended Annual Base Amount Payments to each of RTD's two children, described in Paragraph 4-B(2) above, should be paid in equal quarter-annual installments on the last day of the second month of each calendar quarter from income and, to the extent income is insufficient, from principal. The first such quarterly payments should preferably be made on August 31, 2004. All such base amounts shall be subject to the cost-of-living adjustment provisions set out in Paragraph 8-K below.

4-B(2)(a).  Annual Value Appreciation Supplemental Distributions To The Two Children.  In addition to the amount distributed under Paragraph 4-B(2) above, and in addition to all amounts distributed to the two children under other paragraphs of this Agreement, or under other trust agreements, it is recommended that the Corporate Trustee, in all events, whether RTD be living or deceased, make an additional distribution to each child then living during each year following a year in which common stock prices increased above their level at the end of the immediately previous calendar year. Each such additional distribution is here designated a "Value Appreciation Supplement" or "VAS".

With respect to the annual Value Appreciation Supplement (VAS) distribution to each of the two children, it is recommended that it be determined in the following way. The closing figures as of the last business day of (i) the immediately preceding calendar year and (ii) the year immediately prior to such preceding year for (a) the Dow Jones Industrial Stock Index, (b) the Standard and Poor Index of 500 stocks and (c) the NASDAQ composite index shall be noted. From such figures there shall be calculated the percentage of increase or decrease during the immediately preceding calendar year in each index; and the resulting increase/decrease figures shall be added to a total. If any one or two of the three indices experiences a decrease under the index closing figure as of the end of the prior year, such decrease shall be subtracted from the increase total of the other index or the other two indices. The total resulting from such calculations shall then be divided by three. The resulting figure is sometimes herein called the "3 Index Average Increase". If the resulting figure is a negative figure, reflecting an overall decrease in the average performance of the three indices, no VAS distribution shall be paid relating to such year; but such negative experience shall not cause a reduction in the recommended annual minimum or base amount distributable to each child during any year.

If any of the three indexes, in the Corporate Trustee's judgement, becomes no longer reflective of the market for common stocks which it currently represents, the Corporate Trustee is authorized to select another index more likely to be so representative, such replacement index to be first utilized during the second full calendar year following the calendar year in which it was selected. Thus, if a replacement index were to be selected in August of 2007, it would first become effective during the year 2009.

During each calendar year, commencing with the year 2004, in which there is an increase in the 3 Index Average figure, then, in that event, it is recommended that a supplemental distribution to each child then living be made and paid in quarterly installments during the year following that in which such an increase was experienced. The overall annual distribution for each child would be in the amount of $2,000 for each full one-tenth of one percent (ten basis points) increase, in the 3 Index Average level during the

12

previous calendar year, except that no VAS distribution during or for any calendar year to either child should exceed $400,000. Thus the VAS distribution for any year should not be calculated against an increase of more than 20% over the previous year in the 3 Index Average level; 1% = ten-tenths, and 20% = two hundred tenths; 200 tenths x $2,000 for each one-tenth of 1% increase equals $400,000, the maximum VAS distribution for any one year.

If a child is deceased during any portion of the year during which the increase was experienced, the child's estate, heirs or legatees should receive a prorata share of the VAS distribution as later calculated for the full year of the child's death, based upon the number of days in such year during which the child was living (thus utilizing a fraction, the numerator of which would be the number of days of such year during which the child was living and the denominator of which would be 365); such prorata share of the year's distribution should then be paid during the year following the year of increase, in quarterly installments, to the child's estate or to its heirs, legatees, or descendants as the child may have designated by Will or by living trust.

Several illustrations would here seem useful.

| | | Index Increases (Decreases) | | | |
| | | Year A | Year B | Year C | Year D | Year E |
|---|---|---|---|---|---|---|
| a) | Dow Jones Industrials | + 4% | – 6% | + 5.00% | + 4% | +20% |
| b) | S & P 500 Stocks | + 6% | +10% | +21.0% | + 5% | +16% |
| c) | NASDAQ Composite Index | – 7% | +11% | + 2.98% | –11% | +27% |
| d) | Total | + 3% | +15% | +28.98% | – 2% | +63% |
| e) | Average index increase (total divided by 3) | 1% | + 5% | 9.66% | -0.66% | +21% |
| f) | VAS distribution to each child at $2,000 for each 1/10th of 1% increase in the 3 index average level, subject to the $400,000 maximum in any year. | 1% or 10 tenths; 10 x $2,000 = $20,000 | 5% or 50 tenths x $2,000 = $100,000 | 9.66% or 96 tenths x $2,000 = $192,000 | -0- | 21% or 210 tenths x $2,000 = $420,000; but the VAS distribution here would be $400,000 because $400,000 is the maximum VAS amount payable |

The $400,000 annual ceiling on VAS distributions set out above is to be increased annually commencing January 1, 2005 in accordance with the provisions of Paragraph 8-K below (a cost-of-living adjustment).

The VAS provision, it should be observed, utilizes increases in common stock values merely as a basis for measuring or determining additional distributions to the two children, to permit them to participate in a rise in the general level of wealth of the country regardless of how well or how poorly the assets of the Trust and DFI may be performing. Such provision, for VAS distributions, is not, therefore, to be interpreted as suggesting that the

13

Trustees invest Trust assets entirely in common stocks or in indexed funds. RTD's views on such investments are set out in Paragraph 13-B below.

4-B(2)(b).  Authorized Further Discretionary Distributions To RTD's Two Children.  In addition to the payments provided for above or authorized in any other provisions of this overall Paragraph 4-B (through and including 4-B(8)), the Corporate Trustee may in its discretion pay to Richard or Kathy, or use for his or her benefit, so much of the income or principal of the Issue Trust as such Trustee from time to time determines to be required or desirable for his or her medical needs, support, welfare, education and best interests.

4-B(3).  Recommended Distributions To Surviving Spouses Of Deceased Children Of RTD.  In all circumstances, whether RTD is living or deceased, it is recommended that the sum of $25,000 be distributed each year for ten (10) consecutive years from the Issue Trust to the surviving spouse of a deceased child, such sum to be payable whether the other of RTD's two children (the sibling) is living or deceased.  Such payments should commence during the first calendar year after the year of the death of the deceased child and should be payable in quarterly installments of $6,250 each on the last day of the second month of each calendar quarter (thus on the last day of February, May, August, and November).  It is recommended that the first such quarterly payment be made on the last day of February of the first calendar year after the year of the death of the deceased child.  The payments to the surviving spouse should cease upon the death of such spouse and should not continue in favor of the spouse's estate, heirs or legatees.

4-B(4).  Discretionary Payments For Education, Medical And Health Care Services To The Spouses Of The Two Children Of RTD, Each Grandchild Of RTD, The Spouse Of Each Grandchild, And To The Descendants Of Each Grandchild.  The Trustees may in their discretion pay for the benefit of the spouse of each child of RTD, each grandchild of RTD, the spouse of each grandchild of RTD and each descendant of a grandchild of RTD so much of the income or principal of the Issue Trust as the Trustees from time to time determine to be desirable for such beneficiary's education, medical and health care.  Such discretionary payments to or for the benefit of each child of RTD are authorized in Paragraph 4-B(2)(b) above.  Such payments to or for the spouse of a child or grandchild are authorized whether RTD or such child or grandchild is living or deceased.  If the beneficiary is a skip person for the purposes of the generation-skipping tax, such payments shall only be made to qualified third party providers as defined in Code Section 170(b)(1) and 213(d) and shall only be made if such payments are considered to be excluded from the term "generation-skipping transfer" as provided under the terms of Code Section 2611(b).

4-B(5).  Concerning Distributions To Providers Of Education, Medical And Health Care Services.  It is RTD's desire and recommendation that payments for education, medical and health care be principally directed to the payment of those costs not paid, covered or reimbursed by private or government insurance, scholarships, grants, or subsidy of any kind; but such payments can include payments of premiums for medical and hospitalization insurance.  It is possible that RTD while living may elect to personally make

14

Exhibit B Page 25

some if not all payments to third party providers of education and medical and health care services extended to trust beneficiaries, though Bank One as Trustee of certain Section 2503(c) trusts, Section 529 trusts, and other trusts RTD and his deceased wife have heretofore established (or RTD may in the future establish) can also make such payments if the assets in such trusts permit and if the Trustee or Trustees of the various trusts involved, in their sole discretion, deem such payments to be advisable.

4-B(6). Contingent Further Distributions To Kathryn D. Callen (KDC) If She Survives Her Brother Richard D. Doermer. A brief explanation of the background for the provisions to follow, relating to certain distributions to RTD's daughter contingent upon surviving her brother RDD, would here seem useful. On 12/30/92 and 5/30/97, two separate charitable remainder unitrusts were established by RTD and his wife in which KDC was designated a lifetime distributee. Her annual distributions, being made in quarterly installments, are specified to be in a sum equal to 8% of the principal of each trust as of the first business day of each year. Her brother RDD, in both trusts, is named a contingent beneficiary to receive such annual distributions in the event he survives her. As of 4/20/99 these two trusts together had a combined principal value of $4,058,414. Upon the death of the survivor of the two children, the residual amount of each trust is to pass to charity. The residual of the 12/30/92 trust is to be distributed to approximately ten public charities, and that of the 5/30/97 trust is to pass to the Doermer Family Foundation, Inc. For sound reasons which need not here be reviewed, a similar trust for RDD was not established until 4/20/99. However, a change occurred in the tax laws in 1997, effective May 5, 1997 which made it impracticable in 1999 to precisely duplicate, as had been desired, the terms of KDC's two CRUTs in the new CRUT for RDD. The change served to preclude the qualification of a CRUT for status as a non-taxable charitable entity unless the charitable remainder interest, as of the date the unitrust is established, has a present fair market value equal to at least 10% of the value of the total property contributed to the trust. Obviously this residual value determination relates in important part to the actuarial life expectancy of the lifetime distributee or distributees. When both a primary and a succeeding distributee are named, two life expectancies are involved, which serve to lengthen the projected period before which the charitable remainder can be expected to receive its residual interest. This in turn serves to diminish the present value of that interest at the time of the establishment of the trust. Unfortunately, if KDC, in a new charitable remainder unitrust, established after 8/5/97, of which RDD would be the primary lifetime distributee, were to be named a subsequent distributee contingent upon her surviving RDD, the trust would not, because of the present life expectancies of the two children, pass the IRS 10% residual interest test. It appears that to pass the current test the annual distribution rate, if KDC were named a contingent distributee, would have to drop from 8% to approximately 6-1/2%, reducing the annual distribution rate in dollars, assuming a CRUT with a principal of approximately $4,058,000, from $324,640 to $263,770, a significant yearly decrease (omitting the impact of growth in principal attributable to a higher annual earnings rate than payout rate).

Because of these various events RTD and his wife resolved to, and did, establish the "RDD 1999 8% CRUT", doing so on 4/20/99, funding it with $4,058,414.78 in marketable securities (a value equal to that in KDC's two CRUTs at 4/20/99). This CRUT names RDD as the sole distributee, specifies an 8% annual distribution or payout rate (the same as the

15

two CRUTs for KDC) and, in order to pass the IRS 10% charitable remainder test, omits KDC as a contingent distributee if she survives RDD. The Doermer Family Foundation, Inc. is named the charitable residual beneficiary.

Thus, each of the two children at 4/20/99 was the primary beneficiary of a CRUT or CRUTs with aggregate assets, as of 4/20/99, of $4,058,414, which CRUTs were expected, at such value (and under the annual distribution terms described above, assuming adequate investment results) to distribute approximately $324,000 pretax per year to each child.

However, due to the tax-driven omission of KDC as a contingent distributee in the RDD 8% CRUT of 4/20/99, the described actions could lead to a possible inequity as between the two children if KDC were to survive her brother. KDC would receive no distributions from her brother's 8% CRUT, but if he survived her, he would continue to receive the 8% distributions from her two 8% CRUTs.

Against this background, and to inject a needed and important equality in the treatment of the two children, RTD is moved to, and hereby does, recommend that the Corporate Trustee, if RDD predeceases KDC, make an additional annual distribution to KDC from the Issue Trust in an amount each year determined as follows:

In the event KDC survives RDD, it is recommended that the Corporate Trustee of the Issue Trust, promptly after RDD's death, commence making calendar quarter distributions in cash from the Issue Trust to KDC in the same quarterly dollar amount as had been distributed to RDD from the 4/20/99 8% CRUT bearing his name during the calendar year of RDD's death. It is recommended that such quarterly cash payments from the Issue Trust to KDC during the remainder of the calendar year of RDD's death then continue until the end of such calendar year, at which time they should be re-determined for the subsequent year, and then re-determined for each calendar year thereafter, under the following procedure:

(1) The Corporate Trustee should note what had been the principal balance in the RDD 8% CRUT of 4/20/99 on the first business day of the calendar year of RDD's death. An amount equal to 8% of such balance would have been payable to RDD from his CRUT during such year had he survived the full year.

(2) The Corporate Trustee should use such beginning balance figure as a base figure for the calculation of future distribution amounts to KDC from the Issue Trust under the authority of this Paragraph 4-B(6). Such amounts would be in addition to those payable to KDC from her two CRUTs of 12/30/92 and 5/30/97. The Corporate Trustee should add to such base figure an amount determined by multiplying such figure by a percentage equal to the percentage increase in the Standard and Poor Index of 500 stocks experienced during the full calendar year of RDD's death. The resulting enlarged base figure is herein called the "appreciated base figure".

(3) The Corporate Trustee should next subtract from the appreciated base figure (i) an amount equal to all distributions to RDD from his CRUT during the year of his death and

16

shall also subtract (ii) an amount equal to all distributions to KDC during such year from the Issue Trust pursuant to the authority of this particular paragraph. The Corporate Trustee need not time-weight the effect of such distributions. The resulting figure is here called the "yearly adjusted base figure".

(4) The Corporate Trustee should then multiply the yearly adjusted base figure by 8% (the same payout percentage specified in the RDD CRUT), and the resulting product amount should be the amount distributed, in quarterly installments, to KDC during the calendar year immediately following the calendar year of RDD's death.

(5) Before March 1 of each subsequent calendar year the Corporate Trustee should (a) note the immediately prior year's "adjusted base figure" and (b) should add thereto an amount determined by multiplying such figure by a percentage equal to the percentage increase in the S&P Index of 500 stocks experienced during such prior year (as in subparagraph 2 above). From such appreciated adjusted base figure the Corporate Trustee (c) should subtract all distributions to KDC during such year from the Issue Trust (thereby determining a current "yearly adjusted base figure"...as in subparagraph 3 above). (d) The Corporate Trustee should then multiply such current yearly adjusted base figure by 8%, and the resulting product amount would be the amount distributed from the Issue Trust, in quarterly installments, to KDC during the ensuing calendar year. Such amount should be in addition to all other amounts distributed to KDC from the Issue Trust under the authority of other paragraphs of this Agreement during such year.

(6) If the S & P Index of 500 stocks does not increase in value during a calendar year, there should be no percentage reduction in the prior year's adjusted base figure because of any decrease in the S & P Index of 500 stocks.

Similar annual calculations, actions and distributions should then, it is recommended, be regularly undertaken by the Corporate Trustee until the death of KDC.

The following illustration may be helpful.

If the RDD 8% CRUT of 4/20/99 at the beginning of the year of RDD's death then had a balance of $5 million (the "base figure"), and if RDD had been receiving $100,000 in quarterly distributions from the RDD 8% CRUT at the time of his death ($400,000 on an annual basis), KDC would, promptly following RDD's death, commence receiving identical quarterly amounts from the Issue Trust and would receive them through the balance of the calendar year of RDD's death. The first such payment to KDC relating to a period of less than a full quarter should be appropriately prorated. At the end of such year, if the total return on the S&P 500 Index had risen by 8.64% during such year, the "base figure" (as described in subparagraph (2) above) would rise from $5 million to $5,432,000 (the "appreciated base figure") (8.64% x $5,000,000 = $432,000 + $5,000,000 = $5,432,000). If total distributions to RDD from the RDD 8% CRUT during such year (the year of his death) had been $300,000 and if distributions to KDC during such year from the Issue Trust under the authority of this Paragraph 4-B(6) had been $100,000, these amounts (totaling $400,000) would be subtracted from the $5,432,000 figure leaving a current "yearly adjusted base

17

figure" of $5,032,000. The Corporate Trustee would then multiply such adjusted base figure ($5,032,000) by 8% (the payout percentage specified in the RDD CRUT) to determine the annual amount ($402,560) to be distributed, pursuant to this Paragraph 4-B(6), in quarterly installments (of $100,640), to KDC from the Issue Trust during the ensuing year. If during the following year (the first full year after RDD's death) the S & P 500 Index were to rise by 3%, the adjusted base figure ($5,032,000 at the beginning of such year) would be increased from $5,032,000 to $5,182,960 (3% x $5,032,000 = $150,960 + $5,032,000 = $5,182,960). The amount of the extra distributions in the sum of $402,560 recommended under this Paragraph 4-B(6) to be made to KDC from the Issue Trust during such year (based on a payout of 8% multiplied by the $5,032,000 adjusted base figure applicable to such year), would then be subtracted from the $5,182,960 adjusted base figure, leaving a new adjusted such base figure of $4,780,400. During the following calendar year, the extra distribution payable from the Issue Trust to KDC under this Paragraph 4-B(6) would be in the sum of $382,432 (8% of $4,780,400). Similar annual calculations would then be made by the Corporate Trustee by March 1 of each subsequent year for such year, and all of the determined additional annual distribution amounts would then be made to KDC during each such year from the Issue Trust until KDC's death.

The Corporate Trustee, in determining discretionary amounts to be distributed to all Issue Trust beneficiaries under this Agreement, is herein directed, as an on-going review, to consider the possibility of the additional distributions to KDC contemplated in this Paragraph 4-B(6), because of her potential survival of RDD (her present life expectancy actuarially exceeds that of RDD by approximately seven years). It is presently expected, however, that the Issue Trust will be amply funded to enable such extra distributions to KDC without a material adverse effect upon distributions for the benefit of other beneficiaries under this Agreement.

While distribution adjustments are herein recommended to be made based in part upon future increases in the S&P Index of 500 stocks, if in the Corporate Trustee's judgment such Index becomes no longer representative of the market for stocks as a whole, such Trustee is authorized to select another index of a kind more likely to be so representative and is empowered to utilize, in its sole discretion, such replacement index in lieu of the S&P 500 Index in making the annual calculations and distributions herein recommended.

The contingent distributions to KDC to be made under this Paragraph 4-B(6), when or if made, should have no effect whatsoever on the Corporate Trustee's discretion and determination of other amounts authorized to be distributed to her under other provisions of this Agreement; and the Corporate Trustee should then, if such contingent payments to KDC become actual payments, wholly exclude from its consideration in determining such other distributions to KDC all amounts distributed or to be distributed to her under this Paragraph 4-B(6).

4-B(7). <u>Prorating Annual Base Amount Payments, VAS Distributions And Substitute CRT Payments To KDC For Any Short Year.</u> In determining (i) each VAS distribution, and (ii) the substitute contingent payment to KDC pursuant to Paragraph 4-B(6), the Corporate Trustee should prorate the same, on a daily basis, for any short taxable

18

year. A short taxable year shall include that portion of a calendar year which precedes the date of death in such year of any beneficiary and shall also include any calendar year in which an Annual Base Amount Payment commences, terminates or changes. For the year 2004 the taxable year shall be considered to have commenced on August 1, 2004.

4-B(8). Reimbursement Of Certain Income Taxes Paid Or Payable By RTD's Two Children. RTD wishes to state that whenever a federal, state or local income tax liability is incurred by either of his two children relating to (i) base amount distributions, VAS distributions, and all other distributions made by the Issue Trust to the child, though excepting and excluding tax reimbursement distributions made under this Paragraph 4-B(8), or relating to (ii) payments made to any other person or entity for the benefit of such child (as for education and medical and health care benefits), then and in each such event it is recommended that the Corporate Trustee make a tax reimbursement distribution or distributions to such child in such amounts as will reimburse it for the federal, state and local income taxes incurred by it as a result of such distributions, payments or events. The Corporate Trustee should note that authorized reimbursements for the income taxes described in the previous sentence are limited to RTD's two children and are limited also to the amount of taxes incurred as a result of the distributions described and do not apply to distributions designed to reimburse such children for income taxes payable on reimbursed amounts.

The total amount of each such tax reimbursement distribution during any calendar year should be that amount which equals the excess of such income taxes as are in fact payable or paid by the child for the taxable year involved (excluding those taxes attributable to distributions intended to reimburse such children for income taxes payable on reimbursed amounts) over what such taxes would have been if no income tax relating to Issue Trust distributions or imputed taxable income were payable by such child.

It is recommended that such reimbursement be made both for income taxes incurred during a previous calendar or fiscal year but payable during a current year and for a current year's taxes which are payable in advance installments based upon declarations of estimated taxes for such year.

The Corporate Trustee may rely on income tax returns of RDD or KDC or such other information as such Trustee deems relevant in determining the reimbursement amount payable pursuant to this Paragraph 4-B(8), including for each year involved a written statement from the child's income tax preparer identifying the reimbursement amount and setting forth the related tax calculations which led to the determination of such amount. The Corporate Trustee shall have no obligation to verify the correctness (i) of either child's tax returns or (ii) of a written statement of a child's tax return preparer identifying the reimbursement amount.

RTD wishes here to observe that there are not similar express provisions in this Agreement for income tax reimbursements relating to distributions made to other beneficiaries than RTD's two children (as distributions to spouses, grandchildren, etc.) except for distributions reimbursing a beneficiary for tax liability incurred as a result of

19

Exhibit B Page 30

taxable income imputed or attributed but not in fact paid to such beneficiary, because of RTD's concern that such additional provisions might unduly strain the aggregate of Trust resources and thereby frustrate the realization of RTD's overall estate plan objectives.

It is RTD's desire that the minimum annual base amount payments, the VAS distributions and all other distributions authorized in this Article IV for each of his two children be exclusive of and not include nor consist of, nor be affected by, distributions intended to enable the payment of, or to reimburse for, income taxes on taxable income of the kind described in this Paragraph 4-B(8).

4-C. <u>Limited Power Given To Children And Grandchildren Of RTD Allowing Children And Grandchildren To Modify Payments To Their Respective Spouses And Descendants.</u> Each child and each grandchild of RTD shall here be referred to as a Power Holder. A Power Holder may, by signed written instrument delivered to all the Trustees, direct the Trustees not to make any future annual payments or discretionary distributions to such Power Holder's spouse, child or children or to any third party providers of education, medical and/or health care services for the benefit of such spouse, child, or children; and the Power Holder may in a similar manner direct the Trustees to reduce, suspend, condition or otherwise modify (though not to increase above the amounts recommended or specified in this Agreement) any annual or periodic payment or discretionary distribution to or for the benefit of any spouse, child or children of the Power Holder, including payments to providers of medical, health or education services to or for any of such persons; and the Power Holder may withdraw any such directive and reinstate it, upon the same or different terms, at any time. Each written directive delivered to the Trustees by a Power Holder shall be effective and shall bind such Trustees for the particular period of time specified in such writing, but no such time period shall exceed 36 months from and after the date of delivery of such directive to the Trustees. If no time period is specified in any directive, the time period shall be twenty-four months.

The Trustees should note that each Power Holder's authority hereunder extends to distributions to or for the Power Holder's spouse, child or children but not to or for the Power Holder's grandchildren (as RTD's great grandchildren) or other descendants (unless authorized to do so as an Alternate Power Holder appointed by a Power Holder's child,...for which provision is made below in this Paragraph 4-C).

A Power Holder during or following the expiration of any applicable time period, may deliver to the Trustees a new written directive reinstating, modifying, or cancelling an earlier directive in whole or part, subject only to the limitations set forth in this Paragraph 4-C; and the Power Holder may also then exercise any of his or her other authorities set out in the paragraph immediately above.

A Power Holder may from time to time, by a signed written instrument delivered to the Trustees during the lifetime of the Power Holder, appoint one of the Power Holder's children or a sibling, niece, or nephew of the Power Holder as an Alternate Power Holder, to act concurrently or successively in place of the Power Holder for such time or until the occurrence of such event as is designated by the appointing Power Holder. An Alternate

20

Power Holder, except as otherwise provided in this Paragraph 4-C, shall have all of the rights and powers given to a Power Holder under the provisions of this paragraph. At no time shall there be more than one Alternate for each Power Holder. A Power Holder may also from time to time, by a signed written instrument delivered to the Trustees during the lifetime of the Power Holder, revoke the appointment of any Alternate Power Holder. The authority of an Alternate Power Holder shall, unless otherwise indicated in the document of appointment, survive the incapacity and the death of the appointing Power Holder; but such authority shall not extend to the appointment of an Alternate by any Alternate Power Holder.

The Trustees shall have no duty to notify a Power Holder of any considered or proposed discretionary distribution.

RTD may not be appointed as an Alternate Power Holder. An Alternate Power Holder is authorized to act with respect to the spouse of the appointing Power Holder, the children of the appointing Power Holder and the spouses of children of the appointing Power Holder. No Power Holder or Alternate Power Holder, however, may act if such person is determined to be incompetent as provided in Paragraph 12-H of this Agreement.

In addition to the authorities given to each Power Holder hereunder the Trustees, with respect to any Trust beneficiary, are hereby given the power to take any of the actions authorized for or to each Power Holder if in the Trustees' sole and exclusive judgment any beneficiary is expending a material part of his or her Trust distributions in a manner which, in the sole opinion of the Trustees, works to such beneficiary's serious prejudice or to the serious prejudice of such beneficiary's spouse, child, or children. Illustrations of conduct or behavior serving to generate such prejudice would in RTD's judgment include (though not be limited to) an addiction to or a pattern of excessive use of alcoholic beverages; drugs in any form; gambling at a level which materially invades individual or family income; criminal, deviant or irresponsible behavior, etc. RTD extends to the Trustees full and wholly exclusive power and authority to determine if any beneficiary, as specified above, "is expending all or a material part of trust distributions in a manner which works to the serious prejudice" of such beneficiary or his family members; and the Trustees' decision in each such matter, absent a willful or gross misuse of the Trustees' discretionary power hereunder, shall be conclusive and binding on all parties.

Under no circumstance shall any action taken by a Power Holder serve to provide the Power Holder with any benefit or basis for personal gain of any kind.

4-D.  Recommended Annual Distributions To GST Tax-exempt Trusts. It is recommended, subject to the Trustees' senior authority to terminate the Issue Trust in the event of adverse changes in the GST tax laws as noted in Paragraph 6-B below, that the Trustees, following the death of the survivor of RTD and the first of RTD's two children to die, distribute the sum of Fifty Thousand Dollars ($50,000) per year to each of the GST trusts established under RTD's GST Trusts Agreement established on this same date. The first such annual payment should be made in the year immediately following the year of such child's death.

21

Exhibit B Page 32

Then upon the death of the survivor of RTD's two children, it is recommended that the Corporate Trustee, commencing during the succeeding calendar year following the calendar year of the death of the deceased child, increase such annual distribution to each of the GST trusts from $50,000 to One Hundred Thousand Dollars ($100,000).

All of such annual payments described in this Paragraph 4-D should, if made, be made in semi-annual installments on or about May 30 and November 30 of each year, and the distribution of the increased amount ($100,000) should commence on May 30 following the year of death of the survivor of RTD's two children.

RTD is aware that such distributions may be subject to withheld GST tax, but feels nevertheless that their after-tax value to the beneficiaries of the GST Trusts may in part offset the effect of such distributions in reducing the size and the distribution capabilities of the Issue Trust.

4-E. If Any Of The Five Public Charities Or The Family Foundation Is Not In Existence Or Becomes Not Qualified As A Charitable Beneficiary. In the event any of the five public charities or the Doermer Family Foundation is not a qualified charity at the time of any distribution to be made to it under this Agreement, the distribution directed to be made to it hereunder shall instead be made to the Roman Catholic Diocese of Fort Wayne-South Bend, Inc. or to its successor, or if it is not a qualified charity at the time of any distribution to be made to it under Paragraphs 4-B(1), the distributions directed to be made to it under Paragraph 4-B(1) shall instead be made to the University of St. Francis, Fort Wayne, Indiana, or if it is not a qualified charity at the time of any distribution to be made to it hereunder, such distribution shall instead be made to such qualified charity or charities which have an office or offices in and provide charitable service to those residing in Allen County, Indiana as are selected by the Trustees or by the Corporate Trustee if it is then serving as the sole trustee. A qualified charity is an organization described in Section 170(c), 2055(a) and 2522(a) of the Code.

4-F. Internal Revenue Code. Unless otherwise specified, all references to Sections in this Agreement are to Sections of the Internal Revenue Code of 1986, as amended, and shall include corresponding provisions of subsequent federal tax laws. ----

4-G. Consideration Of Other Income And Resources Of Trust Beneficiaries. In determining whether and to what extent to make discretionary payments of income or principal to, or for the benefit of, (i) RDD or KDC or (ii) for the education, medical or health care of RDD or KDC, the Corporate Trustee shall not take into account any other property or sources of income or support of RDD or KDC known to the Corporate Trustee. In determining whether and to what extent to make discretionary payments of income or principal to, or for the benefit of, any beneficiary other than RDD, KDC, the five public charities and the Family Foundation, the Trustees may, but shall not be required to, take into account any other property or sources of income or support of the beneficiary known to the Trustees.

4-H. Limitations On Annual Distributions To RDD And KDC. Notwithstanding

22

other contrary provisions of this Agreement, if any appear herein, in each calendar year during which RTD is living (including the year of the death of RTD) the Corporate Trustee shall not make a distribution from the Issue Trust to RDD or KDC to the extent that such distribution would cause the total distributions (excluding distributions for education, health or medical care) for such calendar year from the Issue Trust to such child to exceed $1,000,000. In each calendar year after the death of RTD, such Trustee shall not make a distribution from the Issue Trust to RDD or KDC to the extent such distribution would cause the distributions for such calendar year from the Issue Trust to such child, again excluding distributions for education, health or medical care, to exceed $1,250,000. For the purpose of the limitations in the two preceding sentences the Trustee shall not consider (i) a substitute CRT payment under Paragraph 4-B(6) to KDC if she survives RDD or (ii) a reimbursement for income taxes to any beneficiary to be a distribution.

4-I.   Changes In The Pattern Of Distributions For Education And Medical Or Health Care.  The Trustees are requested to consult with that one of RTD's two children or that of RTD's grandchildren who is the spouse, parent, parent-in-law, or grandparent of a person being considered as a beneficiary by such Trustees under the provisions of this Article IV before initiating or materially changing a pattern of distributions for the education and medical or health care of such person under this Agreement; and the Trustees are requested thereafter to consult periodically with such child or such grandchild concerning the desirable amounts and frequency of such distributions. The Trustees and each of RTD's two children are requested also to confer periodically concerning the size and frequency of distributions, to be made after such child's death, for the education and medical or health care of such described beneficiaries, if any. RTD feels that such conferences would be useful to the Trustees in determining that level of distributions which would most likely best serve the interests of all concerned.

4-J.   Issue Trust Is Chargeable With Those Estate Taxes Assessed In Or Payable By A Beneficiary's Estate Attributable To Such Properties If Includible In The Beneficiary's Estate.  Upon the death of any beneficiary of the Issue Trust, the properties then in the Issue Trust shall, be chargeable with its share of those estate, inheritance, transfer, or succession taxes, if any, which are assessed or assessable against such beneficiary's estate as are attributable to such trust or the properties therein. The portion of each such tax so attributable shall be that amount which equals the excess of such tax finally determined against the beneficiary's estate over what such tax would have been if such properties had not been included in such gross estate for purposes of such tax. Upon written certification by the personal representative of such estate (even if Bank One Trust Company, N.A. is serving as both a Trustee of the Issue Trust hereunder and as such estate personal representative) of the amount of such taxes so attributable, the Trustees of the Issue Trust may pay such amount to such personal representative without further responsibility connected with such payment or with matters relating thereto.

4-K.   In Making Annual Base Amount Distributions, VAS Distributions And Distributions For The Medical And Health Care And Further Education Of RTD's Two Children, And All Other Distributions To RTD's Two Children, The Corporate Trustee Need Not, Except To Anticipate Contingent Payments To KDC As Provided In Paragraph 4-

23

Exhibit B Page 34

<u>B(6). Consider The Effects Upon Remaindermen Or Other Subsequent Interests.</u> In making recommended annual base amount distributions, VAS distributions, distributions for the further education and medical and health care and all other distributions to RTD's two children, the Corporate Trustee need not consider the effects of such distributions upon the capability of the Issue Trust to make future distributions to or for the benefit of any other beneficiaries named herein including but not limited to RTD's GST tax-exempt trusts under Paragraph 4-D hereof, RTD's grandchildren, grandchildrens' spouses and descendants, the spouses of RTD's two children, and the Doermer Family Foundation, Inc., ultimately in its role as final charitable residuary beneficiary except, however, that such Trustee is expressly requested but not directed to consider the effect of such distributions upon the directed annual distributions to the five public charities and the Doermer Family Foundation as described in Paragraph 4-B(1) and possible future distributions to KDC contingent upon her survival of her brother RDD, as provided in Paragraph 4-B(6) above.

ARTICLE V

<u>Protection Against A Beneficiary's Creditors And
Restrictions On Transfers Of Beneficiary Interests</u>

5-A. Neither the income nor principal of the Issue Trust or of any other trust established under this Agreement ("the trust" below in this Article) shall ever be liable for or be subject to any debts, obligations, or liabilities, present or future, arising by contract, tort, marriage, or otherwise, of any beneficiary, nor be subject to the right of any creditor whomsoever of any beneficiary, to seize or reach the same under any writ, process, or attachment, or by any proceeding, judgment, or decree at law or in equity. "Creditor" as used herein shall include the spouse or former spouse of any beneficiary if or when any such spouse asserts any claim whatsoever, including but not limited to alimony, maintenance and support, against any beneficiary or against the income or principal of any trust established hereunder. Further, no beneficiary of any trust shall have any right or power to give, grant, sell, convey, mortgage, pledge, or otherwise dispose of, encumber, or anticipate any of the income or principal of the trust, or any property subject to any power of appointment (if any) hereunder, it being RTD's express direction that no right or power of disposition of any such property shall vest in any beneficiary of the trust until the same shall have been actually transferred or paid over to that beneficiary free of trust in accordance with the terms of this Agreement.

If any beneficiary shall attempt to alienate, dispose of, anticipate, encumber or create a charge upon such trust principal or income, or if any beneficiary shall become bankrupt or make any assignment for the benefit of creditors, or if such principal or income shall be in any way attached, diverted, seized or sequestered or any attempt shall be made to attach, divert, seize or sequester the same by any legal process, or if the Trustees believe that a third party claimant or claimants may take any such attachment, diversion, seizure or sequester action with respect to the income or principal of any trust, the Trustees may and are encouraged to immediately cease to pay amounts of principal or income, in whole or part, to such beneficiary.

24

Exhibit B Page 35

In such event the Trustees, subject to the provisions of Article I limiting the participation of the two Doermer children as Trustees in certain distribution decisions, shall have the power to pay to the beneficiary, or to apply to or for his or her education, health, maintenance, and support, and to pay to other beneficiaries to whom the Trustees in their discretion are authorized to make payments hereunder, and/or to pay to any public charity any part of the trust principal or income threatened or sought to be seized or attached by a third party claimant as such Trustees may in their sole discretion from time to time determine. Any income not so paid or applied shall be accumulated by the Trustees; and amounts so accumulated may at any time thereafter, in the sole discretion of the Trustees, be paid to or applied for the benefit of the beneficiary in such manner and amounts as such Trustees alone may determine. When the beneficiary's interest would have terminated without regard to the provisions of this Article V, the total income then accumulated for such beneficiary shall be added to and, with the principal retained or unpaid, shall be administered as part of the principal of the trust and shall be distributed to or for the benefit of subsequent beneficiaries as is provided for such trust in other Articles of this Agreement.

To further fortify and protect the interests of trust beneficiaries against third party claims, RTD, as provided in other paragraphs hereof, has extended to the Trustees an unusually broad discretion and authority to determine the timing and amounts of authorized distributions to or for the benefit of any beneficiary from the Issue Trust established hereunder. It is RTD's desire that the Trustees view that broad power of discretion in the particular context of RTD's concerns about the possibility, however remote, of such third party claims. RTD would further suggest to the Trustees that his directives or his recommendations for distributions to or for the benefit of specified beneficiaries be viewed as subordinate to the directions designed to protect and safeguard beneficiary interests set out in this Article V.

## ARTICLE VI

### Expiration Of The Issue Trust

6-A. Expiration Of The Issue Trust Agreement And Termination Of The Issue Trust. Rule Against Perpetuities And Restraints On Alienation. Ultimate Passage Of Residual Assets To Doermer Family Foundation, Inc. The Issue Trust established hereunder shall terminate, unless terminated or exhausted earlier under the provisions hereof, upon the sooner of the following two events to occur: (i) the expiration of twenty (20) years and three hundred and sixty (360) days following the death of the survivor, the last to die, of the group comprised of RTD's children and grandchildren living at the time of RTD's execution of this Agreement (namely Richard D. Doermer, Kathryn D. Callen, John M. Callen, Thomas B. Callen, Mary M. Callen, Caitlin M. Doermer and Abigail M. Bergeron), or (ii) the expiration of the period of the Rule Against Perpetuities then prevailing in the State of Indiana applicable to such trust or to the interest of any beneficiary in the trust, except that if the situs or domicile of the Trust has, under the authority of Paragraph 12-D below, been established in a state other than Indiana, then the applicable Rule Against Perpetuities shall be that prevailing in such other state. Thereupon, upon the termination of the Trust under

25

the terms of this paragraph, the properties of the terminated trust shall pass and be paid free of trust to the Doermer Family Foundation, Inc.

All interests of any beneficiary in any trust created under this Agreement and any accumulation of income in any trust created hereunder shall be construed so as to vest within the time fixed by the rule against perpetuities as adopted in Indiana and presently appearing in Indiana Code 32-17-8, et seq., or any amendment or substitution thereof. If any period for the vesting of interest under the law governing any trust created under this Agreement (such as the Rule Against Perpetuities) could cause the trust to fail to vest within the time specified by any such rule, then that trust shall terminate on the date on which expiration of the vesting period specified in that Rule would occur. Any provisions of this Agreement with respect to the distribution of any assets in any trust established hereunder, or with respect to the accumulation of income in any trust, shall be ineffective to the extent that any such distribution or accumulation is contrary to the applicable Rule Against Perpetuities at such time or is contrary to any other applicable law,...that is, shall be ineffective for any period beyond the period (though shall be effective until the expiration of the period) permitted under such Rule or under other applicable law; and notwithstanding anything (if anything) herein to the contrary, each trust established under this Agreement shall terminate, unless sooner terminated under the provisions of this Paragraph 6-A above, upon the expiration of the period applicable to such trust under such Rule Against Perpetuities; and the Trustees shall thereupon forthwith terminate each such particular trust and shall distribute the trust property involved, free of trust, to the Doermer Family Foundation, Inc. as provided in this Paragraph 6-A.

6-B. <u>Trustees' Authority To Terminate The Issue Trust In Event GST Taxes Deemed By The Trustees To Be Excessive Are Imposed Upon Qualified Distributions For Education And Medical Care Services.</u> If the applicable law (including Code Section 2611), which presently excludes from generation skipping transfer tax qualified distributions from trusts to third party providers of education, health and medical care services *is at any time amended* so as to impose such taxes at rates deemed by the Trustees to be excessive, the Corporate Trustee, upon the death of the survivor of RTD's two children, is authorized and encouraged to make the following distributions to each of the distributees named below, such distributions to be made in cash, in marketable securities, or in DFI Class B Limited Interests, or in a mix of such assets, all as determined solely by the Corporate Trustee. Each distribution shall have an aggregate fair market value equal to that percentage, specified below, of the net fair market value of all Issue Trust assets as of the calendar year-end immediately previous to the year in which the distributions under this Paragraph 6-B occur:

(1) to the GST Trusts in the aggregate...58%, each GST trust to receive an equal share;

(2) to the six charities listed in Paragraph 1 in the aggregate...30%, each such charity to receive an equal 5% share; and

(3) to the Doermer Family Foundation, Inc....in addition to its one-sixth share as one of the six charities specified in (2) immediately above, such Family Foundation should receive the entire balance of assets in the Issue Trust. Any transfer tax imposed on any such

26

Exhibit B Page 37

distribution shall be paid by the distributee or paid out of the distributee's share of the
distribution which triggers the tax.

6-C.  Distributions To Other Charities If Doermer Family Foundation, Inc. Not In
Existence.  If the Doermer Family Foundation, Inc. is not in existence at the termination of
the Issue Trust, or is not qualified as a charitable organization under tax laws prevailing at
any point in time at which a distribution is to be made to it hereunder, then a private
foundation or a charitable trust which shall be qualified as a charitable organization as
described in IRC Sections 170(c)(2), 2055(a) and 2522(a) (with Bank One Trust Company,
N.A. or its successor to serve as Trustee) shall be organized to serve as nearly as possible the
charitable purposes served by the Doermer Family Foundation, Inc. at the time of the
execution of this Agreement; and distributions directed hereunder to the Doermer Family
Foundation, Inc. shall instead pass to such replacement charitable entity.  If such a charitable
corporation or trust cannot feasibly, in the sole opinion of the Corporate Trustee, then be
organized, or reorganized, with powers and under terms which will enable it to operate
substantially as the Doermer Family Foundation, Inc. was organized to operate prior to its
termination, (including those provisions in its charter which specify various annual limits on
distributions, commitments, or contributions to qualified charities), the property in the Issue
Trust(as well as any other trust property otherwise passing under this Agreement to the
Doermer Family Foundation, Inc.) shall be distributed, as follows:

(1) 14% to the United Way of Allen County, Inc., Fort Wayne, Indiana;
(2) 16% to University of St. Francis, Fort Wayne, Indiana;
(3) 14% to the University of Notre Dame Foundation, Notre Dame, Indiana;
(4) 14% to the Roman Catholic Diocese of Fort Wayne-South Bend, Inc.;
(5) 16% to the Catholic Community Foundation, Inc., Fort Wayne, IN;
(6) 7% to the Greater Fort Wayne Chamber of Commerce Foundation, Fort Wayne,
Indiana;
(7) 7% to the Fort Wayne Community Foundation, Inc., Fort Wayne, Indiana;
(8) 6% to St. John the Baptist Catholic Church, Fairfield Avenue at Sherwood
Terrace, Fort Wayne, Indiana; and
(9) 6% to Indiana University-Purdue University at Fort Wayne (IPFW).

In the event that any of such charitable organizations above (or its successor) is not
then in existence, or does not then qualify as a charitable organization under then-prevailing
tax laws, the Corporate Trustee shall distribute such charity's percentage interest
proportionately to the other charities listed above which are then in existence (based upon
each charity's respective percentage interest in the distribution which would have passed to
the charity had it not gone out of existence).

27

## ARTICLE VII

### Trustees' Powers If Any Beneficiary Is Deemed Incompetent; Subchapter "S" Corporation Provisions; Generation Skipping Taxes

7-A. Trustees' Power To Retain Property In Trust If Beneficiary Is Deemed Incompetent Or To Distribute Such Property To Others For The Benefit Of Such Beneficiary. Except as is otherwise provided in paragraphs hereof dealing with distributions from the Issue Trust to third party providers of education, medical and health care services, if any beneficiary hereunder excluding RTD's two children is deemed incompetent under the provisions of Paragraph 12-H below, the Trustees may in their discretion elect to withhold and suspend, in whole or part, any distributions to such person which they would otherwise make and to retain, either in a separate trust or in the corpus of the Issue Trust, the funds or property not distributed or to distribute all or part thereof to such beneficiary's guardian, parent, spouse, sibling or to any other responsible party, to be used exclusively for the benefit of the incompetent person, all to the extent the Trustees in their sole judgment may determine. If either of RTD's two children is deemed incompetent under the provisions of Paragraph 12-H, the Corporate Trustee alone shall have the powers set out in the previous sentence.

7-B. Subchapter "S" Corporation Provisions. RTD has carefully considered the tax and other consequences of a possible election by any corporation whose stock is held in any trust hereunder to become or continue to operate as an "S" Corporation under Section 1361(a)(1) of the Code. Therefore, if any trust under this agreement holds or will hold shares of a corporation eligible for an election under the Code as an S corporation, the Trustees, both before and after RTD's death, with the written consent of RTD's two children or their survivor, may elect to qualify the corporation as an S corporation or to retain S corporation status for the corporation. The Trustees may amend any trust under this Agreement to the extent needed to qualify the trust as an S corporation shareholder under the Code and then make any election to so treat the trust, provided that any such amendment is not, in the judgment of the Trustees, inconsistent with the dispositive intent of RTD as expressed in the various provisions of this Agreement. If the Trustees make the judgment described, and obtain the written consent of the two children or their survivor, as specified above, the Trustees and any beneficiary of such trust may make or implement any such modifications to qualify for S corporation status or retain S corporation status, and, following such decision and implementation, the administrative provisions hereof shall continue to control the administration of the trusts affected hereby only to the extent such provisions are not inconsistent with the orderly administration of the trusts under the S corporation rules of the Code.

7-C. Allocating Burden Of Any Generation Skipping Transfer Tax. Any generation skipping transfer tax which may become payable by reason of any transfer or distribution made pursuant to any trust created under this Trust Agreement (though no such GST taxes are expected) shall be paid and charged, except as otherwise provided by law or in this Agreement, as follows: (a) In the case of a "taxable termination" or a "direct skip", the tax shall be paid by Trustees and charged against and paid from the property constituting the

28

taxable termination or direct skip; (b) in the case of a "taxable distribution," the tax shall be paid by the transferee, but Trustees shall withhold the amount of the tax from the transferee and shall make those funds available for the payment of the tax owing by the transferee. The quoted terms shall have the meanings given by them in Chapter 13 of Subtitle B of the Code.

7-D. <u>Generation Skipping Tax Election; Allocation Of Tax Exemption</u>. If an election is, or may be, made under Section 2632 of the Code, or under any other code section, to allocate any unused generation skipping tax exemption to only a part of any trust created under this Agreement, Trustees shall then have the power, in their discretion, upon prior written notice (of at least ten days) of such election or proposed election to the beneficiary or beneficiaries affected, to segregate on the basis of the then fair market value of the assets of such beneficiary's or beneficiaries' trust, and thereafter separately to account for and administer as separate trusts, (a) that portion of such trust with respect to which a generation skipping tax exemption was or may be allocated (generation skipping tax-exempt trust) from (b) that portion with respect to which a generation skipping tax exemption was not or may not be allocated (generation skipping tax non-exempt trust). If Trustees exercise such power, any invasions of principal of any trust estate for a beneficiary who is a "non-skip person," as defined in the Code, shall be made only from that beneficiary's trust with respect to which a generation skipping tax exemption has not been allocated, until either such trust is exhausted or no readily marketable assets remain therein.

7-E. <u>Trustees Are Authorized To Divide Any Trust Into Two Separate Trusts To Achieve Inclusion Ratios Of Either Zero Or One</u>. Trustees are authorized (but not directed) to divide any trust under this Agreement, at any time, into two separate trusts, in order that the inclusion ratio, as defined in section 2642 of the Code, for each such trust shall be either zero or one. Anything in this Agreement to the contrary notwithstanding, in funding the two separate trusts so created, Trustees must fund such two resulting trusts in accordance with the requirements prescribed by the Secretary of the Treasury respecting allocation of post-death changes in value for purposes of section 2642(b)(2)(A) of the Code.

If a distribution of income or principal may be made from more than one trust under this Agreement or under any other trust agreement executed by RTD or his deceased wife in favor of a beneficiary who is not a skip person as defined under section 2613 of the Code, payment, in such event, from a trust with a larger inclusion ratio, as defined under Section 2642 of the Code, shall be preferred to payment from a trust with a smaller inclusion ratio; and the reverse shall be preferred in the case of a payment to a beneficiary who is a skip person. References to issue or children of RTD shall be only to those persons who are issue or children of both RTD and his deceased wife, Mary Louise Doermer.

Trustees may act or not act in exercising any of the powers or rights described in this Article VII as Trustees deem advisable in the context of their interpretation of RTD's overall estate plan and estate objectives, and none of such acts or omissions shall result in adjustments among beneficiaries of any trust, nor shall they result in Trustees' personal or corporate liability of any kind.

29

## ARTICLE VIII

### Other Powers Of The Trustee And Other Administrative Provisions

8-A. *General Powers of Trustees.* Except as otherwise restricted in this Agreement, the Trustees hereunder (and each successor Trustee), shall have and is hereby given the general power to deal with any property, real or personal, held in any trust established hereunder, as freely as RTD might in the handling of RTD's own affairs. In addition, no person who transfers money or other property to the Trustees shall be required to see to the proper application of such money or other property. It is intended by the provisions of this Article VIII that the Trustees shall have the specified powers stated below in addition to its powers conferred by law.

Except for and subject to the provisions of Paragraph 8-C and 8-C(1) below (which require certain beneficiary consents before a sale or other disposition can be made of Avis voting stock and other specified interests), nothing in this Agreement shall preclude the Trustees from selling any trust assets to any member of the Doermer Family (as defined in Paragraph 12-B(12)) at fair market value and on market terms; and no fiduciary obligation shall in any way exist with respect to, nor shall attach to, any Doermer family member in negotiating or effecting any such purchase or sale transaction.

In acquiring, investing, reinvesting, exchanging, retaining, selling, and managing the assets of DFI and the estate of the Trust established under this Agreement, the Trustees are hereby relieved from any provisions or requirements imposed by any applicable law or regulation restricting or directing the manner in which trust funds may be invested, other than that RTD, except with respect to the trust assets described in subparagraphs 8-A(1) through 8-A(4) below and as provided in Paragraph 8-B(2) below, expects of the Trustees good faith and that degree of judgment and care in the exercise of the rights, powers, duties, and privileges granted to the Trustees hereunder which a prudent man would use if he were the owner of the trust property or the property of DFI.

8-A(1). Trustees are specifically given the right to purchase, acquire, retain and enlarge (i) life insurance coverages on the life of RTD payable to any trust established hereunder or to the partnership DFI, L.P., and (ii) any interests in Avis Industrial Corporation, Pacific Service Company partnership, Doermer Family Interests, L.P. and any other closely-held general or Sub S corporation, limited liability company, or general or limited partnership, as defined in Paragraph 12-B(9) below, and (iii) any investment or interest in any form or entity given by RTD to any trust established hereunder, notwithstanding that some of such investments or interests may not be permitted by the laws of Indiana governing investments by fiduciaries or by any Prudent Investor Rule or Prudent Man Rule.

8-A(2). Trustees, also, are empowered (i) to retain for any period of time without limitation, and without liability for loss or depreciation in value, any property transferred by any person to the Trustees, including partnership interests (whether general, special or limited), even though the Trustees could not properly purchase the property as a trust investment and even though its retention might violate principles of investment

30

Exhibit B Page 41

diversification, including the Prudent Man Rule and the Prudent Investor Rule; (ii) to invest any amount of the trust principal, up to and including all of the trust principal at any particular time, as a limited or a general partner in Doerner Family Interests, L.P., irrespective of investment by RTD or by the Trustees (in any capacity) in such partnership, without regard to whether the Trustees may properly invest as a partner in such partnership under applicable law (including, but not limited to, the disregard of any duty the Trustees may have to diversify investments or any duty the Trustees may have not to delegate investment decisions).

8-A(3). Trustees are also empowered to maintain, renew or extend any agreements and investments acquired by Trustees, and to enter into new such investments or agreements, which are or have been, in the Trustees' sole judgment, intended in part to enhance Trust cash income, or to diversify (without selling), or to limit potential market value decline or loss in, any trust investment in any publicly traded stock held by or resting in the aggregate in all trusts established under (i) this Trust Agreement, and (ii) under the GST Tax-exempt Trusts Agreement executed on this same date, and/or (iii) held by or resting in the Doerner Family Interests, L.P. partnership (ownership units of which are held by one or more of such trusts). Such permissible agreements and/or investments by the Trustees (if renewed or entered into following Trustees' affirmative judgment that investment diversification without incurring undue capital gain taxes, and/or investment protection against possible trust asset market value decline, is desirable in any or in all trusts) shall include, but not be limited to, buy and sell covered option agreements, stock performance exchange or equity performance swap agreements, investments in limited partnerships or other entities which may constitute "exchange funds", the maintenance of margin accounts and brokerage accounts, maintaining long and/or short positions in any stock, transactions involving the receipt of marginable credit in any brokerage account, borrowing and/or lending any securities from or to any third parties or entities, the maintaining of cash or unencumbered securities in any margin account to meet required equity positions in an account, utilizing "shorting against the box" (or "short versus the box in perpetuity") or no cost or low cost collar strategies, Over The Counter cash settled derivatives, and/or synthetic equity diversification programs, and the utilization of any other investment formulas or strategies deemed by the Trustees to be useful or advisable only in the interest of (a) maintaining directly or indirectly for any trust hereunder a desired investment diversification or (b) legitimately deferring income taxes otherwise payable if trust or DFI securities were directly sold in a conventional sale transaction. Trustees shall not, however, utilize any of the strategies or techniques herein described for the purpose of enhancing yield or total returns on any trust investment or for the purpose of speculating in any way in any market in order to enhance the investment performance of any trust or other entity.

8-A(4). Also, the Trustees are fully authorized, although no obligation is imposed in this respect, to invest the trust property in savings accounts, certificates of deposit or similar accounts or securities of the Trustees in whatever capacity or capacities the Trustees may then serve and to maintain deposit accounts of all kinds with and to purchase authorized securities from any department of or any corporation affiliated in any way with the Corporate Trustee and/or Bank One Corporation ("Bank One") or any

31

successor corporation to Bank One. This authority shall include but not be limited to the purchase of shares or other securities, or investment units, issued by mutual funds or common trust funds of every kind and nature, (and the shares of other entities or corporations), which are organized, administered, managed, sponsored or sold by the Corporate Trustee in any capacity, or by any corporation or entity affiliated in any way with, or owned in whole or part by, Bank One or any affiliate or subsidiary, or any successor to any of such entities, including the Corporate Trustee.

8-A(5). By way of further elaboration, and perhaps some redundancy, the Trustees, in addition to the powers conferred by law, but subject to the limitations contained elsewhere in this Agreement, shall observe, and shall also have the powers set out in, the following provisions. They are empowered:

(a) To invest in bonds, common or preferred stocks, notes, real estate mortgages, common trust funds, shares of regulated investment companies or other entities (including any participation in an investment company registered under the Investment Company Act of 1940 for which the Corporate Trustee or an affiliate of the Corporate Trustee is acting as an investment advisor, custodian or administrator), partnership interests (whether general, special, or limited), interests as members in limited liability companies, and other securities or property, real or personal, domestic or foreign, including partial interests, such as life estate, term or remainder or lead interests, without being limited by any statute or rule of law governing investments by a trustee;

(b) To make allocations, divisions, and distributions of trust property in cash or in kind, or partly in each; to allocate different kinds or disproportionate shares of property or undivided interests in property among the beneficiaries or separate trusts, without liability for, or obligation to make compensating adjustments by reason of, disproportionate allocations of unrealized gain for federal income tax purposes, though Trustees are requested to observe RTD's recommendations expressed elsewhere in this Agreement that distributions to beneficiaries of the same class, in the absence of particular or special circumstances and excluding distributions for the education and medical care of beneficiaries, be in approximately equal amounts and, where feasible, have somewhat similar tax cost basis and income tax effects to the beneficiaries of such class; and to determine the value of any property so allocated, divided, or distributed;

(c) To exercise in person or by general or limited proxy all voting and other rights, powers, and privileges and to take all steps to realize all benefits with respect to stocks or other securities; and to enter into or oppose, alone or with others, voting trusts, mergers, consolidations, foreclosures, liquidations, reorganizations, or other changes in the financial structure of any corporation;

(d) To cause any security or other property to be held, without disclosure of any fiduciary relationship, in the name of the Trustees, in the name of a nominee, or in unregistered form;

32

(e) To pay all expenses incurred in the administration of the trust, including reasonable compensation to each Trustee, and to employ or appoint and pay reasonable compensation to accountants, depositaries, investment counsel, attorneys, attorneys-in-fact, and agents (with or without discretionary powers);

(f) To deal in any way with the fiduciary or fiduciaries of any other trust or estate, even though any Trustee is also the fiduciary or one of the fiduciaries of the other trust or estate;

(g) To compromise or abandon any claim in favor of or against any trust;

(h) To lend money to the personal representative of RTD's estate, and to purchase property from the personal representative of such estate and retain it for any period of time without limitation, and without liability for loss or depreciation in value, notwithstanding any risk, unproductivity, or lack of diversification;

(i) To commingle for investment purposes the property of the trust with the property of any other trust held hereunder, allocating to each trust an undivided interest in the commingled property;

(j) To receive any property, real or personal, added to the trust by lifetime or testamentary transfer or otherwise, if the Trustees consent thereto in writing;

(k) To execute instruments of any kind, including instruments containing covenants and warranties binding upon and creating a charge against any trust property and containing provisions excluding personal liability; and

(l) To obtain and maintain medical and hospitalization insurance for the benefit of each or any trust beneficiary named herein; and

(m) To perform all other acts necessary for the proper management, investment, and distribution of any trust property.

The powers granted in these Paragraphs 8-A through 8-A(6) shall be in addition to those granted by law and may be exercised even after termination of all trusts hereunder until actual distribution of all trust principal, but not beyond the period permitted by any applicable rule of law relating to perpetuities.

8-A(6). In addition to the powers listed above, the Trustees shall also have the power to deal with matters involving the actual, threatened, or alleged contamination of any property held in any trust (including any property or other interest held in sole proprietorships, partnerships, or corporations in which a trust may have an ownership or other interest). In particular, the Trustees are empowered:

(a) To inspect and monitor trust property periodically, as any Trustee deems necessary, to determine compliance with any environmental law affecting such property,

33

Exhibit B Page 44

with all expenses of such inspections and monitoring to be paid from the income or principal of the trust;

   (b) To respond (or to take any other action necessary to prevent, abate, or "clean up") as the Trustees deem necessary, before or after the initiation of enforcement action by any governmental agency, to any actual or threatened violation of any environmental law affecting any of such property, the cost of which shall be payable from the income or principal of the trust;

   (c) To settle or compromise at any time any claim against the trust related to any such matter asserted by any governmental agency or private party;

   (d) To disclaim or reject any power which any Trustee determines may cause the Trustee to incur personal liability as a result of any such matter, whether such power is set forth in the trust, incorporated by reference herein, or granted or implied by any statute or rule of law;

   (e) To decline to serve as Trustee hereunder or, having undertaken to serve, to resign at any time; and

   (f) To disclaim, renounce or refuse to accept any property as an asset of the trust if the Trustees, in the Trustees' sole discretion, determine that the environmental risks related to the asset expose the trust or the Trustees in the Trustee's individual capacities to risk of loss, or that the costs of "clean up" related to the asset exceed the market value of the asset.

The Trustees shall not be individually liable to any beneficiary or other party interested in the trust, or to any third parties, for any claim against the trust for the diminution in value of trust property resulting from such matters, including any reporting of or response to: (i) the contamination of trust property by hazardous substances; or (ii) violations of any environmental laws related to the trust; provided that the Trustees shall not be excused from liability for the Trustees' own negligence or wrongful act..

When used in this agreement, the term "hazardous substance(s)" shall mean any substance defined as hazardous or toxic or otherwise regulated by any federal, state or local law(s) or regulation(s) relating to the protection of the environment or human health ("environmental law(s)").

Notwithstanding any contrary provision of this Agreement, if any appears in this Agreement, the Trustees, upon complete or partial termination of any trust, may withhold a distribution to a beneficiary until the Trustees have received from the beneficiary an indemnification agreement in which the beneficiary agrees to indemnify each Trustee against any claims filed against the Trustee pursuant to any federal, state or local statute or regulation relating to clean up or management of hazardous substances.

8-B. Special Provisions Concerning The Voting Of Avis, Pacific Service Company, Doerner Family Interests, L.P., And Other Family Closely-held Interests. With respect to

34

Exhibit B Page 45

the stock of Avis Industrial Corporation and partnership interests in Pacific Service Company and Doermer Family Interests, L.P. (whether General Partner full voting interests or interests in a limited voting class), and any interest in any closely-held partnership, and the stock of any closely-held corporation, as defined in Paragraph 12-B(9) below, all collectively referred to hereinafter as "Family Closely-held Assets", there is a reasonable possibility that some of such stock and other interests may be acquired and held in trusts established hereunder at inception or at some future time. Since RTD desires that his two children shall have certain rights over the voting of such stock and partnership interests, the provisions of Paragraphs 8-B(1), 8-B(2), 8-C and 8-C(1) and (2) incorporating rights and restrictions shall apply to and govern the administration of such interests, though they shall be subject and subordinate to the provisions of Paragraphs 13-E (RTD's Right To Reacquire Principal And Substitute Other Property Of Equivalent Value) and 8-C(14) (Transactions Involving Closely-held Interests Between Or Among Family Trusts And Partnerships).

8-B(1). <u>Trustees Shall Have Power To Vote Stock And Partnership Interests, But RTD's Two Children Can, In Their Individual Capacities, Upon Request, Obtain Trustees' Proxy To Vote All Or Any Of Closely-held And Other Specified Family Interests.</u> The Trustees shall, as relates to all corporation stock and partnership interests held in any trust established under this Agreement, have the power to vote all or any of such stock and interests, except, however, that, if either of RTD's two children, in his or her individual capacity, so requests in writing prior to and with respect to any meeting of the shareholders or partners of any of the closely-held interests identified in Paragraph 8-B above, the Trustees shall give their proxy to vote such interest or interests at each such meeting to RTD's children (if they are legally competent) acting jointly with both to be named as joint proxy holders in the proxy instrument. In the event of a deadlock in any voting as to which such children serve as joint proxy holders and they do not unanimously agree, the Corporate Trustee shall have the right to revoke the proxy and to vote such stock or other interests. In the event of the incapacity or death of either child, or the failure for any reason of a child to participate in a given voting proceeding, the other child shall alone hold all voting rights under such proxy.

If neither of such children is alive and legally competent, the Corporate Trustee alone shall exercise all voting rights relating to such described corporation shares and partnership interests.

The provisions of this Paragraph 8-B(1) are prompted by RTD's feelings that, in dealing with the specific assets described as Family Closely-held Assets, which may be of particular interest to the Doermer family, the Corporate Trustee may be somewhat less qualified than either of RTD's two children to make a decision satisfactory to a majority of family members. No trustee shall be accountable for any loss or diminution in value sustained by reason of a compliance with the terms of this Paragraph 8-B(1) or by reason of action or inaction taken by the children in the exercise or failure to exercise the rights and powers granted to them hereunder.

The Corporate Trustee shall forward to each of RTD's two children, promptly upon receipt, copies of all notices from Avis, Pacific Service Company, and Doermer Family

35

Interests, L.P. (and copies of all notices received from or relating to every other corporation or partnership interest described above in Paragraph 8-B) advising of shareholder or partner meetings or any other actions or proposals in any way affecting shareholder or partner values or rights
(including notices of action requiring the vote or consent of the holders of any closely-held stock, securities, or partnership interests).

All such powers to vote described in this Paragraph 8-B(1) shall be held and administered in a fiduciary capacity for the best interests of the beneficiaries of the trust in which such assets are held, and such powers shall not be used to self deal nor exercised to enlarge or shift any of the beneficial interests created under this Agreement except as an incidental consequence of the discharge of such fiduciary duties. However, (i) voting in favor of a sale of any trust assets pursuant to an authority contained in this Agreement, or (ii) voting for the election of a given beneficiary or beneficiaries, including the voter, to any corporation board or as an officer, executive, employee or agent of any closely-held corporation or partnership, and (iii) the payment of reasonable dividends and reasonable salaries, consulting or professional fees, board of directors and board committee fees and other compensation for services paid to RTD's children, grandchildren and great-grandchildren, and the spouses of any of such persons, shall not in any way be deemed to be self-dealing events or occurrences under this paragraph or under general trust law as applied to this Agreement.

8-B(2). Those Holding Power To Vote Closely-held Interests Are Not To Be Subject To The Prudent Man Rule Or Any Prudent Investor Rule In Exercising Such Voting Power. RTD is aware of the fact that certain risks are inherent in the operation of any business, and he expects that decisions of a "businessman's risk" nature will be required of those exercising the right to vote (in contrast to decisions made under the Prudent Man Rule or a Prudent Investor Rule). Therefore, RTD directs that those exercising the right to vote the interests described in Paragraph 8-B and 8-B(1) above and to vote closely-held interests as defined in Paragraph 12-B(9) below shall not be held liable to any trust hereunder for any loss resulting from the retention, operation, sale or other disposition of any such closely-held business interest unless such loss shall result directly from their bad faith or willful misconduct. In determining any question or liability for losses, it should be considered that such individuals are engaging in a speculative enterprise at RTD's express request.

8-C. Special Consent Provisions Concerning The Sale, Distribution Or Other Disposition Of Family Closely-held Assets. Many Other Specific Powers Are Given To The Trustees. With respect to Family Closely-held Assets as defined in Paragraph 8-B, it is RTD's desire that his two children have certain rights over the sale or other disposition of such assets. Accordingly, the provisions, rights and restrictions set out in Paragraphs 8-C(1) and (2) below shall apply to and govern any sale or disposition of any Family Closely-held Assets, though they shall be subject and subordinate to the provisions of Paragraphs 13-E (RTD's Right To Reacquire Principal And Substitute Other Property Of Equivalent Value) and Paragraph 8-C(14) Trustees' Powers Relating To Transactions Involving Closely-held Interests Between Or Among Family Trusts And Partnerships) below.

36

8-C(1). <u>Prior Written Consents Of RTD's Two Children Or Their Survivor Are Required Before A Sale, Distribution, Pledge, Or Other Disposition Can Be Made Of Family Closely-held Assets. RTD's Children Can Direct The Trustee To Seek Out Prospective Buyers Of Such Assets.</u> Notwithstanding any other provisions of this Agreement, but subject and subordinate to the provisions of Paragraph 13-E (RTD's Right To Reacquire Principal And Substitute Other Property Of Equivalent Value) and Paragraph 8-C(14) (Trustees' Powers Relating To Transactions Involving Closely-held Interests Between Or Among Family Trusts And Partnerships) and Article XIV (Dealings Between Trusts Or Between Any Trust And The Estate Of RTD), the Trustees, before undertaking any sale, distribution, pledge, mortgage, or other disposition, in whole or in part, of any Family Closely-held Asset, described in Paragraph 8-C above, shall first obtain the written consent of RTD's two children, in their individual capacities, or their survivor.

The sale or disposition of Family Closely-held Assets shall also, of course, be subject to the terms of applicable partnership and corporate shareholder agreements, if any.

The Trustees, if moved to sell, distribute, pledge, or otherwise dispose of any Family Closely-held Asset, shall first give written notice of any such proposed sale, pledge, or distribution to RTD's two children or to their survivor, which notice shall describe the terms of the proposed transaction and be delivered to each of the two children at least thirty (30) business days prior to the date specified for such transaction. The Trustees, in such notice, shall invite the two children to a meeting in the Corporate Trustee's offices in Fort Wayne to be held at least twenty (20) business days prior to the date specified for such transaction, at which time the transaction can be discussed and questions answered. The terms of this paragraph are obviously intended to give each of the two children a reasonable opportunity to evaluate any such proposed transaction before providing or withholding their consents thereto. No trustee shall be accountable for any loss or diminution in value sustained by reason of following the terms of this Paragraph 8-C(1) or by reason of action or inaction taken or not taken by the two children in the exercise or failure to exercise their rights and powers granted hereunder.

RTD would urge the Trustees and his children to be very cautious in considering any proposed sale, distribution, or other disposition of Avis stock (except perhaps for non-voting Avis stock proposed for sale to employees of Avis or of any Avis subsidiary or affiliate company) or of Pacific Service Company ("PS") interests which does not extend to and include all such stock and interests in such entity owned collectively by or for the benefit of members of the Doermer Family, as the term "Doermer Family" is defined in Paragraph 12-B(12) below. Inasmuch as RTD's present ownership (as of the date this Agreement is signed), and that held directly or indirectly by other members of the Doermer family and derived from his initial ownership in Avis, represents fifty percent (50%) of the voting power and of the total equity of Avis (the other 50% resting with Leland and LaRita Boren and members of the Boren family), and inasmuch as RTD and/or DFI owns 50% of the Pacific Service Company partnership, it is apparent that the sale, distribution or other disposition of even one (1) share of voting stock of Avis or the sale or distribution of any of the PS Interests, would upset the ownership or control balance of Avis and the PS partnership, could diminish the value of remaining shares or interests, and could convert the

37

exceptionally harmonious and productive fifty-fifty equal division of the present ownership between the Boren and the Doermer families (for which harmony RTD again salutes his warm friends, the Borens) into something potentially contentious, to the serious prejudice of those holding minority interests. This is said with sober recognition that the Borens and RTD will not live forever; others will follow them who may not have the same bond of unusual friendship, understanding, trust, and common interest. Fair treatment of such other persons would appear to suggest the advisability either of keeping intact the respective family voting interests in Avis and such family interests in the Pacific Service Company partnership, or of selling such interests as separate 50% ownership blocks but in one transaction which disposes of all interests of both families and their affiliated interests or successors in the particular entity involved (that is, all of both the voting stock and non-voting stock of Avis or all of Pacific Service Company, or all of both entities, as the case may be). These provisions are intended only to discourage, but not to prohibit, sales or transfers of any portion of the separate Avis and Pacific Service Company interests (except for the sale of the entire family block of such particular entity) to transferees who are (i) outside of the Doermer family or (ii) outside of trusts or partnerships existing for the primary purpose (in Corporate Trustee's sole judgment) of serving the interests of some or all of Doermer family members. It is not intended, to clarify further, that if the ownership of either one of such entities (Avis or Pacific Service Company) is sold, the ownership of the other must also be sold (though, to RTD, that certainly would be strongly preferable);...rather, it is intended that if either one is sold, all of the several trusts' interests in that particular entity should preferably be sold so that the trusts established primarily to serve the interests of Doermer family members (regardless of under which of RTD's agreements they are established) are not in the aggregate left holding less than a 50% aggregate ownership interest in such particular entity.

One of the obvious reasons for the retention of the 50% block of Avis voting stock and of the PS Interests is that it provides the right under certain circumstances to seek a dissolution and liquidation of the entity involved with a resultant distribution of the ultimate liquidation proceeds if there is no other way to realize the fair market value of the related investment. Such a liquidation step, however, to realize fair value should be viewed as one of last resort and one not likely to produce the best results for all owners, including the beneficiaries of trusts established hereunder.

With respect to interests in Doermer Family Interests, L.P. or in any other closely-held family partnership, RTD similarly urges but does not direct the Trustees and his children and grandchildren to retain in trust such interests in any such partnership, if any are held in any trust hereunder, in order to maintain the general partner ownership block and voting power held by or for the benefit of Doermer family members. If, however, it is deemed advisable to sell such interests, then preferably the entity involved should be sold as an entire ownership block.

It is to be noted that, except as may be provided in related partnership agreements or other documents, any distribution in kind to beneficiaries of any of the assets described in Paragraph 8-C would seem to remove them from their present protection against creditor

38

claims provided in Article V hereof and expose them to seizure by non-family members, a result not considered desirable by RTD.

In the event the two children or their survivor deem it desirable that the Corporate Trustee sell any Family Closely-held Asset, they may direct such Trustee to seek out prospective buyers, utilizing customary and reasonable means to obtain purchase proposals, including the employment of investment banking, broker, legal, accounting, appraisal and other professionals, the expense of which shall be charged to the Trust, as appropriate, or to the entity recommended to be sold. Any resulting sale and the terms thereof shall be subject to the approval of the two children or their survivor. In the event of the death or incapacity of either child, the other sibling shall have the rights accorded to both under this paragraph. If neither child is living and competent, the Corporate Trustee alone shall have the authority, on terms deemed fair and reasonable to it, to sell or otherwise dispose of any Family Closely-held Asset or any other asset held by the Trust.

8-C(2). Separate Sales Of Avis Or Pacific Service Co. Divisions, Subsidiaries Or Assets Are Not Subject To The Consent Restrictions Of Paragraph 8-C(1). Nothing in Paragraphs 8-C and 8-C(1) shall be interpreted as any effort to restrict or influence the Board of Directors of any corporation (including Avis) or the partners of any partnership (including Pacific Service Company) in decisions involving the possible sale of individual corporate subsidiaries, divisions or assets, or the possible sale of partnership assets, or the possible liquidation and/or dissolution of any affiliated or subsidiary corporation or partnership. RTD recognizes that these are decisions to be made by such Boards or partners subject to appropriate or required approvals by affected shareholders or partners. Thus the consents of the two children required for transactions described in Paragraph 8-C(1) are not to be required under this Agreement for the transactions described in this Paragraph 8-C(2) unless shareholder or partner consent (in whatever measure) is required by law or organization charter, by laws, or partnership or other agreement for any such transaction.

8-C(3). Trustees And RTD's Children Shall Not Be Responsible For The Acquisition, Retention Or Enlargement Of Any Family Closely-held Asset. RTD considers those particular Family Closely-held Assets, as defined in Paragraph 12-B(9) below, held as of the date of this Agreement, or as of any subsequent date, by the Trust, or by the DFI partnership, or by any trust established by RTD under the terms of the Issue Trust and the GST Trusts Agreements, to be proper trust investments; and he therefore authorizes the Trustees to retain indefinitely, to enlarge or, subject to the consent of RTD's two children as provided in Paragraph 8-C(1) above, to reduce the Trust's investments in any or all of such particular interests or assets as the Trustees alone deem advisable. Such authority extends also to the retention, the enlargement and the reduction of assets or interests (as the Avis stock) which are reflected in the value of DFI partnership interests held by the Trust but are not directly owned by the Trust; and it extends, further to any entity which succeeds to the business of any Family Closely-held Asset by consolidation, merger, purchase of assets, or otherwise. It is RTD's belief that the interests of all beneficiaries of this Trust, both current and future, will likely be better served by the retention of the particular Family Closely-held Assets described, even though such securities may lack liquidity, may be considered, and in

39

Exhibit B Page 50

fact may be, more volatile or risky than alternative investments, may never yield a dividend or other income, and may constitute a very large percentage or all of the trust principal. He realizes that retention of the Family Closely-held Assets may not, at given points in time, be considered wise from a narrow financial or investment perspective.

Even though the Trustees may propose a sale, distribution, mortgage, pledge or other disposition of a Family Closely-held Asset, it is RTD's intention that the Trustees will have no duty to monitor or report the performance or worth of any such Asset except as is provided in Paragraph 8-C(22) hereof. Paragraph 8-C(22), as will be noted, sets forth requirements relating to reports (concerning Issue Trust and DFI financial condition and performance) to be periodically sent by the Corporate Trustee to Trust beneficiaries. No Trustee shall be accountable for any loss or depreciation in value sustained by reason of the Trustee's compliance with RTD's wishes as expressed in this paragraph. RTD, however, requests the Corporate Trustee to give its advice and counsel to RTD's two children and his grandchildren as requested by them from time to time.

RTD acknowledges that interests in certain assets such as Avis Industrial Corporation and Pacific Service Company are not currently owned by the Trust, but rather are owned by Doermer Family Interests, L.P. As such, the general partners of Doermer Family Interests, L.P., or the Partnership manager, will make decisions with respect to such assets. The provisions and references to Avis Industrial Corporation or Pacific Service Company are included in this Paragraph 8-C(3) in the event the limited partners of Doermer Family Interests, L.P. (including the Trust) are required to vote on a matter that concerns such interests or in the event of the termination of the partnership and distribution of its assets to the various partners.

8-C(4). <u>Competent Appraisals Should Be Obtained Of Any Interest Described In Paragraph 8-B Above Considered Or Proposed To Be Sold Or Disposed Of By RTD's Two Children Or By The Corporate Trustee; Borens Should Be Given First Reasonable Opportunity To Buy Any Of The Avis And Pacific Service Company Interests Or Any Other Closely-held Interests Held By The Trustees In Which The Borens Also Have An Interest.</u> In the event it is deemed advisable by RTD's two children, or by the Corporate Trustee, with the consents of the two Doermer children specified in Paragraph 8-C(1) above, to sell any of the interests described in Paragraph 8-C, the Trustees should obtain a competent appraisal of such interests provided by an appraiser or firm of appraisers which has extensive experience in evaluating interests comparable to those considered to be sold.

If it is deemed advisable by RTD's two children or by the Corporate Trustee, with the childrens' consents, to sell any of the voting stock of Avis (preferably the full 50% block) or any of the non-voting stock of Avis (except for a sale or sales to employees of Avis or of any Avis subsidiary or affiliate) or any of the Pacific Service Company interests (preferably the full 50% block), it is urged, if either Leland E. Boren or LaRita Boren then be living and then seek to buy such stock or such Pacific Service interests, that the Borens or the survivor of them be given a reasonable opportunity to make a proposal for the purchase of such stock or PS Interests. If either or both of them elect to make a proposal that is

40

considered reasonable and fair, it would be preferable, in deference to RTD's long Boren-Doermer friendship, that such a proposal be accepted.

RTD, however, again emphasizes the importance, as noted in Paragraph 8-C(1) above, of selling, if there is a sale of Avis stock, the entire 50% block of such stock or such Pacific Service Co. interests, and not selling less than the full block, even though the Borens or one of them may be interested in purchasing less than the 50% block.

8-C(5).  Trustees' Power To Treat Each Closely-held Interest As An Entity Separate From Any Trust And To Consent To The Reinvestment Of Income Of Such Entity For Reasonable Business Purposes.  With respect to the various interests described in Paragraph 8-B above, the Trustees shall have the power to treat each such interest as a business entity separate from any trust and therefore to do those things they deem appropriate, in the exercise of a business judgment, as determined under the laws of the state governing the Trust's administration as provided in Paragraph 12-D below, to maintain or obtain a reasonable operating performance from such entity.  In so treating any such interest as a separate entity, Trustees may, in Trustees' discretion, consent to the reinvestment of the income of the interest for purposes deemed by the Trustees to be sound and reasonable, including, but not limited to, retiring debt, expansion of physical facilities and equipment, expansion into new markets or new products, spending for product research and development, remodeling, and establishing reasonable reserves.

In its accounting to any Trust beneficiaries, Trustees shall only be required to report the information regarding any closely-held entity to the extent such information is provided to the Trustees by such entity or by the DFI partnership.

8-C(6).  Powers Of Corporate Trustee Relating To Collection Or Enforcement Of Promissory Notes, Guaranties, Etc. Directly Or Indirectly Involving Doermer Family Members.  If any promissory notes originally held by RTD as payee or as assignee are held at any time by the Trustees hereunder or by the trustees of any trust established by RTD, reflecting indebtedness of either of RTD's children or their spouses, or any of RTD's other issue or their spouses, or any corporation or partnership in which any of such persons has an ownership interest of twenty-five percent (25%) or more, become, in whole or part, a part of any trust estate and are in default, the Corporate Trustee, acting wholly alone, is authorized, as a supplement to conventional collection remedies, to deduct, during each calendar year, from amounts, if any, to be periodically distributed to such obligor(s) hereunder, a sum equal to preferably not more than twelve percent of the amount(s) so distributable during each such year and applying such deducted amounts to a reduction of the unpaid amounts due on such note or notes.

8-C(7).  Sales Of Trust Property Are Authorized Subject To The Consents Of The Two Doermer Children As Provided In Paragraph 8-C(1).  Subject to the consent provisions of Paragraph 8-C(1) relating to the sale or disposition of Family Closely-held Assets, (and subject also to the terms of the DFI Partnership Agreement as respects any disposition of DFI interests), the Trustees are empowered to sell and convey any of the property of any trust or any interest therein, and/or to exchange the same on such terms as in

41

their discretion and judgment may be deemed in the best interest of the trust and the beneficiaries thereunder, and to execute and deliver any deed or deeds, receipts, releases, contracts, or other instruments they deem necessary in connection therewith.

8-C(8). Repairs Of Trust Property And Payment Of Expenses And Taxes. Trustees are authorized to make all repairs and improvements at any time deemed necessary and proper to and upon real or personal property constituting a part of any trust, and to build, construct, and complete any building or buildings upon any trust real estate which in their discretion and judgment is deemed advisable and proper and for the best interests of each trust and the beneficiaries thereunder, and to determine the extent to which the cost of such repairs and improvements shall be apportioned as between corpus and income of any trust.

Trustees are also authorized to pay out of any money belonging to any trust any and all necessary and proper expenses in connection with the operation and conduct of such trust, and to pay all taxes, insurance premiums, legal assessments, debts, claims, fees, or charges which at any time may be due and owing by, or which may exist against, the trust.

8-C(9). Trustees May Consent To Corporate Reorganizations. Subject to the restrictions on the voting of Avis shares, the PS Interests, DFI family partnership General Partner Interests, and the shares of other closely-held corporations provided in Paragraph 8-B(1) above, the Trustees are empowered to consent to the reorganization, consolidation, merger, liquidation, readjustment of, or other change in any corporation, company, partnership or association (or to the sale, mortgage, or lease of the property thereof or any part thereof) the securities or other ownership interests of which may at the time be held by any trust established hereunder; and the Trustees may perform any act or exercise any power with reference thereto which may be legally exercised by any persons owning similar property in their own right, including the exercise of conversion, subscription, purchase, or other options, the deposit, surrender, or exchange of securities, the entrance into voting trusts, and the making of agreements or subscriptions which it may deem necessary or advisable in connection therewith; and the Trustees may hold and redeem, sell or otherwise dispose of any securities or other property which they may so acquire.

8-C(10). Claims And Settlements. Trustees, subject to the other terms of this Agreement, are also empowered to compromise, settle, arbitrate or defend any claim or demand in favor of or against any trust; to enforce any bonds, mortgages, security agreements, or other obligations or liens held hereunder; and to enter into such contracts and agreements and to make such compromises or settlements of debts, claims, or controversies as it may deem necessary or advisable.

8-C(11). Payment Of Administrative Expenses. The Trustees are authorized to incur and pay the ordinary and necessary expenses of administration of each trust, including (but not by way of limitation) reasonable attorneys' fees, accountants' fees, Trustee's fees, investment counsel fees, appraisal fees, and similar expenses.

8-C(12). Trustees Are Authorized To Use Agents Or Attorneys-In-Fact. The Trustees are also authorized to act hereunder through an agent or attorney-in-fact, by and

42

under power of attorney duly executed by any of the Trustees, in carrying out any of the powers and duties herein authorized.

8-C(13). Authority Given To Corporate Trustee To Borrow Money. The Corporate Trustee is authorized on behalf of the Trust to borrow money from the estate of RTD and the estate of any beneficiary of any trust established by RTD, and from any bank (including any bank owned by the Corporate Trustee or affiliated with such Trustee). And, subject to the restraints of Paragraph 8-C(1) above (requiring specified consents of RTD's children to any pledge or other disposition of described assets), the Corporate Trustee is authorized to pledge any trust assets to secure any such borrowing if the purpose of such borrowing is to obtain funds (i) to effect distributions to any beneficiary or distributions to a trust for any beneficiary established hereunder, or (ii) to diversify or to limit potential market value decline in any trust investment in any publicly traded stock (as described in Paragraph 8-A(3) above), or (iii) to acquire and pay for, and to pay future premiums on, life insurance policies which render death benefits payable to any trust or family limited partnership upon the death of the named insured or insureds, and or (iv) for any other purpose deemed by the Corporate Trustee in its sole discretion to serve or to be in the best interests of any such beneficiary or trust. Each such borrowing, if any, shall be at such rate of interest and for such period of time, and with or without security, as such Trustee alone shall determine. Further, (a) with respect to the Corporate Trustee's purchase of any property, such Trustee, as part of the consideration given for any such purchase, is authorized to assume, as Trustee, a liability of the transferor secured by such property or to acquire such property subject to a liability, provided the liability assumed or to which the transfer is subject does not exceed sixty percent (60%) of the fair market value of the property acquired, and (b) the Corporate Trustee may accept as part of the assets of any trust estate any life insurance policy notwithstanding that such policy may be encumbered by a loan or loans secured by some or all policy cash or other values.

8-C(14). Corporate Trustee's Powers Relating To Sales And Other Transactions Between Or Among Doerner Family Trusts And/Or Doerner Family Partnerships. The Corporate Trustee, on behalf of the Issue Trust, is expressly authorized alone, and without the participation, consent or direction of either of RTD's two children, individually or as Trustees, and upon such terms and conditions as the Corporate Trustee alone determines, (1) to sell or pledge (incident to any borrowing) all or any part of any assets in any trust established under this Agreement to DFI and/or to any trust established by RTD, or by his deceased wife MLD, including but not limited to trusts established pursuant to the terms of this Agreement or to the terms of the Doerner Descendants GST Tax-exempt Trusts Agreement of this same date; (2) to permit DFI, on reasonable terms, to redeem in whole or part any DFI interests held in any trust established hereunder; (3) to loan money or other assets to DFI, to the estate of RTD, and to any trust established by RTD, including but not limited to any of the trusts described immediately above, on such terms, and with or without security, as the Corporate Trustee alone shall consider acceptable; and otherwise (4) to fully deal with DFI and RTD's estate and any of such trusts in any reasonable way in order, in such Trustees' sole discretion, to achieve any of RTD's directives or recommendations set out in this Agreement. The authorities set out in this Paragraph 8-C(14) shall extend to and include dealings which involve borrowing and/or the selling of

43

assets for the purpose (among other purposes) of funding distributions to beneficiaries of any trust established hereunder or established under the terms of the Doermer Descendants GST Tax-exempt Trusts Agreement of this same date.

Any of the described transactions between or among Doermer family trusts and partnerships, however, shall, if undertaken, be on equitable terms and at fair market values, all as determined in the Corporate Trustee's sole discretion.

·8-C(15).  Authorized Loans To RTD's Children And Grandchildren, Subject To An Aggregate Limit, As Respects Each Such Borrower, Of $300,000.  In addition to the powers conferred above in Paragraph 8-C(14) and elsewhere herein, the Corporate Trustee of each trust established under this Agreement shall have the sole authority to lend money to each of RTD's two children and to each of his grandchildren, except that the aggregate of outstanding loan balances of any one such borrower owed to all lending trusts, including trusts established under this Agreement and under the RTD GST Tax-exempt Trusts Agreement shall at no time, except as provided in Paragraph 8-C(15)(a) below, exceed the sum of Three Hundred Thousand Dollars ($300,000).  All such loans, if any, shall be made on such terms - interest rate, repayment term, collateral, etc. - as the Corporate Trustee alone shall determine; but RTD recommends (i) that such terms be somewhat more favorable, rather than less favorable, in the context of general market conditions then prevailing, (ii) that the principal of each loan be repaid in equal annual installments over, preferably, not more than ten years, except that if the loan is secured by a first mortgage on the borrowers principal home and the loan meets the conditions set out in Paragraph 8-C(15)(a) below, a term of twenty-five (25) years would seem reasonable, and (iii) that interest, when payable, absent circumstances deemed to be unusual or compelling by the Trustee, not simply be added to unpaid principal.  The $300,000 amount shall be adjusted upward each year, to reflect annual increases in the cost-of-living, in the manner set out in Paragraph 8-K below.

8-C(15)(a).  Additional Loan In Form Of Mortgage On Principal Residence.  Notwithstanding the provisions of Paragraph 8-C(15) above, an additional amount may be loaned to either or both of RTD's two children on terms satisfactory to the Corporate Trustee, for the purpose of acquiring or maintaining a home in which the borrower lives as his or her principal residence.  It is recommended, but not mandated, that the terms of any such loan, subject to the sole judgment of the Corporate Trustee, include the following:

    (i)  if the loan is secured by a first mortgage on the property in favor of the Trust or trusts,...

    . the loan should not exceed a sum equal to 70% of the appraised value of the property as made or determined within sixty days prior to the date of the loan;

    . the amount of the loan should not in dollars exceed $750,000;

44

. the loan term should not exceed 25 years, and the loan should specify equal
monthly payments to amortize and fully repay the loan within the
designated term;

. the mortgage note and related mortgage documents should contain
provisions common to bank first mortgages in the general area of the home;

. the interest rate should be not less than 100 basis points under a rate viewed
by the Trustee to be competitive in the market at the time the loan is made.

(ii) if the property is subject to a first mortgage senior to any loan by the Trust or
trusts,...

. the loan from the trust or trusts should be secured by a second or equivalent
mortgage on the property;

. the loan should not exceed a sum equal to 50% of the difference
between the current appraised value of the property and the balance
owing on the senior first mortgage;

. the amount of the loan in dollars should not exceed $150,000;

. the loan term should not exceed 12 years, and the loan itself should
specify equal monthly payments to amortize and fully repay the
loan, including interest, within the designated term;

. the mortgage note and related mortgage document should contain
provisions common to bank second mortgages in the general area of
the home;

. the interest rate should be not less than 100 basis points under a rate
viewed by the Trustee to be competitive in the market at the time.

The $750,000 and $150,000 limits on mortgage loans authorized above should also
be adjusted upward each year to reflect annual increases in the cost-of-living as provided in
Paragraph 8-K below.

8-C(16).  Trustees Have Authority To Make Allocations To Principal And
Income.  Trustees shall, utilizing appropriate accounting principles, have the power to
allocate all receipts, expenditures, profits and losses of any trust created hereunder either to
income or to principal, or in part to each, in such manner as Trustees deem proper and not
inconsistent with the applicable dispositive provisions of this Agreement.  Trustees may also
create reserves for depreciation and depletion, as well as other reserves and allowances
permitted by the Indiana Trust Code.  The authority conferred by the immediately preceding
sentence shall not, however, be interpreted as authorizing the holding of Subchapter S
Corporation stock in contravention of the provisions of Paragraph 7-B.  Whenever a

45

Exhibit B Page 56

beneficiary's personal representative has an election to claim any amount as a deduction either for income tax purposes or for estate, inheritance or succession tax purposes, Trustees are not required to make any compensatory adjustment between principal and income or between beneficiaries because of the election made; but Trustees may in their sole discretion make an adjustment if it deems one advisable.

8-C(17). Distributions In Kind To Beneficiaries Are Authorized. Except as otherwise provided in Paragraph 8-C(1) and 8-C(2) above (which require the consents of RTD's two children or their survivor to any distribution, sale or other disposition of Family Closely-held Assets), the Corporate Trustee shall have the power to make any divisions or distributions to RTD's two children or to other beneficiaries authorized hereunder in kind or in money, or partly in kind and partly in money, as it deems proper; but in doing so it shall be mindful of the income tax base of each asset distributed in kind and shall observe also to the extent it considers feasible the provisions of Paragraph 13-A below relating to a desired general equality in amount and character of distributions to trust beneficiaries of the same generational class.

8-C(18). No Consents Of Courts Or Other Persons Are Required For Trustees' Actions Unless Otherwise Directed. The Trustees may freely act under all or any of the powers by this Agreement given to them in all matters concerning the trusts herein created, after forming their judgment (based upon the circumstances of any particular situation) as to the most advisable course to pursue in the interest of each trust and the beneficiaries thereunder; and they may exercise such powers without, except as is otherwise provided in this Agreement, the necessity of obtaining the consent or permission of any person interested therein, notwithstanding that they may also be acting individually, or as Trustees of other trusts, or as Trustees or agents for other persons, corporations or other entities, or as Executor of an estate interested in the same matters, or that it may be interested in connection with the same matters as shareholder, director, partner, or otherwise; provided, however, that it shall exercise such powers at all times in a fiduciary capacity primarily in the interest of the beneficiaries hereunder.

8-C(19). Separate Shares Within Any Trust May Be Created For Income Tax Purposes. With respect to any trust, if any, as to which a portion is treated for federal income tax purposes as being owned by an individual other than such trust's named beneficiary or beneficiaries, the Trustees are authorized, in their sole discretion, to create separate shares for such specific trust, segregating specific trust property on an impartial basis (for accounting purposes) between the shares based on the portion treated as being owned by such individual or individuals for federal income tax purposes versus the portion treated as not being owned by such individual or individuals for such purposes.

8-C(20). Authorized Distributions In Event Of Disability Or Incapacity Of A Beneficiary. During any period of legal, physical or mental incapacity of any beneficiary to or for whom all or any portion of a trust estate established hereunder is authorized to be distributed, the Trustees may distribute or hold such portion in any one or more of the following ways: distribute directly to such beneficiary; distribute to the guardian of the person or of the property of such beneficiary; distribute to a relative, friend or other person

46

or organization to spend such trust estate solely for the benefit of such beneficiary; or Trustees may hold all of such interest for the future benefit of such beneficiary. The Corporate Trustee shall have the exclusive power to determine whether any beneficiary is physically or mentally incapacitated at any time and from time to time, provided such Trustee observes and complies with the provisions of Paragraph 12-H below (which describe the procedure for determining incompetency); and the Corporate Trustee's determination in such event shall be final and conclusive. To the extent that the provisions of this paragraph, if applied to trusts holding Subchapter S or similar company stock, would nullify the Sub 'S' or similar election available to the company issuing such stock, they shall not be applicable or applied to such trusts; but this sentence shall not be interpreted as authorizing the holding of Subchapter S corporation stock in contravention of the provisions of Paragraph 7-B above.

8-C(21). <u>Corporate Trustee Has Authority To Terminate Trusts Of $100,000 Or Less.</u> If the Corporate Trustee, in its sole judgment, determines that the principal of any trust established under this Agreement has a fair market value of One Hundred Thousand Dollars ($100,000) or less, then the Trustee, in its sole discretion, may terminate such trust and distribute the trust estate of such trust in equal shares to the two Doermer children, per stirpes except, however, that such termination can only be made if a prior written notice of at least sixty days of the Trustee's intention to terminate is given to the beneficiary or beneficiaries of the Trust involved and provided, further, that if Avis voting securities or DFI general or limited partner interests are held directly in any such trust, then no such termination shall be made. Such $100,000 amount shall be adjusted each year, to respond to inflation forces, in the same manner described in Paragraph 8-K below.

8-C(22). <u>Corporate Trustee Shall Periodically Send Detailed Reports To Trust Beneficiaries Concerning Issue Trust Assets, DFI Partnership Interests Held By The Trust And Concerning DFI Assets Which Underlie The Value Of Such Partnership Interests.</u> Since it is expected that the dominant portion of Issue Trust asset value will rest in Class B limited interests in the DFI partnership, it appears necessary, in the interest of keeping trust beneficiaries meaningfully informed concerning the value of their respective interests in the Trust, that they be periodically provided with a balance sheet and an income and expenditure statement relating to both the Issue Trust and (separately) the DFI partnership and Avis Industrial Corporation, each to be prepared as of the end of, and reflecting the income and expenditure experience of each entity for, the immediately preceding calendar year. The Corporate Trustee is accordingly directed to prepare or obtain such statements for the Trust and to obtain such statements, relating to DFI and Avis, from the Partnership Manager or a General Partner of DFI, doing so as soon after the end of each calendar year as is practicable. For the purpose of receiving such reports the word "beneficiaries" as used in this Paragraph shall mean RTD's two children and all of RTD's grandchildren who are 21 years of age or older. A copy of each report shall also be sent to RTD and to RTD's assistant, Phyllis Alberts unless advised otherwise by an individual Trustee.

In submitting such statements of assets and liabilities of the Issue Trust and DFI, the Corporate Trustee shall show marketable assets at tax cost, book or accounting carrying cost, and fair market values. Other limited partnership interests (excluding DFI) shall where

47

feasible be shown at their values most recently reported by the Valuation Committee or by a general partner of each partnership entity involved (if there be such a report), and all other assets, including DFI partnership interests and Avis stock, shall be shown at their tax cost, book or accounting carrying cost, and at their most recent appraised value (as determined by a qualified outside appraisal firm). The general partners of the DFI partnership and Bank One as Trustee of a charitable remainder trust, established by DFI on May 29, 2001, in which DFI has a unitrust interest, described in (3), below have been advised by RTD, and have agreed, to fully cooperate with the Issue Trust Corporate Trustee in its periodic evaluations of Issue Trust assets and of DFI assets underlying the value of DFI interests held by the Trust. Such cooperation shall include but not be limited to providing full access to such Trustee to all records and documents of DFI relating to its acquisition, retention, and administration of DFI assets and liabilities and to the income and expenditure experience of DFI.

In making its various value determinations, the Corporate Trustee is directed:

(1) to determine as of each calendar year-end, or more frequently if the Trustee so desires, a fair market value (i) for both voting and non-voting shares of Avis Industrial Corporation, (ii) for each class (and each 1% unit) of DFI partnership interests outstanding, and (iii) for the various promissory notes executed by the Trustees of the Issue Trust, the Trustees of each GST Trust, and executed by each of RTD's two children and by the Trustees of the two Management Trusts incident to the purchase by such Trustees and by RTD's children of DFI Class A, Class B, General Partner or other interests in the DFI Partnership, utilizing, as or if deemed helpful by the Corporate Trustee, and in any and all events at least every year, the services of an impartial outside appraisal firm which has experience, if Avis shares are then held by any trust or by DFI, in the evaluation of (among other organizations) manufacturing companies similar to Avis;

(2) to determine and present at least quarterly, at each calendar quarter end, the value of all marketable securities owned by the Issue Trust, by the DFI partnership, and by the DFI CRUT of May 29, 2001 described below, indicating in each report the total investment performance of the respective portfolios compared to the performance of appropriate benchmark portfolios or indices and indicating also the allocation among asset classes and sectors of the securities held in each portfolio compared to allocations appearing in other benchmark portfolios or indices; to obtain and include in the Trustee's quarterly reports a balance sheet and income statement relating to Avis Industrial Corporation, prepared internally by the Avis staff; the income statement should include supplementary revenue and expenditure information on each operating subsidiary or division in the format employed by the Avis staff for quarterly Avis Board of Directors meetings.

(3) to value at each calendar year-end the unitrust interest of DFI in, and the interest of the charitable remainder beneficiary in, the charitable remainder unitrust ("CRUT") established and funded by DFI on May 29, 2001;

(4) to select appropriate performance benchmarks against which can be measured the total investment performance in each of the two securities portfolios described

48

Exhibit B Page 59

at items (2) and (3) immediately above. The Trustees shall also select performance benchmarks for individual asset classes within such two portfolios and the Corporate Trustee shall present in quarterly reports both actual and benchmark figures for each asset class during representative periods of time including but not limited to 1 year, 3 years, 5 years and since inception. The actual date of inception of each portfolio shall also be shown. Allocations of such securities among sector or industry categories and among investment styles shall also be identified by the Corporate Trustee and compared with sector and style allocations of other appropriate benchmark portfolios or indices. The Corporate Trustee is also directed:

(5) to include at each year-end, in the Trustees' report to Trust beneficiaries, the most recent available interpolated terminal reserve amounts, or surrender values, as of a date within six months of the calendar year end, relating to each insurance policy owned by DFI or by the Trust insuring the life of RTD or any other person;

(6) to determine the value of all other assets of the Trust and of DFI, at least annually, at calendar year-end, including but not limited to partnership interests held by DFI in Pacific Service Company and in various limited partnerships managed by The Banc Funds Company, LLC of Chicago and by others, and

(7) to provide in each quarterly and each annual statement, to the beneficiaries of the Issue Trust being reported on, a detailed accounting of transactions by category in the income, expense and principal accounts of the Trust and of DFI and, in each calendar year annual report, provide an indication of the amounts of discount from underlying asset values which have been applied to the most recent net asset appraisal figures because of lack of marketability, lack of voting control, status as a minority interest, or other reasons (showing the amount of discount ascribed to or for each of such reasons).

It is recommended that, in fixing, for the purposes described in this Paragraph 8-C(22), the initial valuation of the various Issue Trust and DFI assets referred to above, the Trustees utilize the values found to be appropriate as of a reasonably current date by Management Planning, Inc. ("MPI") of Princeton, New Jersey (a national appraisal firm which specializes in the evaluation of family and business assets). MPI's initial appraisal is presently in process of completion. In initially valuing the shares of Avis, the General Partner, Class A, Class B, and other interests of DFI, and the unitrust interest of DFI in the DFI CRUT of 5/29/01, the Corporate Trustee, with the assistance of such outside appraisal firm, shall indicate the amounts of discount from underlying asset values which have been applied to the various appraised asset figures because of lack of marketability, lack of voting control, status as a minority interest, or other reasons, as provided in subparagraph (7) above.

The ability of the Corporate Trustee to obtain financial information and statements from DFI relating to DFI itself and to Avis, the DFI CRUT and other DFI assets, will, of course, depend upon the cooperation of the DFI general partners and/or the DFI Partnership Manager and Avis personnel. The Corporate Trustee shall not be accountable for any failure to report financial information relating to DFI, to the DFI CRUT of 5/29/01, or to Avis

49

which is attributable to a failure by DFI or Avis to provide information requested of it by the Corporate Trustee.

All appraisal expenses incurred in the employment of an outside appraisal firm to make or assist in making the appraisals described above in this Paragraph 8-C(22) shall be equitably borne and paid by DFI and the various trusts holding DFI interests.

8-C(23). <u>No Court Qualifications Nor The Posting Of Bonds Shall Be Required Of Trustees.</u>  To the extent that any such requirement may be legally waived, no Trustee shall be required to give any bond as a Trustee or to qualify before, or be appointed by, any court.  Further, each Trustee is relieved from any requirements as to routine court accounting which may now or hereafter be required by law in any jurisdiction.

8-C(24). <u>Annual Meeting And Discussion With Trust Beneficiaries.</u> Corporate Trustee is requested, within 120 days after the end of each calendar year, to invite all Doermer family members and others who are beneficiaries of any trust created hereunder and who are twenty-one (21) years of age or older, and the parents of each such beneficiary under the age of twenty-one (21), separately or as a group as such Trustee deems advisable, to a meeting in Trustee's offices in Fort Wayne, Indiana to discuss trust investments and administration in detail.  Such invitation should be in writing, mailed to each such beneficiary at least 30 days prior to such meeting.

8-C(25). <u>If Two Or More Trustees Are Given Authority To Administer The Trust.</u>  Whenever the authority for the administration of the Issue Trust is extended to two or more Trustees, the following provisions shall apply:

(a)  It is agreed that the Corporate Trustee will maintain all of the books and records for the Issue Trust, will provide all of the accounting, tax, reporting and other services which it provides other trust clients of similar size and character and which it would provide the Trust(s) established hereunder were it the sole trustee, and will provide all of the reports, valuations, and other information described in Paragraph 8-C(22) relating to each Trust.

(b)  The individual Trustee will provide investment views, counsel on the various conditions, needs and circumstances relating to the beneficiaries of the Trust being served, and a continuous general guidance and evaluation of the trust services being provided.

(c)  With respect to any matter as to which two or more trustees have joint authority, a Trustee, by written notice, may temporarily delegate any or all of that Trustee's rights, powers, duties, and discretion as Trustee to any other Trustee sharing that authority, with the consent of the latter.

(d)  The Corporate Trustee is authorized to perform on behalf of the Trustees all acts necessary for the orderly administration of the Trust and the continuing investment of its cash and securities, including such activities as the acquisition, sale and transfer of personal and real property, and including the signing and endorsing of checks and other negotiable

50

instruments, stock and bond certificates and powers, deeds of real estate and related transfer documents, applications, tax forms and other forms or documents; and no person dealing with the Trustees need inquire into the propriety of any such act or the authority of the Corporate Trustee to act on behalf of the Trust.

(e) Unless specifically otherwise provided herein, at any time when more than two Trustees are acting, the action or decision of a majority in number shall control each vote or decision by the Trustees. If only two Trustees are serving and only one Trustee is an individual Trustee, the action or decision of the Corporate Trustee shall control. A Trustee, in such event, who does not vote or who does not concur in any vote on any matter shall not be liable for any act, or failure to act, on the part of the other Trustee(s) or for any act or failure to act on the matter subject to vote.

RTD wishes here to comment on the provision herein that the vote or decision of the Corporate Trustee shall control and prevail in the event, if or when there are only two Trustees serving the Trust, they do not or cannot agree on a given decision or course of action or inaction. Such provision is prompted by RTD's opinion that an institutional Trusteeship normally lends a useful objectivity and a valuable experience factor to trust administration and investment work,...values which are not always fully understood by trust beneficiaries; and when there are two or more categories of beneficial interests in a given trust, some junior or subordinate to others or contingent upon various events, trustee decision-making can become difficult and uncomfortable. It is during such times and under such circumstances that an institutional experience proves particularly useful. Thus, notwithstanding the experience and the good intentions of his two children, and the abundance of his affection for each of them, and his respect for their sound judgments which have been demonstrated many times over many years, RTD feels it advisable to extend to the Corporate Trustee a final authority in matters relating to the administration and the investment of the assets of the Trust herein established. He is confident that such Trustee will not at any time act arbitrarily and will always weigh carefully the views of RTD's children in all matters relating to the interests of family members set out in the several trusts he is establishing or has established for their benefit.

8-D.  Consolidation Of Trusts; Trustees' Fees; General Power To Vote Securities.

8-D(1).  Trustees' Power To Consolidate And Manage Certain Trusts As A Single Estate Until Division Becomes Necessary. The trusts being established under this Trust Agreement shall be separate trusts and shall be administered and accounted for as separate trusts; but for convenience, economy and facility of investment, Trustees may hold, manage, and invest the principal and income of two or more of the separate trusts as a single undivided estate until actual division becomes necessary in order to make any distribution permitted hereunder; and the separateness of a trust may for the purposes of this Agreement be reflected by Trustees simply by appropriate entries in its books of account.

8-D(2).  Copies Of Trust Agreement To Beneficiaries Upon Request. The Trustees, upon the request of any beneficiary who is twenty-one years of age or older, or either parent or the legal representative of a minor or incompetent beneficiary, shall give a

51

copy of this Trust Agreement to such adult beneficiary and to the parent or legal representative of any such minor or incompetent beneficiary.

8-D(3). Trustees' Fees. The separate Trustees may pay to themselves reasonable fees for the services which each Trustee performs for the holding, administration, distribution and supervision of assets held in each trust hereunder. In determining such periodic fees, the Trustees shall take into consideration the aggregate value of all trusts and estates administered by the Trustees for the members of the Doermer family and the extent of fees paid to them by other such trusts or estates, as well as fees paid to others for investment or administrative services provided to any trust (as fees chargeable by mutual funds, limited partnership managers, investment advisors, etc.).

8-D(4). Trustees' General Power To Vote Securities. Except as is provided in Paragraphs 8-B, 8-B(1), 8-C and 8-C(1), which authorize RTD's two children to vote certain closely-held interests and require the consent of such children to any sale or other disposition of such interests, the Trustees may exercise voting rights accorded by all voting securities or other interests held in trust. However, if the Trustees are prohibited by any law, regulation, policy or agreement from exercising such voting rights in any respect, then such voting rights, except as given to RTD's children in previous paragraphs of this Agreement, may be exercised by the Trustees' designee.

8-E. Power To Appoint Successor Trustees. There shall be three trusteeships for the trust under this Agreement, and Richard, Kathy, and Bank One shall be the initial trustees of the trust as follows: the First Trusteeship is the position to which Richard is appointed, the Second Trusteeship is the position to which Kathy is appointed, and the Third Trusteeship is the position to which Bank One is appointed.

The following provisions shall apply to the appointment of successor trustees:

1) Richard shall have the power to appoint or provide for any person to serve as a successor individual trustee of the trust in the First Trusteeship; provided that any person appointed to serve hereunder as an individual trustee in the First Trusteeship shall cease to serve as such upon the death of Richard.

2) Kathy shall have the power to appoint or provide for any person to serve as a successor individual trustee of the trust in the Second Trusteeship; provided that any person appointed to serve hereunder as an individual trustee in the Second Trusteeship shall cease to serve as such upon the death of Kathy.

3) If Bank One for any reason fails or ceases to serve as a corporate trustee in the Third Trusteeship, then Richard and Kathy jointly, if both are living, or either Richard or Kathy, if the other of them is not living or is under a legal disability, or if both Richard and Kathy are either not living or are under a legal disability, then the majority of the grandchildren of RTD who have attained twenty-five years of age (but only if there are at least three such grandchildren, at least one of whom shall be a descendant of Richard) shall have the power to appoint or provide for a bank or trust company to serve as a successor

52

corporate trustee of the trust in the Third Trusteeship, provided that the successor bank or trust company shall have power to act as trustee and shall have net worth, guaranties, or financial equivalents that render it capable of fully satisfying a fiduciary liability under this Agreement of at least $100,000,000. RTD requests, as a matter of importance to him, his children and his grandchildren, that any successor bank or trust company appointed under this subparagraph be selected from the list provided below, which presents potential corporate successors in RTD's order of preference:

> a. Northern Trust Corporation, Chicago, IL
> b. Bessemer Trust Company, New York, NY and Chicago, IL
> c. Bank of America, Chicago, IL
> d. Fifth Third Bancorp, Cincinnati, OH
> e. Wells Fargo and Company, San Francisco, CA
> f. National City Corporation, Cleveland, OH

4) The powers granted above in this Paragraph 8-E may be exercised by a written instrument signed and acknowledged by the removing and appointing persons and placed in the files of the Trust. Any such instrument may be revoked or amended both prior to and after the time it becomes effective. Under this power, except as expressly limited above, the person holding such a power may appoint or provide for trustees in the applicable trusteeship throughout the term of the trust to the same extent as if so provided in this Agreement.

5) If, under the preceding provisions of this Paragraph 8-E or otherwise, the situation ever arises in which the trust has no trustee serving or to commence serving in the First Trusteeship, then in that event, and subject to that power granted above and its exercise, the First Trusteeship shall remain vacant.

6) If, under the preceding provisions of this Paragraph 8-E or otherwise, the situation ever arises in which the trust has no trustee serving or to commence serving in the Second Trusteeship, then in that event, and subject to that power granted above and its exercise, the Second Trusteeship shall remain vacant.

7) If, under the preceding provisions of this Paragraph 8-E or otherwise, the situation ever arises in which the trust has no corporate trustee serving or to commence serving in the Third Trusteeship, then in that event, and subject to that power granted above and its exercise, the Corporate Trustee in the Third Trusteeship of the trust shall be appointed in accordance with applicable law, provided that any corporate trustee so appointed in accordance with applicable law shall be a bank or trust company which has power to act as trustee and has net worth, guaranties, or financial equivalents that render it capable of fully satisfying a fiduciary liability under this Agreement of at least $100,000,000.

8) Notwithstanding the preceding provisions of this overall Paragraph 8-E, the following provisions shall apply to the removal and replacement of trustees:

53

a) Richard shall have the power to remove any individual trustee from the First Trusteeship of the trust, with or without cause, and to appoint a successor individual trustee in place of the removed trustee. Such removal shall be effective sixty days after delivery of notice thereof in writing to the trustee being removed and to any other trustee or trustees of the trust.

b) Kathy shall have the power to remove any individual trustee from the Second Trusteeship of the trust, with or without cause, and to appoint a successor individual trustee in place of the removed trustee, effective sixty days after delivery of notice thereof in writing to the trustee being removed and to any other trustee or trustees of the trust.

c) Richard and Kathy, if both are living, or either Richard or Kathy, if the other of them is not living or is under a legal disability, or if both Richard and Kathy are either not living or are under a legal disability, then the majority of the grandchildren of RTD who have attained twenty-five years of age (but only if there are at least three such grandchildren at least one of whom shall be a descendant of Richard) shall have the power to remove any corporate trustee from the Third Trusteeship of the trust, with or without cause, and to appoint a bank or trust company to serve as a successor corporate trustee in place of the removed trustee. Such removal shall be effective sixty days after delivery of notice thereof in writing to the trustee being removed and to any other trustee or trustees of the trust, provided that the successor corporate bank or trust company shall have power to act as trustee and shall have net worth, guaranties, or financial equivalents that render it capable of fully satisfying a fiduciary liability under this Agreement of at least $100,000,000. RTD requests, as a matter of importance to him, his children and his grandchildren, that any successor bank or trust company be selected from the list provided below, which presents potential corporate successors in RTD's order of preference:

1. Northern Trust Corporation, Chicago, IL
2. Bessemer Trust Company, New York, NY and Chicago, IL
3. Bank of America, Chicago, IL
4. Fifth Third Bancorp, Cincinnati, OH
5. Wells Fargo and Company, San Francisco, CA
6. National City Corporation, Cleveland, OH

d) The removal powers granted in this subparagraph 8-E(8) shall be ineffective absent the appointment by the holder or holders of such power of a qualified successor trustee and such successor trustee's acceptance of such trusteeship within sixty days after the notice of removal is delivered as required above. Notwithstanding the foregoing provisions of this paragraph, however, the holder or holders of the power, the trustees being removed, and the successor trustee may agree on an earlier effective date. Notwithstanding the preceding provisions of this paragraph, no power under this paragraph shall be exercised in such a manner that a trustee serving in one trusteeship of the trust under this Agreement shall also serve as a trustee in another trusteeship of the trust.

54

9. In no event and under no circumstances shall RTD ever serve as a trustee of the trust under this Agreement.

10. No change of name of any bank or trust company nor any merger or consolidation of its corporate powers with another bank or trust company nor its conversion to another entity shall affect the right or capacity of any bank or trust company to act under this Agreement.

11. Any of the trustees under this Agreement may resign at any time, with or without cause, effective ninety days after delivery of notice thereof in writing to the other trustees.

12. Any successor trustee hereunder shall have all the title and powers of the trustee succeeded, without the necessity of any conveyance or transfer, and any successor Corporate Trustee may accept without examination or review the accounts rendered and the property delivered by or for a prior corporate trustee without incurring any liability or responsibility for so doing.

13. The Corporate Trustee shall maintain in its files relating to the Trust a financial statement setting forth its assets, liabilities and shareholders' equity as of the last day of December of each year and its income and expense experience for the calendar year then ended, which statements shall be made available to each adult beneficiary of the trust at any time upon request. The Corporate Trustee's annual report to its shareholders will serve this purpose provided the serving Corporate Trustee meets the financial requirements specified in subparagraph 8-E(3).

14. In an effort to be of some counsel to all trust beneficiaries, RTD urges that his two children and his grandchildren exercise extreme caution in any consideration to remove and replace a corporate trustee. Quite typically, if a sense of customer dissatisfaction develops in a banking relationship, it will relate to personality or attitudinal differences which can easily be corrected with open discussion...or with an assignment of new personnel to serve the customers' needs. RTD's advice here is to recognize that changing trustees involves significant administrative effort and many uncertainties. While the successor institutions authorized in Paragraph 8-E(3) above are known well for the quality and reliability of their work in trust administration and asset management, the selection of any one of them should be an action of last resort in seeking to solve a service problem with a predecessor trustee.

15. Those persons who are entitled to exercise a power to remove and to appoint a trustee may do so without liability to any beneficiary hereunder, and they may approve the accounts of and give a full and complete release and discharge to the removed trustee. Such approval, release, and discharge shall have the same effect as a final decree of an appropriate court.

16. Notwithstanding the provisions of Paragraph 8-E above, if a corporate trustee shall for any reason not be qualified or able to act as trustee for any property situated

55

outside of Indiana, then, with the written consent of RTD's two children, or their survivor, an officer or officers of the then acting Corporate Trustee, as said trustee may designate from time to time, shall be authorized to serve as trustee for such property and shall have all of the rights, powers and privileges and be subject to all of the duties and limitations given to and imposed upon the trustee. The trustee(s) so acting shall regularly deliver to the Corporate Trustee all income received from, and all proceeds of the leasing, mortgaging, sale or other disposition of, any of such property, all to be held and administered pursuant to the terms of this Trust Agreement.

8-F.  Disclaimers And Releases By Beneficiaries Are Permitted.  The disclaimer provisions set out in Paragraphs 8-F and 8-F(1) below shall govern the exercise or execution of any disclaimer of any interest or of any power granted to a beneficiary under the terms of this Agreement.

8-F(1).  Each Beneficiary May Disclaim Or Release Any Interest In Any Trust.  A beneficiary may disclaim, in whole or in part, any right, power or interest created for him by or pursuant to the terms of this Agreement by doing so in accordance with the provisions of applicable Indiana law in effect at the date of this Agreement and as from time to time thereafter amended.

8-F(2).  Release Of Rights And Powers By A Donee Or A Holder.  A donee or holder (other than Trustee) of any right or power (including without limitation a power of appointment) given him by the terms of this Agreement may at any time release or reduce that right or power, in whole or in part, by delivering to Corporate Trustee his written release or reduction thereof in any instrument which complies with the applicable provisions of Indiana law.

8-F(3).  Power Of Conservator, Guardian Or Attorney-In-Fact To Disclaim Or Release.  A disclaimer or release of any right or power may be made by the guardian, conservator or attorney-in-fact of any beneficiary, holder or donee who would have the power to make it if he or she were not under legal disability.

8-G.  If The Corporate Trustee Merges Into Or Consolidates With Another Institution, Successor May Serve Without Court Order.  If a Corporate Trustee shall consolidate with or be merged into any other banking association, corporation or trust company which is eligible to become successor Corporate Trustee under Paragraph 8-E above, or if another banking association or corporation or trust company which is eligible to become successor Corporate Trustee under Paragraph 8-B shall acquire all or substantially all of the assets of a serving Corporate Trustee and succeed to a substantial part of its trust business, then such successor bank or trust company shall automatically, without the necessity of any conveyance or transfer of trust property, and without order of any court, become the successor Corporate Trustee under this Agreement, subject to all of the provisions hereof.

8-H.  Further Powers And Provisions Concerning Trust Administration.  The following provisions, while perhaps redundant to others in this Agreement, shall also apply

56

in connection with the administration of each trust hereunder unless expressly herein provided otherwise. In the event of any inadvertent conflict between the provisions below in this Paragraph 8-H and provisions in other paragraphs of this Agreement, or in the event restrictions or limitations are imposed upon specified Trustee powers in other such paragraphs, the provisions of such other paragraphs shall prevail and control.

8-H(1). The Trustees are authorized, subject and subordinate to the terms of other paragraphs of this Agreement but otherwise upon such terms and conditions as they alone may determine.

(a) to execute any instrument or enter into any contract or undertake any other action necessary or advisable in their judgment to exercise any power Trustees have to manage or employ the trust properties in a businesslike manner;

(b) to negotiate instruments by any form of endorsement, and to grant or take licenses;

(c) to continue or terminate or liquidate any business, to form partnerships or corporations with any persons or entities, to subscribe for stock or other securities and to contribute any property to any partnership or corporation for an interest therein;

(d) to abandon or release any cause of action; to pay or satisfy any debt or claim upon evidence deemed by Trustees to be sufficient; to extend the time of payment of any bond, mortgage, or other obligation or of any installment thereof; to hold any such obligation past maturity; to consent to alteration of any terms of any such obligation; and to foreclose any security interest;

(e) to carry any property in the name of a Trustee or in the name of a nominee or to hold it unregistered without thereby increasing or decreasing its liability as a fiduciary;

8-H(2). Trustees may make the term of any real estate lease, pledge, encumbrance or other contractual obligation relating to real estate owned by any trust to extend for a period not to exceed fifteen years.

8-H(3). Each Trustee is empowered to exercise, with respect to property situated outside the State of Indiana, any power granted to Trustees by this Agreement or by the statutory or other laws of the State of Indiana.

8-H(4). Trustees may make and retain joint investments and investments of undivided interests in any property, and, for convenience in administration, Trustees may mingle any or all of the properties of two or more separate trusts hereunder, by holding such properties in one or more consolidated funds in which the separate trusts shall have undivided interests.

8-H(5). Any payment or distribution to any beneficiary may be made by any

57

method appropriate under law, including payment by any Trustee depositing the amount thereof to the credit of the beneficiary in any bank or trust company including the Corporate Trustee.

8-H(6). No Trustee and no agent or employee of a Trustee shall be entitled to reimbursement or indemnification from any beneficiary for any liability or loss incurred by any of them, but their right of reimbursement and indemnification shall be limited to satisfaction out of the trust properties involved.

8-H(7). Trustees shall have the power to make contracts and have dealings with themselves in any other fiduciary capacity, as executor or trustee, or the Corporate Trustee in its corporate banking capacity as a lender, as a seller of mutual funds or other securities, or as a depository of funds, with respect to any estate or trust created by RTD, the intent here being to allow the management of trust assets to be carried on for the best interests of each trust without being subject to rules prohibiting a fiduciary from contracting or dealing with itself as a fiduciary of other assets. Trustees are also authorized, in their absolute discretion, without regard to whether any one of them may also be serving as a personal representative of RTD's estate, to purchase on behalf of the Issue Trust established hereunder any property, real, personal, or mixed, tangible or intangible, wherever situated, belonging to RTD's estate, including partnership interests, and to make loans, secured or unsecured, to the personal representative of RTD's estate and to the trustee of any trust established by RTD, in order to provide funds with which to pay claims, taxes, administration expenses, or other indebtedness of such estate or estates or with which to pay bequests or make distributions to or for the benefit of designated beneficiaries. Any such purchases and loans shall be made upon such terms and conditions as Trustees in their discretion deem appropriate and reasonable.

8-H(8). Trustees shall not be obligated to examine or seek alteration of any accounting for trust assets provided by any executor or administrator or any preceding Trustee, nor shall Trustees be liable for failing to do so, or for any act or omission of any executor or administrator or of any preceding Trustee.

8-H(9). This Agreement need not be recorded or filed in any official governmental records. All persons dealing with Trustees with respect to any trust property, and all other persons relying upon or claiming under any instrument executed by Trustees with respect to any trust property, shall be entitled to rely conclusively upon each Trustee's representations (i) that Trustee has the power to perform any act and to execute any instrument and to consummate any transaction, (ii) that any trust is in full force and effect, and (iii) that any document is executed in accordance with the provisions of this Agreement and is binding upon the owners of beneficial interests hereunder. No person dealing with Trustees shall be obligated to see to the application of any money or other property paid or otherwise transferred to Trustees to determine that the terms of any trust have been complied with, or to inquire into the necessity or advisability of any act undertaken by any Trustee.

8-H(10). All powers of appointment exercisable with respect to any trust property or any interest in any trust shall be wholly governed by Indiana law.

58

8-I.  Life Insurance Interests.  No insured person who is a beneficiary of any trust established hereunder shall have any present beneficial interest whatever during the term of such trust in any insurance policy or contract or in insurance cash or other values or death benefits payable at his or her death; but upon termination of that trust, any insurance proceeds then on hand shall pass and be paid in accordance with the provisions of this Agreement or other governing Agreement, if any.  The term "Insurance" in this paragraph shall include the policy and all incidents of ownership therein and all proceeds and other property derived therefrom.

8-J.  Support Of Dependents.  Nothing in this Agreement and no distribution of income or principal from any trust established hereunder shall be deemed or considered in any way to discharge or relieve RTD or either of his children or any of his grandchildren from any obligation to support any of their respective dependents.

8-K.  Cost Of Living Adjustment Provisions.  Wherever in this Agreement there are distributions payable in specified dollar amounts to any beneficiary, RTD recommends, in order to preserve a sizeable measure of each distribution's intended purchasing power, that such amounts be adjusted upward each calendar year, commencing January 1, 2005 to first affect distributions in the year 2006, in the manner described below.

Specifically, each directed, recommended or requested single payment distribution dollar amount, and each directed, recommended or requested annual base amount distribution, and each other dollar amount stated in this Agreement, whether or not suggested elsewhere herein to be adjusted for inflation in accordance with the terms of this Paragraph 8-K, should preferably, and it is so recommended, commencing with distributions which can be made in the year 2006, be adjusted upward each calendar year (and continuing thereafter as long as this Trust Agreement is in effect) in that percentage over the previous calendar year as shall be equal to eighty percent (80%) of the increase in the cost of living over that of the previous calendar year, except that such cost of living adjustment shall not be made to the $2,000 component figure utilized in the VAS distribution calculation, at line (f), under Paragraph 4-B(2)(a).  Thus, by way of example, if the cost of living were to rise by 5% during 2005 (between December 31, 2004 and December 31, 2005), a $140,000 recommended annual base distribution to RDD and to KDB (to each) during the period prior to the death of RTD, would, for the year 2006, be increased by $5,600 (5% x 80% = 4% x $140,000 = $5,600), lifting the distribution in 2006 to $145,600.  And if the cost of living were to rise by 7% during calendar year 2006, a $145,600 base distribution would, for year 2007, increase by $8,153.60 to $153,753.60 (7% x 80% = 5.6% x $145,600 = $8,153.60 + $145,600 = $153,753.60).  Similar calculations shall be made on an annual basis to increase recommended stated dollar amount annual distributions, whether paid direct to a beneficiary or in trust for a beneficiary.  The provisions of this paragraph are not to be applied to percentage figures in this Agreement but only to figures stated in dollars.

In determining the recommended cost-of-living increase each year, the Trustee is requested to utilize the "Consumer Price Index - U.S. City Average For Urban Wage Earners And Clerical Workers" as published monthly by the U.S. Bureau Of Labor Statistics in the Monthly Labor Review (or a near equivalent index or index number then published by

59

Exhibit B Page 70

said Bureau or any other agency of the United States Government selected by the Trustees), or if the Trustees feel that such index fails to accurately reflect increases in the cost of living for most households, or for the households of the beneficiaries named herein, it is authorized to use any other index it, alone, feels is appropriate. There shall be no downward adjustments in any year made to reflect any decrease in the index used.

The cost-of-living adjustment (COLA) provisions of this Paragraph 8-K also are recommended to be utilized to adjust certain stated dollar amount figures specified in other paragraphs of this Agreement, in addition to annual distribution amounts specified for beneficiaries. Thus, such other amounts subject to COLA adjustments would include but not be limited to the specified minimum shareholders' equity and trust asset amounts required of a Corporate Trustee under Paragraph 8-E, the dollar size of trusts below which the Trustee can terminate a trust under Paragraph 8-C(21), the maximum amount of trust loans to any beneficiary under Paragraphs 8-C(15) and 8-C(15)(a), and the limitations on total annual distributions to RTD's two children under Paragraph 4-H, and such other amounts as shall in the sole judgment of the Corporate Trustee, be within the intent of RTD as among amounts which merit a COLA adjustment hereunder.

## ARTICLE IX

### Particular Limitations On Powers Of Trustees And Others

9-A. Except as expressly otherwise provided in this Agreement, no person, subject to fiduciary obligations hereunder shall have a power enabling such persons to purchase, exchange, or otherwise deal with or dispose of principal or income of any trust for less than an adequate consideration in money or money's worth, nor a power to act hereunder in a non-fiduciary capacity.

## ARTICLE X

### Life Insurance; Ownership And Administration

10-A. During the lifetime of RTD, the Trustees are authorized to retain, convert, procure, and/or to deal in, and to serve as assignee of, insurance policies and/or options to obtain such policies on RTD's life, and/or upon the life or lives of either or both of his two children; and the Trustees shall have full power to deal with any such policies and, for a fair consideration, to assign and transfer them to other parties, except, however, that any child or grandchild of RTD who is a Trustee of a trust which owns or has any interest in a life insurance policy insuring the life of such Trustee cannot participate in the exercise of any incidents of ownership whatsoever relating in any way to any such policy. The Trustees shall cause the proceeds of all such policies to be payable to the Trustees. Notwithstanding any provision, if any, to the contrary in this Agreement, each Trustee is authorized to use the principal of any trust hereunder and to borrow funds from any source, including but not limited to any insurance company, and to pledge policy cash or other values, for the purpose of (a) paying premiums on any policy or policies of insurance owned in whole or part by any

60

trust established hereunder and (b) for the purpose of paying interest and/or principal on loans secured by or relating to policy cash or other values lying in any of such policies.

The Trustees may also apply all or any part of the dividends on such policies to the payment of the premiums on such policies or for the purchase of additional life insurance on the life of RTD, and on either or both of his two children, and/or for the payment of interest and/or principal relating to any loans on any policy values. If the marketable portions of trust principal are insufficient to pay the premiums on such insurance policies, the Trustees shall be under no obligation to pay such premiums and shall not be liable to any extent whatsoever if such premiums are not paid. However, in the event the Trustees are ever unable to pay premiums on any insurance policies held hereunder, the Trustees, after sixty (60) days' written notice to RTD and to RTD's two children advising of the Trust's inability to pay such premiums, shall distribute such insurance policies to either of RTD's two children, notifying the other child and RTD, if living and competent, of such delivery. Notwithstanding the foregoing provisions, the Trustees may at any time surrender all or any of such insurance policies and obtain the cash surrender value thereof or convert any of such policies to paid-up policies, or exercise any other right accorded under any of such policies to the owner thereof.

Upon the death of any person on whom life insurance is owned by any trust created hereunder, the Trustees, if the related insurance policy designates the Trust as beneficiary, shall take all necessary steps to collect the proceeds of such insurance policies. To facilitate the prompt collection of such sums, the Trustees shall furnish the necessary proofs of death to the respective insurance companies and are authorized and empowered to do any and all things which in the discretion of the Trustees are necessary or advisable to collect such proceeds, including, but not limited to the following: to execute and deliver releases, receipts, and all other necessary documents; to compromise or adjust any disputed claim; and to bring suit upon any policy, the payment of which is contested by the insurer, and to pay the expenses of any such suit, including attorneys' fees, from the trust property, provided, always that the Trustees shall be under no obligation or duty to bring suit unless it is advisable to do so in the opinion of the Trustees' counsel and unless the Trustees shall have either adequate funds with which to pay the expenses of such suit or shall have indemnification to each Trustee's satisfaction against any loss, liability, or expenses which may be incurred in bringing such suit.

Upon the collection of the proceeds of any insurance policy held hereunder, the Trustees shall add such proceeds as appropriate to the trust property or properties involved and shall manage and administer the same in the manner provided or authorized elsewhere in this Agreement pertinent to the trust in which such insurance proceeds are held.

ARTICLE XI

Investment Advisors Are Authorized

11-A. Investment advisors or managers beyond those in the Corporate Trustee's employ (an "outside advisor"), with the written consent of RTD's two children or their

61

Exhibit B Page 72

survivor, may be employed by the Trust. Further, the two children acting jointly, or the survivor of them, may direct the Corporate Trustee to utilize the investment management and/or the securities custodial services of an outside advisor or advisors or provider of securities custodial services; and in such event the direction by the children shall be in writing and shall indicate (i) the maximum amount to be subject to the investment management and/or custodial service of such outside advisor(s) and (ii) the terms of the employment of such advisor(s). The Corporate Trustee, upon any such employment, shall be fully relieved of all responsibilities for the management and investment of and the custodial service provided for those particular trust assets placed under the management of an outside advisor or under the control of an outside provider of securities custodial services. All of such outside advisors' reasonable fees shall be payable by the Trustees as an expense of the trust or trusts whose assets are, in whole or part, being managed, invested or controlled by such outside advisor(s).

## ARTICLE XII

### Miscellaneous Provisions, Including Definitions, Applicable Law, Determination Of Incompetence, And Gender Usage

12-A.  Additional Properties May Be Added To Any Trust.  Any person, including RTD, may, at any time and from time to time, add property to any trust estate established hereunder provided such addition and property are acceptable to the Trustees.

12-B.  Definitions Of Terms Used.

12-B(1).  RTD's Children.  When the term (or similar reference) "RTD's children" is used in this Agreement, such term or such similar reference shall refer only to Richard David Doermer and Kathryn D. Callen.

12-B(2).  Grandchildren, Great-Grandchildren, Child, Children, Descendants, And Issue.  The words "child", "children", "grandchild", "grandchildren", "great-grandchildren", "descendants", and "issue" shall include those natural descendants of RTD born both before and after the death of RTD, and shall include a fetus then in the period of gestation and later born alive as if the person were living at the applicable time, provided such fetus has survived and is living one year after its birth; however, none of such seven words (those in quotation marks) shall include any person adopted by either of the two children of RTD even if such adopted person is the natural child of the spouse of one of RTD's children, nor shall such words include the descendants of any such adopted person, nor any person born out of wedlock unless the natural parents of such person are subsequently joined in marriage and have continuously lived together as husband and wife for a period of at least three (3) consecutive years immediately prior to any act, event, or date which would serve to confer upon or deliver any right, benefit, or thing of value to such person under this Agreement. The exclusion from the seven definitions above of persons adopted by either of RTD's two children does not extend to persons who are under the age of 16 when finally adopted by any of RTD's grandchildren and subsequent descendants, all

62

Exhibit B Page 73

of which adopted children, if any, and if under the age of 16 when adopted, shall be included as within the definitions in the same manner as natural descendants of RTD.

The definitions prescribed in this Paragraph 12-B(2) shall apply whenever any of the seven defined terms are used in this Agreement, including but not limited to the various distribution provisions set out in the paragraphs of Article IV hereof.

RTD wishes here to observe that he anguished over his decision to exclude certain adopted persons from those defined in one or more of the seven words in quotation marks set out at the beginning of this Paragraph 12-B(2). It is his feeling, however, that he is providing well for his two children and that such children should be able, in turn, to provide very satisfactorily for those, if any, they may choose to adopt. He is concerned that including children adopted by either of his two children could in some circumstances, materially dilute the benefits intended for his natural grandchildren, for whom he has a very special affection and from whom he has drawn great pleasure.

The Trustees shall be provided with certified copies of any birth or marriage certificate, or divorce decree that they deem desirable to verify the eligibility of any person under this Paragraph 12-B(2), or the Trustees may rely without further investigation on the sworn affidavit of a descendant of RTD as to any fact or circumstance relating to beneficiary eligibility hereunder, until they are notified in writing to the contrary.

12-B(3). Spouse. The word "spouse" of a child or a grandchild of RTD shall mean any individual of the opposite sex, thus not an individual of the same sex, who is both married to such child or grandchild and has been living together in the same household with, as a person legally married under statutory law to, such child or grandchild continuously for at least one hundred and eighty (180) days (i) prior to any distribution to such "spouse" from any trust established hereunder, or (ii) prior to the death of such child, or grandchild, or (iii) prior to any other act or event which would serve to confer upon or deliver any right or thing of value to such person under this Trust Agreement. However, included in such period of 180 continuous days (and therefore qualifying as days living together in the same household) shall be days during which such child, or grandchild or such spouse was temporarily absent for business, medical or other reasons not related or attributed to marital discord, disagreement or failure.

If an individual is not both married to a child or grandchild and living with such child or grandchild in the manner, and for the 180-day period, specified in the paragraph above at the time of any trust distribution, or was not so living at such child's or grandchild's death, such individual, notwithstanding anything to the contrary in this Agreement, shall not be considered a "spouse" and shall not receive any benefits under this Agreement (if otherwise entitled to any) nor possess any powers whatsoever (if otherwise possessing any) under this Agreement.

The Trustees may wholly rely upon the sworn affidavits of any two of the group composed of RTD's children and grandchildren over the age of twenty-one (21) concerning the facts and circumstances described in this Paragraph 12-B(3) to be resolved incident to

63

Exhibit B Page 74

the Trustees' determination that a given person is a "spouse" within the meaning of this paragraph or a child, grandchild, issue or descendant within the meaning of Paragraph 12-B(2) above. The burden in all such events shall not be on the Trustees to establish or assert relevant facts but rather shall be on the proponent(s) to present appropriate facts in a fashion considered acceptable to the Trustees.

The decision of the Trustees with respect to a satisfaction by the spouse of a child or the spouse of a grandchild in meeting or complying with the definitional conditions of the word "spouse" set out immediately above, and with respect to a satisfaction by a child, grandchild, great-grandchild, issue or descendant of RTD in meeting or complying with the definitional conditions of the various terms set out in Paragraph 12-B(2) above, shall be final and binding on all parties.

12-B(4). <u>Emergency</u>. The word "emergency" as used in this Agreement shall mean any event or circumstance relating to a beneficiary's health, support or reasonable financial security which was, in Trustees' sole judgment, not reasonably to be expected and, in Trustees' sole discretion, requires action beyond that contemplated in what the Trustees would normally interpret as RTD's intention or expectation hereunder absent such event or circumstance. The Trustees are requested to interpret and apply the term "emergency" with caution and not to permit undue invasions of trust assets in a way which would threaten the long-term viability of any trust.

12-B(5). <u>Transfer Taxes</u>. The words "transfer taxes" shall mean state and federal gift, estate, and generation skipping taxes due under the Internal Revenue Code and under any state law, as amended, as a result of a transfer of assets under this Agreement.

12-B(6). <u>Trust Estate</u>. The term "trust estate", as used in this Agreement, shall refer to all of the principal and to all of the income (accumulated, accrued, or unpaid) less any applicable expenses and other appropriate reductions of the particular trust involved.

12-B(7). <u>Per Stirpes</u>. Any provision for property to pass to the issue of a designated person per stirpes shall mean that the property shall pass to such person's children then living in equal shares or all to such person's child if only one is then living; and if any child of such person is not then living but has issue then living, the property which would have passed to such deceased child if he or she were then living shall pass instead to his or her issue then living, by their right of representation of such deceased child.

12-B(8). <u>Various Tax Terms</u>. The words "Code" and "Revenue Code" shall mean the Internal Revenue Code of 1986, as amended. Whenever the term (or a similar reference) "Revenue Code," "gross estate," "adjusted gross estate," "pass," "estate tax," "marital deduction," "generation-skipping tax or transfers," "deemed transferor," "direct skip," "taxable termination," "taxable distribution," "S Corporation," "unified credit," or "credit for state death taxes" is used in this Agreement, if any of such terms appears herein, such term or such similar reference shall have the same meaning which such term or such similar reference has under the provisions of the Code which shall be applicable to the

64

Settlor's estate. Whenever the term (or a similar reference) "adjusted gross estate" is used in this Agreement, if used, such term or such similar reference shall have the same meaning which such term or such similar reference is deemed to have under the Code as of this date.

12-B(9). Family Closely-held Asset Defined. A "Family Closely-held Asset, or a "closely-held corporation or partnership" as those or similar terms are used in this Agreement, shall, unless otherwise indicated where used, include any corporation or partnership or limited liability company of or as to which twenty-five percent (25%) or more of its total voting ownership (equity) interests and twenty-five percent (25%) or more of its total non-voting (equity) ownership interests, whether such interests are held directly or indirectly in trust (beneficially), rests, in the aggregate, in, with or among members of the Doermer family, which family is hereby defined to include those persons, trusts and other entities specified in the definitions of "Doermer Family" set out in Paragraph 12-B(12) below. The Trustees in determining such ownership percentage may wholly rely on a written certification (i) of the secretary of the entity involved or (ii) of any child or grandchild of RTD concerning ownership holdings of such entity.

12-B(10). Successor Corporation. The term "successor corporation" as used in this document shall include any corporation which has acquired substantially all of the assets or all of the issued stock of a predecessor corporation whose shareholders have exchanged their stock for stock issued by the successor or acquiring corporation.

12-B(11). Avis Stock. The term "Avis stock" or "Avis securities" as used herein shall not be confined to stock or securities issued by Avis alone, but shall include the stock and other securities and interests issued by any corporation or partnership which is or represents an immediately succeeding entity of Avis or any Avis subsidiary or division, provided thirty percent (30%) or more of the total ownership, both voting and non-voting, of such entity is, in the aggregate, closely held by or for the Leland E. and LaRita Boren family and the Doermer family. The term, therefore, will also extend to securities received as a result of any spin-off of any Avis subsidiary or Avis division to Avis shareholders. The term "Doermer family" shall be those persons and entities determined by the definition set out in Paragraph 12-B(12) below, and the term "Boren family" shall be those persons and entities determined by the same definition but with the name "Boren" substituted for the name "Doermer" and the names "Leland and LaRita Boren" substituted for the phrase "of the Settlor" therein.

12-B(12). Doermer Family. The terms "Doermer Family" and "Doermer family members" as used herein shall mean RTD, his children, grandchildren, and great grandchildren, spouses (as such terms are defined in Paragraphs 12-B(2) and 12-B(3) above) of any such children or grandchildren, (but not including spouses of great grandchildren) and trusts of any kind created by either RTD or by his deceased wife, or by any of such persons for any of such persons. Such term shall also mean and include the estates of such persons and any entity at least 25% of the ownership of which (including at least 25% of the voting power or control) rests in one or more of such persons or in trusts for one or more of such persons. Such term shall also include the Doermer Family Foundation, Inc., Doermer Family Interests, L.P., and any other entity in which Doermer family members own 25% or

65

Exhibit B Page 76

more of the entity's ownership or equity interests. The Trustee may wholly rely on a written certification from any authorized corporate officer or partner of the entity involved as to percentage of ownership from time to time held or owned by any entity referred to in this Paragraph 12-B(12).

12-C.  Simultaneous Death; Presumption Of Certain Survivals.  If RTD and any beneficiary of any trust which is established under this Trust Agreement shall die under circumstances which do not provide sufficient evidence to determine the order of their deaths, then for the purposes of this Trust Agreement it shall be conclusively presumed that RTD predeceased such beneficiary; and each of the trust estates of each of the trusts which are established under this Trust Agreement shall be held, administered, and distributed in accordance with such presumption.

12-D.  Trust Situs.  The original trust situs of the trust created under this Agreement is the State of Indiana, and the trusts shall be construed, governed and regulated by the laws of the State of Indiana.  The Trustees may, however, in their discretion, and in order to better serve the needs of the Trust Agreement and the respective beneficiaries, elect to change the domicile of the trust from Indiana to any other state in which the Corporate Trustee is authorized to serve as a trustee; and, thereafter, such trust shall be construed, governed, and regulated by the laws of the state which becomes the domiciliary state of the trust or trusts created under this Agreement concerning which the Trustees have made such election.

12-E.  Notices.  Any notice, which is required or permitted to be given under the provisions of this Agreement shall be sufficient if such notice is in writing and sent by certified mail to the address last given to the sender by the person to whom such notice is to be sent.  However, any person may change the place to which any such notice is to be sent to such person by notifying the Trustees, in writing and by certified mail.  The initial address of the primary participants identified in this Agreement are as follows:

. Settlor RTD: 1723 Prestwick Lane, Fort Wayne, IN 46814, residence telephone: 260-625-4735 (or 260-427-8184 business);

. The Corporate Trustee: Bank One Trust Company, N.A.
    c/o Manager, Private Client & Trust Services Department
    110 East Wayne Street
    Fort Wayne, IN 46802

. The principal beneficiaries:

- Mrs. Kathryn D. Callen
    1306 Westover Road
    Fort Wayne, IN 46807
    Tel.: 260-456-2610
    Cellular: 260-414-5587

66

Exhibit B Page 77

- Richard D. Doermer
  Apartment 9-A
  1410 North State Parkway
  Chicago, IL 60610
  Tel.: 312-953-9444
  Residence: 312-867-1832
  Cellular: 312-953-9444

- Doermer Family Foundation, Inc.
  c/o Richard T. Doermer
  Post Office Box 2345
  One Summit Square
  Wayne at Calhoun Streets
  Fort Wayne, IN 46801
  Tel.: 260/427-8184

12-F.  Form And Mailing Of Payments.  Any payment, which is to be made hereunder, shall be made in currency of the United States of America or by lawful checks, or lawful automatic deposit into an account specified in writing by the payee.  If made by check, each payment shall be mailed or delivered to the address last given to the payor by or on behalf of the person to whom such payment is to be made.

12-G.  Heirs, Successors And Assigns Are Bound By Trust Terms.  Each of the rights, powers and obligations which are granted or imposed herein are legally binding upon each of the named parties hereto; and between themselves and other persons; and such rights, powers and obligations are binding upon the successors, executors, administrators, personal representatives, heirs, devisees, beneficiaries, assignees and Trustees, as the case may be, of both of the parties.

12-H.  Incompetency, How Determined.  Individuals who have any powers or rights under any of the trusts established hereunder shall be considered not competent by reason of a physical, mental, or emotional disability, and therefore unable to exercise such powers or to assert such rights, if uncontroverted written opinions by two licensed and practicing medical doctors to that effect are provided to the Trustees.  Such opinions shall state the cause of such incompetence and indicate that the inability to exercise such powers or assert such rights has continued for thirty (30) days and is not expected to be relieved for at least an additional ninety (90) continuous days.  After receipt of such opinions, and until the disability terminates (as also determined by the uncontroverted written opinions of two licensed and practicing medical doctors to that effect), the individual shall not be entitled to exercise such powers or assert such rights; and in such event further or future distributions to any such individual shall be governed by the provisions of Paragraph 8-C(20) above.  If a medical opinion is submitted to the Trustees which conflicts with the opinion of such two doctors in the matter, the Trustees shall appoint a third physician who shall then provide the Trustees with his or her opinion concerning the competence of such individual.  The Trustees shall thereafter have the sole and final authority to determine whether such individual is competent within the meaning of the terms of this Paragraph 12-H.

67

Exhibit B Page 78

**12-I.** **Restriction On Powers Granted To Trustees And Others To Preclude An Inclusion Of The Value Of Any Trust Property In The Taxable Estate Of RTD.** Notwithstanding any other provision of this Agreement, each power, discretion or authority herein granted to the Trustees of any trust estate created hereunder, or accorded to the Trustees thereof generally pursuant to law, or granted herein to any individual, shall be exercised and exercisable only in such manner and with such restrictions and limitations as may be necessary in order to prevent the value of the trust estate, in whole or in part, from being includible in RTD's estate.

**12-J.** **Gender And Singular And Plural Usage.** The male gender is occasionally used in this Trust Agreement solely for convenience and shall be deemed to include the female gender when applicable, as shall the female gender be deemed to include the male gender when applicable. The use of pronouns he, she, him, her, it, etc. shall include any other gender appropriate to the context; and they, along with singular and plural forms, are to be interpreted interchangeably. Also the words Trustee and Trustee shall have identical meaning hereunder and are used interchangeably in this Agreement

**12-K.** **Birthdates Of RTD, His Two Children And His Grandchildren.** For the information and convenience of the Trustees, RTD is in this paragraph setting forth his birthdate and the birthdates of his children and grandchildren:

| | |
|---|---|
| Settlor RTD........................ | 12/12/22 |
| Son RDD............................. | 03/01/51 |
| Daughter KDC.................... | 04/08/55 |
| John Michael Callen............ | 02/19/85 |
| Thomas Bradford Callen...... | 07/22/87 |
| Mary McNabb Callen.......... | 05/29/91 |
| Caitlin M. Doerner............. | 07/16/91 |
| Abigail Marie Bergeron...... | 09/22/97 |

**12-L.** **Distributions Of Income Or Principal To Or For The Benefit Of RTD Are Prohibited. Trustees Purchases Of Assets From Or Loans To RTD's Estate, However, Are Permitted.** Neither the income nor principal of any trust established hereunder shall revert to, be distributable to, or otherwise be used or applied in any way for the benefit of RTD. The preceding sentence shall not, however, be interpreted to preclude the Trustees from purchasing, following RTD's death, any assets from RTD's estate, or from lending money to such estate, provided any such purchase or loan is upon fair and reasonable terms, as required under Article XIV below ("Dealings Between The Trust And The Estate Of Richard T. Doerner"), nor shall it be interpreted to preclude ownership by RTD of limited interests in the DFI partnership.

68

ARTICLE XIII

Further Requests Addressed To Beneficiaries And
Further Authorities And Instructions To The
Trustees; RTD's Right To Reacquire Trust
Principal And To Substitute Other Property Of
Equivalent Value; Services Of Phyllis J. Alberts

13-A.  Desired General Equality Of Recommended Distributions To Two Children,
As Feasible, From The Issue Trust; Communication Of Income Tax Character Of Amounts
Distributed In Kind To Distributees.  With respect to each recommended distribution by the
Corporate Trustee to RDD and to KDC from any trust established hereunder, including the
base amount and VAS and other recommended distributions in Paragraphs 4-B(2) and
4-B(2)(a) and (b), RTD, as was set out earlier in this Agreement, requests the Corporate
Trustee, to equalize the aggregate such distributions from such trust to his two children so
that each child, to the extent practicable and as deemed equitable by the Trustee in the light
of each child's needs, medical condition, and general economic circumstances (as
determined solely by the Trustee), will receive, in each distribution, approximately the same
aggregate value.  As respects any discretionary distributions in kind, RTD requests that the
Trustee distribute to each child, if feasible, the same number and dollar value of shares or
other securities of each corporation whose shares are to be distributed, and the same units
and dollar values of other assets to be distributed, as the other child shall receive; and, to the
extent possible, the Trustee shall consider the tax basis or cost of each such distributed asset
so that preferably neither child shall receive any particular tax cost advantage or benefit not
enjoyed by the other.  RTD, however, readily acknowledges that the financial, medical and
educational needs and circumstances of each child may well, at various times, suggest
material differences in discretionary distribution amounts to such children.

The Corporate Trustee and the individual Trustees are also requested, in making all
distributions, particularly following RTD's death, to be mindful of the tax character of
income distributed - whether ordinary income of a current year, ordinary income from a
prior year or years, net long-term capital gain income, tax-free income, tax-free distribution
of principal, etc. - and to advise each distributee of such tax character and, where feasible, to
discuss that tax character with the distributees prior to actual distribution on those occasions
where the distribution amounts would appear to the Trustees as likely to have a material
impact on the distributees income tax liabilities for a given year.  These matters do not lend
themselves to precise expression, but RTD merely wants to alert the Trustees that these tax
effects are important and may properly influence the Trustees in making its various
investment and distribution decisions hereunder.

13-B.  Comments To RTD's Children Concerning Sharing Of Benefits Of Trust
Ownership Of Closely-held Interests.  RTD would urge his two children, especially as
respects the voting of shares of Avis, the Pacific Service Co. interests, the DFI General
Partner Interests, and other closely-held interests (if or when held in any trust created
hereunder), to be sensitive to RTD's desire, repeatedly expressed in this Agreement, that
each child (or its designate) reasonably enjoy essentially the same benefits of trust

69

ownership of shares in various closely-held corporations, or interests in partnerships or other entities, as the other, including such indirect things (aside from dividend income and capital appreciation) as services on the boards of directors or committees of one or more of such companies or any related companies, appropriate employment income and/or service fees properly and fairly earned therefrom, etc.

13-C. <u>RTD's Observations To Trustees Concerning Mix And Quality Of Investments And The Balancing Of Beneficiary Interests</u>. RTD wants the Trustees and the beneficiaries to be very aware of his concerns that the assets of the DFI partnership and of the Issue Trust be managed and invested in such a way as to fulfill, to the extent reasonably possible, his principal objectives set out earlier, including (i) the financial security of the two Doermer children, (ii) the payment of medical care and education expense for such children, RTD's grandchildren, the spouses of the two children and of such grandchildren, and for other descendants of RTD and his deceased wife and (iii) the directed additional funding of the five public charities and the Doermer Family Foundation, Inc. He has recommended cost-of-living adjustments for various beneficiary distributions because of his concern for the effects of inflation on their purchasing power; but he is concerned that such adjustments, absent reasonable earnings and asset value appreciation, could invade trust principal and impair that of his objectives intended eventually to serve the needs of others through a reasonably funded family foundation. The Trustees and the DFI Partnership Manager, therefore, have been given broad investment powers for the particular purpose of achieving returns, in a total return sense (interest, dividends and net capital appreciation), which hopefully will permit the annual distributions recommended and directed herein without material loss in the purchasing power of principal.

While, RTD fully understands and appreciates that the Trustees may have very little power over the management of the DFI partnership, he is most hopeful that the Trustees and DFI's general partners and Partnership Manager will work closely together in the determination of suitable investments for each trust entity. With respect to the investments of each entity, RTD believes that the overall objectives of this Agreement will be best served by the investment of partnership and trust assets, excluding the Family Closely-held Assets described in Paragraph 8-B above and excluding DFI interests held by the Trustees, primarily in a sound mix of common stocks. Since the bulk of Trust assets will initially lie in DFI limited partnership interests, RTD suggests that the Trustees seek to influence DFI's Partnership Manager in such a way as to strongly encourage the investment of Partnership assets in accordance with the views of RTD herein expressed. RTD believes that investment policies reflecting such views and designed largely to realize long-term capital gains, would most likely better serve both the interests of the Doermer Family Foundation, Inc. as the ultimate residuary charitable distributee hereunder and the interests of his two children, grandchildren and other trust beneficiaries.

RTD acknowledges, also, that the long-term character of this Agreement and its provisions for increases in distributions attributable to inflation suggest, and RTD therefore has heretofore in other documents authorized, a level of Partnership investment in growth stocks, all to the extent deemed advisable by the Trustees and the partnership manager in seeking to fulfill RTD's objectives hereunder.

70

Fixed income securities, including convertible debt issues, may also have their place in the Partnership investment picture; but RTD, troubled by concerns over possible inflation and the trend of government spending, is very wary of long-term bonds absent some sort of hedging protection against market value decline, and he therefore believes that the investment emphasis should primarily be on equity securities. He does not, of course, expect the impossible from the Trustees nor from the manager of the DFI Partnership, and he appreciates that it is not feasible, in the light of uncertainties of the future, to specify a fixed income/equities mix or allocation. Depending upon market conditions at any given time, however, RTD tends to feel that a 50% to 70% overall investment in sound equities would likely best serve his long-term objectives, though he recognizes that there may be economic periods during which, or there may be particular beneficiary circumstances which may suggest that, a greater or a lesser investment in common stocks would be more appropriate for a given trust or trusts. These difficult decisions he leaves to the sole judgment of the Trustees, in whom he has great confidence, and the DFI managing partner.

To comment somewhat more on this important subject, it is RTD's general hope that DFI Partnership and Trust assets can be so invested as to generate sufficient annual income and/or market appreciation to meet the various distribution recommendations of this Agreement and still to enjoy a further market value appreciation sufficient to cause the remaining undistributed principal (and retained income) to grow at a rate in excess of the inflation rate. RTD appreciates that these results may not be achievable every year, but he hopes that they may be achievable over reasonable periods of years.

RTD's comments in this Paragraph 13-C are intended only as a very general guide for the Trustees in the exercise of their broad powers hereunder and are (i) subject, of course, to the Trustees' discretionary authorization to retain and to acquire more of certain stocks and interests identified in Paragraph 8-A(1) and (2) and elsewhere (those of Avis, the Pacific Service partnership, Doermer Family Interests, L.P., etc.) and (ii) are subject also to Trustees' obligation under this Agreement to retain various interests unless their sale or other disposition has been approved by the two Doermer children, or their survivor.

In so expressing his general investment views RTD is well aware of the provisions of Article IV above, wherein he has recommended to the Trustees certain distributions to and for the benefit of his two children and others and directed certain distributions to specified charities.

13-D. Further Comments On Trustees' Power To Employ Investment Advisors And To Invest In Mutual Funds. In the light of the particular provisions of Paragraph 13-C above, RTD wishes to re-emphasize the authority conferred earlier in Article XI, namely that the Trustees shall have the right to employ, and may find it desirable to employ, investment advisors or managers for any or all of the trusts established hereunder, in addition to those normally utilized by the Trustees in the providing of trust and investment services. And the Trustees may, when additional other resources than DFI interests become available to any trust, consider it desirable, on behalf of such trust, to invest in mutual funds, including index funds (preferably funds which charge no sales load); and Trustees are hereby authorized to make such investments. In doing so, the Trustees are requested by

71

Exhibit B Page 82

RTD to factor the reduced administrative costs of owning mutual funds and the reduced investment expense to the Trustees of utilizing outside investment advisors into a determination of the Trustees' periodic fees for their services hereunder. The power of RTD's children to direct the Trustees to employ an outside investment advisor or advisors is here restated as set out in Paragraph 11-A.

13-E. RTD's Right To Reacquire Trust Principal And Substitute Other Property Of Equivalent Value. RTD shall have the right, without the consent of any other person, from time to time, to reacquire all or any part of the principal of any trust established under this Agreement by substituting other property of an equivalent value, which right RTD may exercise in a non-fiduciary capacity, within the meaning of Section 675(4)(c) of the Code. Such right may be released and relinquished by RTD at any time. If the amount which is to be paid for, or the value to be assigned to, the reacquired principal, in the exercise of such power, cannot be determined by agreement between the Trustees and RTD, then such amount shall be the fair market value of the principal on the date of the reacquisition, which fair market value shall be determined by a qualified appraiser selected jointly by RTD and Trustees. If the parties cannot agree on a qualified appraiser, they (RTD acting as one party and the Trustees as another) shall each select an appraiser, and the two appraisers shall then determine such fair market value. If such appraisers cannot agree, the Trustees shall request the judge of that Superior Court of Allen County, Indiana which has jurisdiction over trust and probate matters to appoint an appraiser; and the fair market value determined by such appointed appraiser shall then be final and binding on all parties.

13-F. Provisions Of This Trust Agreement Reflect Much Deliberation And Concentrated Effort By RTD And His Wife Prior To Her Death, But Inadvertent Inconsistencies May Appear; The Corporate Trustee Is, Therefore, Authorized To Resolve All Such Inconsistencies, Ambiguities Or Conflicts, If Any, Doing So In The Context And Spirit Of The Agreement Itself As Interpreted Solely By Such Trustee. RTD wishes to indicate that the many provisions of this Agreement have been reviewed and discussed on many occasions by him and his wife Mary Louise Doerner (MLD) prior to her death, and that they had fully agreed and concurred with its terms. It is a product of over eight years of exhaustive joint deliberation and reflection, during which varied approaches to the overall plan were considered, the implications of important family control were assessed (particularly of the Avis stock and other closely-held interests), the needs of area charities were reviewed, and the devastating effects of federal estate, gift, generation skipping, and income tax laws and regulations were painfully learned. A seemingly endless number of drafts and redrafts were undertaken. This version represents, in the light of all circumstances, the best of their thoughts in the interest of everyone affected and hopefully reflects the deep affection they have had and which RTD continues to have for each member of the Doerner family.

This is, however, a long and complex document. Though it has been read, reread, and rewritten many times before this final copy shall have been executed, there may lie within its terms, or between the separate captions or titles to its paragraphs and the provisions of the paragraphs themselves, inadvertent ambiguities or conflicts. If any such conflicts or inadvertent ambiguities are found, the Corporate Trustee is, alone, hereby

72

empowered to resolve them and to reform this Agreement, without order of any court, acting alone and in its sole discretion, doing so in the overall context and spirit of the Agreement itself, as interpreted solely by such Trustee, and in a fashion which such Trustee believes would, in such context, be the desire of RTD and MLD. The Corporate Trustee's authority in this respect shall be absolute, though it may, but is in no way required to, submit the question involved to any appropriate probate court of jurisdiction for guidance or decision. Because of its length and complexity, this Agreement may be summarized by RTD but such summary, along with paragraph titles, should not be used or analyzed as a basis for interpreting or construing any of the provisions hereof which, by inadvertence, may appear ambiguous.

13-G. <u>Allocation Of Expense, Taxes, And Charges Customarily Allocated To GST Tax-exempt Trusts May Be Charged To The Issue Trust</u>. Notwithstanding anything to the contrary in this Agreement, any expenses, taxes, and charges customarily allocated and charged to any trust or portion of a trust created by RTD's wife, Mary Louise, or by RTD which is wholly or partially exempt from generation skipping tax may, in Trustees' discretion, instead be allocated and charged to and paid by the Issue Trust created under this Agreement so long as Trustees make a reasonable and good faith determination that such re-allocation of such expenses, taxes, and charges is appropriate, will not incur a GST tax and is in the overall best interests of Doermer family members. Such trust to which any such expense has been charged shall have no obligation to seek reimbursement for any such expenses, taxes, and charges paid by it, nor shall Trustees be obligated to seek any such reimbursement.

13-H. <u>Services Of Phyllis J. Alberts</u>. RTD invites Trustees' particular attention to the fact that RTD's assistant, Phyllis J. Alberts, currently also an employee of the Bank One Trust or Private Banking Department in Fort Wayne, has been associated with RTD and his family for many years. She has a detailed knowledge of, and in many respects has managed, their somewhat complex financial affairs for over twenty-eight years; and she is well acquainted with the personal circumstances of every family member. She has their complete confidence and their sincere affection. She will be an invaluable resource to both the Trustees and the family in administering, with the assistance of investment, tax, legal and administration counselors, all of the various trust accounts established by RTD and by his deceased wife. He, therefore urges the Trustees to assign Mrs. Alberts to administer on behalf of the Trustees, but with the investment, tax, legal and administration help mentioned, all of the trust accounts established hereunder and established under all other trust and custodial accounts established by RTD and/or by RTD's deceased wife in which the Trustees or any of them are named to serve as Trustee or custodian. When additional compensation to her is appropriate from time to time, the Trustees are authorized and encouraged to pay it and to distribute the cost thereof fairly among the trust and custodial accounts involved, resolving any uncertainties about the amount of such compensation in favor of Mrs. Alberts. If she is not employed by Bank One or its successor at the death of, or at the time of an incapacity of, RTD, the Trustees are urged to employ her on behalf of such accounts, providing her with a compensation which is eminently fair and distributing the cost thereof equitably among the accounts served. RTD would view her total annual compensation, including fringe benefits and bonus amounts, from Bank One and from RTD

73

at the time of the latter's death or incapacity (or as of the last calendar year of her employment by Bank One and by RTD if Mrs. Alberts is not employed by Bank One at the time of RTD's death or incapacity), to be an appropriate and fair guide to the Trustees in fixing Mrs. Alberts' initial compensation (which should be reviewed and reasonably adjusted upward each year) for her services to be rendered hereunder. RTD knows from experience that she will serve skillfully, competently, loyally and in a dedicated fashion, as she has served the family so well for many years. Merely keeping trust short-term assets continually and wisely invested, as she has for RTD for many years, will assure an income stream that will, in his judgment, substantially offset her cost. And the personal interest factor which he assigns to her continued association with his family is beyond a realistic evaluation.

## ARTICLE XIV

### Dealings (Loans, Asset Purchases And Sales, Etc.) Between Trusts Or Between Any Trust And The Estate Of Richard T. Doermer

14-A. One of the several purposes of this Agreement is to provide a potential additional source of liquid funds which, at the discretion of the Trustees, may be available to the estate of RTD to assist such estate in meeting various obligations, including estate taxes, debts, bequests and distributions to beneficiaries of the decedent. Consequently, Trustees shall have the power, in their sole and absolute discretion, utilizing the assets of any of the trusts established under this Agreement, to purchase assets at fair market value from the estate of RTD and/or to make loans to and to obtain loans from such estate on such fair market terms as the Trustees alone deem appropriate. The Trustees are not in any way herein mandated nor directed to take any such actions but may do so if, in their sole judgment, to do so would serve the best interests of the various trust beneficiaries or would assist the Trustees in serving the Doermer family's overall objectives described earlier herein. All such loans shall be made with the provision for adequate interest and, may or may not, in the sole discretion of the Trustees, provide for collateral security.

## ARTICLE XV

### Irrevocability Of Agreement And Of Each Trust Established Hereunder

15-A. This Agreement and each trust established hereunder shall remain irrevocable. RTD, except as provided in Paragraph 13-E above (permitting RTD to reacquire trust assets and substitute other property of equivalent value), shall not have any right or power to revoke, amend, alter, or terminate any such trust, in whole or in part.

74

IN WITNESS WHEREOF, Richard T. Doermer, as Settlor, and Richard D. Doermer, Kathryn D. Callen and Bank One Trust Company, N.A., as Co-Trustees of the Richard David Doermer – Kathryn Doermer Callen Issue Trust have executed this Agreement on the 28th day of July, 2004.

SETTLOR:

                              Richard T. Doermer, Settlor

CO-TRUSTEE:

                              Richard D. Doermer, Co-Trustee

CO-TRUSTEE:

                              Kathryn D. Callen, Co-Trustee

CO-TRUSTEE:

BANK ONE TRUST COMPANY, N.A.

By

                    Leslie H. LaSuer, Co-Trustee
              Its:    Senior Vice President